**U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TEIKA COOKE<br>5707 Linda Lane<br>Temple Hills, MD  20748<br><br>*Plaintiff*,<br><br>v.<br><br>AMERICAN FAMILY LIFE<br>ASSURANCE COMPANY<br>aka AFLAC<br>1932 Wynton Rd<br>Columbus, GA  31999<br><br>Serve Registered Agent:<br>Joey M. Loudermilk<br>at<br>Worldwide headquarters<br>1932 Wynton Rd.<br>Columbus, GA 31999-0001<br><br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action #: _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR NEGLIGENT SUPERVISION AND RETENTION, NEGLIGENT INVESTIGATION, CONSTRUCTIVE FRAUD, AND NEGLIGENT MISREPRESENTATION AGAINST DEFENDANT AFLAC**

The Plaintiff files this complaint against Defendant, and as grounds for her complaint, states as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332 as the parties are diverse and the amount in controversy exceeds $75,000.

2. Venue is properly laid because the brunt of activities complained of herein occurred in this judicial district.

1

## PARTIES HEREIN

3. Plaintiff Teika Cooke was at all relevant times herein employed by the United States Department of Defense as a member of the Pentagon Force Protection Agency (PFPA).

4. Defendant AFLAC is an insurance company with its headquarters located in Columbus, Georgia, and sells various insurance policies.

## STATEMENT OF FACTS

5. In 2005, Plaintiff attended one of many meetings held at the U.S. Pentagon conducted by AFLAC agents Lisa Young and Cassandra "Kim" Aikens (hereinafter "agents") to sell AFLAC insurance policies to PFPA officers.

6. These agents had access to meeting rooms in the Pentagon, had their own parking spaces in the Pentagon, and used the Pentagon premises to sell insurance policies to the Plaintiff and other members of PFPA.

7. As a result of the meeting, the Plaintiff purchased four (4) different types of AFLAC policies including one for disability coverage.

8. As explained to the Plaintiff and to other members of the PFPA, in this meeting and in others, she should buy AFLAC's disability insurance so that in the event that she had an accident, the AFLAC insurance would pay for her lost income.

9. The Plaintiff was also told specifically that the agents would complete the paperwork for her claim and that her obligation was to inform the agents in a timely manner about any accidents that occurred.

10. At all relevant times herein, the Plaintiff already had specific disability insurance coverage courtesy of her employment with the U.S. Department of Defense.

11. From time to time, and in dealing with the AFLAC agents, the Plaintiff was continuously encouraged to submit claim forms in connection with any injuries she had received.

12. Based on information and belief, the Plaintiff was one (1) of approximately three hundred (300) PFPA officers who had purchased and submitted insurance claim forms to AFLAC based on a disability or injury.

13. The AFLAC agents specifically told the Plaintiff, as well as other PFPA officers, that the agents would complete and submit the paperwork to AFLAC headquarters to secure payment of the claim form.

14. Plaintiff received approximately $26,000.00 over a 4 year period as a result of submitting various insurance claim forms, all for legitimate injuries that she had suffered.

15. Unbeknownst to the Plaintiff, agents Young and Aikens would alter claim forms in various material respects to ensure that AFLAC headquarters would process and approve the claim forms and remit checks accordingly to the insureds.

16. As documented in Federal Bureau of Investigation (FBI) 302 statements, the agents' criminal conduct included: altering the doctor's signature, changing the length of the disability period, and generally doing whatever was necessary to ensure that AFLAC Headquarters would process the claims and issue checks to the claimants.

17. The AFLAC agents had repeatedly lied to FBI agents about the nature of their conduct and agent Cassandra "Kim" Aikens eventually pled guilty to lying to the FBI.

18. One of the AFLAC agents, to make sure there was no contradictory evidence available for review by the authorities, would routinely burn original insurance claim forms in her back yard.

19. The income stream generated from selling these insurance policies was the sole income that these two agents received. Hence, the agents were quite dependent on PFPA officers continuing to renew their policies and new PFPA recruits buying new AFLAC insurance policies.
20. The agents' goal was to make sure that AFLAC headquarters would approve any and all claims submitted by PFPA officers and checks would thus be sent out to the various claimants.
21. This was how the AFLAC agents perpetuated their plan and scheme (*i.e.*, selling insurance policies to PFPA officers who did not need said policies, by making sure they received checks to encourage those new young PFPA officers to purchase the identical duplicative insurance.)
22. Under both Maryland and Virginia state insurance regulations such a practice is prohibited (See MD code, Insurance, 27-202 and VA code Ann. 38.2-502)
23. As the AFLAC agents have admitted, not one PFPA officer altered any of the claim forms involved in the agents' scheme.
24. Even though the Plaintiff did not participate, in any manner, in the altering of claim form submissions, she was indicted in the United States District Court for the District of Columbia on January 8, 2010, for allegedly engaging in wire fraud and health care fraud.
25. Eventually, all of those criminal charges were dismissed by the Honorable Rosemary M. Collyer on February 3, 2011.
26. Despite the prosecution's verbal intentions of bringing new charges against the Plaintiff in the District of Columbia Superior Court, such charges were never filed.
27. There are no pending criminal charges against the Plaintiff.

28. As a result of being indicted, the Plaintiff lost her job as a PFPA officer, has suffered financial hardship, and has had her once sterling reputation thoroughly tarnished.

## COUNT I: NEGLIGENT SUPERVISION AND RETENTION

29. The Plaintiff hereby repeats and re alleges paragraphs 1 through 28 as if fully recited herein.

30. Based on information and belief, once these agents were selected, AFLAC made no attempt to monitor their activities in selling insurance policies to the PFPA officers, including its disability policy.

31. Based on information and belief, once these agents were selected, AFLAC made no attempt to monitor the agents' oral representations made to the PFPA officers concerning its disability policy.

32. However, AFLAC did retain control over the conduct of these agents by specifically:

   (a) securing offices and meeting rooms at the Pentagon for them;

   (b) securing parking spaces and other amenities at the Pentagon to facilitate communication with PFPA officers;

   (c) requiring the agents to use only AFLAC claim forms and AFLAC claim procedures;

   (d) retaining final approval on any and all benefits paid to the officers by controlling the claims process;

   (e) using only AFLAC approved promotional materials;

   (f) using only AFLAC approved informational materials;

   (g) requiring the agents to sell only AFLAC approved disability insurance policies to the Plaintiff and other PFPA officers;

5

    (h)    retaining the specific right to inspect any and all business records at any time;

    (i)    requiring the agents to maintain their files in a competent and complete manner;

    (j)    not allowing the agents to change any policy terms; and

    (k)    not allowing AFLAC agents to advertise services of AFLAC or use its name without written AFLAC consent.

33. In addition, AFLAC decided which of their agents would be promoted and which agents had exclusive control over the promotion process.

34. Based on information and belief, Agent Young was promoted to district manager and took over Russell Lassner's position who was promoted further up the AFLAC chain to Regional Coordinator.

35. As detailed in FBI 302 statements, agent Aikens was switched from working for Mr. Lassner, to working for Ms. Young. The hierarchy of the AFLAC system suggests that once promoted to manager or coordinator, agents were no longer independent contractors, but direct AFLAC employees, who only answered to ALFAC headquarters.

36. AFLAC had numerous experiences with its' nationwide agent pool where it had been alerted to the possibility that its agents, for the sake of continuing commissions, engaged in illegal activities.

37. AFLAC failed to adequately supervise agents Young and Aikens, thus allowing the agents to operate their own office on their own terms.

38. AFLAC's only goal in selling these insurance policies was to earn substantial premiums, which it did from the PFPA officers, like the Plaintiff.

39. Based on information and belief, Defendant AFLAC made no attempt to even verify whether or not the insurance disability policy its agents were selling was a disability policy that the PFPA officers could actually benefit from if they were so injured.

40. As the Plaintiff and other PFPA officers eventually learned, they already had comprehensive disability insurance coverage as an automatic employment benefit to new employment with the Defense Department; hence, they were paying substantial insurance premiums to AFLAC for duplicative and questionable insurance coverage.

41. Also, they had no idea that by authorizing the submission of such claim forms, even for legitimate injuries, they were subjecting themselves to potential criminal liability for insurance fraud.

42. These were all police officers, many of whom were veterans, who would not have had any reason to jeopardize their job status by submitting false insurance forms.

43. At no time in the course of submitting these forms, (and the PFPA officers were repeatedly encouraged by the agents to submit these forms), were the PFPA officers informed that there was no insurance coverage for them and that they were paying for duplicative and questionable insurance coverage.

44. Had this been explained to the PFPA officers, like the Plaintiff, or if they had been informed that they were subjecting themselves to criminal liability by simply authorizing the agents to file claims forms on their behalf, they would have never purchased the AFLAC disability insurance policy.

45. But for (a) the agents' conduct, (b) AFLAC's failure to monitor the activities of the agents, (c) AFLAC's promotion of its disability insurance policy and (d) AFLAC'S employment and retention of these agents, the Plaintiff would never have purchased the

duplicative insurance policies and submitted such claim forms. Thus, the Plaintiff would never have exposed herself to criminal liability.

46. Defendant AFLAC owed a duty of full and honest disclosure to the general public and specifically to potential customers like the PFPA officers. Defendant AFLAC breached that duty in failing to inform the Police officers that:

   (a) They were buying duplicative and questionable insurance, and

   (b) Just by authorizing the agents to submit claim forms to AFLAC, even for legitimate injuries, they were exposing themselves to potential criminal liability.

47. Had the Plaintiff been told that she would be subject to criminal liability for filing claims under her disability policy, she never would have purchased the disability policy and authorized the agents to submit these forms, thus avoiding her resulting indictment.

48. Had AFLAC exercised reasonable care, including inspection of business records and original insurance documentation, it would have discovered its agents' criminal behavior and other questionable insurance practices.

49. Had AFLAC been monitoring the activities of agents Young and Aikens on a regular basis, it could have properly considered information that would have precipitated both the termination of the agents and the process whereby claims were being made by the PFPA officers under the alleged disability policy.

50. Because AFLAC did not exercise reasonable care in monitoring the criminal and other activities of its agents, AFLAC continued to retain the agents and thus allowed them to further their criminal conduct, *e.g.*, destroying original insurance documents.

51. AFLAC retained the agents and allowed them to further their criminal activities because it was receiving a substantial amount of premiums from the PFPA for what basically was duplicative insurance coverage.

52. Had AFLAC investigated the activities of its agents in a timely and competent manner, it could have determined that:

    (a) The agents did not re-certify their adherence to AFLAC's Oath of Honesty and Integrity;

    (b) The claim forms under the disability policy were being altered by the agents to secure payments of the claims;

    (c) That PFPA officers were paying premiums for duplicative insurance;

    (d) PFPA officers were exposing themselves to criminal prosecution by simply authorizing the agents to file claims under the disability policy; and

    (e) The agents were destroying original insurance documents.

53. As a result of AFLAC's negligent conduct, the Plaintiff has suffered severe financial injury, including: the loss of her job; the loss of her once sterling reputation; incurring substantial attorney fees to defend herself; and the loss of any employment opportunities in law enforcement.

54. As a result of being unable to secure an alternative position in law enforcement, Plaintiff has lost not less than $200,000.00 to date, and stands to lose approximately $900,000.00 in future salary and benefits because she is unemployable in the law enforcement sector.

55. The Plaintiff has also been accused of engaging in conduct unbecoming an officer and may be subject to the severe punishment of termination from the PFPA.

56. As a direct and proximate result of Defendant AFLAC's negligent supervision and retention of the agents, the Plaintiff has suffered damages in the amount of not less than Two Million Five Hundred Thousand ($2,500,000.00) dollars and severe emotional distress, the amount of which will be determined at trial.

WHEREFORE, the Plaintiff hereby seeks entry of judgment in the amount of not less than Two Million Five Hundred Thousand ($2,500,000.00) dollars against AFLAC and for other relief that this Court deems just and appropriate.

### COUNT II: CONTINUED NEGLIGENT RETENTION OF AGENTS AND NEGLIGENT INVESTIGATION

57. The Plaintiff hereby repeats and re alleges paragraphs 1 through 56 as if fully recited herein.

58. In 2005, PFPA senior officials discussed with AFLAC securing an affordable supplemental disability insurance coverage for PFPA members.

59. AFLAC viewed this opportunity of selling disability insurance to PFPA officers as being quite lucrative.

60. AFLAC pursued this opportunity by:

    (a) Securing meeting rooms at the Pentagon for the agents where PFPA officers could be solicited;

    (b) Furnishing the agents with various promotional and advertising products that could be affixed to the meeting room walls;

    (c) Securing parking spaces and other amenities for the agents at the Pentagon; and

    (d)    Authorizing the agents and contracting with them to offer such a policy to PFPA officers.

61. AFLAC knew that if the agents were allowed to solicit business at the Pentagon, such an arrangement would:

    (a)    Impress upon the PFPA officers that the U.S. Department of Defense was approving AFLAC as an insurance company and the products it offered, including the disability policy it sold;

    (b)    Would facilitate the enrollment of multiple PFPA officers;

    (c)    Ensure maximum sales exposure for the agents; and

    (d)    Enhance AFLAC's cash flow given the large membership of the PFPA and the potential premiums it would receive from PFPA officers' membership pool.

62. AFLAC contracted with the agents to sell insurance policies specifically to PFPA officers—the officers being the specific beneficiaries of such policies.

63. AFLAC knew or should have known in the exercise of due care that the PFPA officers did not need such disability insurance because they had such coverage already by virtue of their employment with the U.S. Department of Defense.

64. AFLAC knew or should have known that its agents were capable of criminal behavior to maintain their new income levels and improved lifestyle.

65. AFLAC knew or should have known that the agents were willing to do anything, including altering claim forms, to maximize the benefits for the PFPA officers.

66. AFLAC knew or should have known that the agents were solely dependent upon revenues generated by selling the insurance to the PFPA officers in order to sustain their new higher income levels and lifestyles.

67. AFLAC knew that the agents would continue to receive commissions and AFLAC would continue to receive premiums only if the PFPA officers were retained by AFLAC and the officers either renewed their policies with AFLAC and/or AFLAC convinced new PFPA officers to sign up for new polices.

68. AFLAC knew that the key to retaining the insurance business of the PFPA was the PFPA officers' satisfaction with the amount of benefits paid out by AFLAC, and the continued retention of agents Aikens and Young.

69. The agents maximized the benefits paid out by AFLAC by altering claim forms and doing whatever was necessary to ensure that the claims were approved.

70. AFLAC knew or should have known that such conduct could eventually lead to the investigation of criminal charges of alleged insurance fraud. Thus, AFLAC had to know that the Plaintiff, as well as other PFPA members, was exposing herself to the filing of criminal charges simply by authorizing the agents to submit claims forms on her behalf.

71. Based on information and belief, AFLAC had experienced a series of incidents involving various allegations of fraud on the part of its insurance agents and policy holders.

72. AFLAC had set up its own investigative in-house unit.

73. The investigative unit had a number of tasks, including detailing the nature of the alleged fraudulent activity, identifying the culpable individuals involved, and, in general, to do whatever was necessary to preserve AFLAC's image as a wholesome and honest business model.

74. AFLAC also initiated a massive public relations effort to bolster its reputation in the insurance industry.

75. AFLAC was embarrassed to learn of the PFPA criminal investigation concerning the sale of approved disability insurance coverage to PFPA members. AFLAC wanted to blame PFPA officers for any criminal wrongdoing to minimize any fall-out with the Pentagon.

76. During the course of its in-house investigation, AFLAC brought in Sharon Bryan-Torsiello as a lead investigator to shift any blame onto the PFPA officers.

77. Ms. Bryan-Torsiello concluded that it was in the best interest of AFLAC if she could steer the focus of the criminal investigation away from the culpable AFLAC agents, and towards PFPA officers who had authorized the agents to file claim forms on their behalf pursuant to their disability policies.

78. AFLAC was concerned with the adverse publicity such an investigation would generate and the reaction from the Pentagon.

79. Investigator Bryan-Torsiello used her best efforts to shift the blame onto PFPA members for the alterations made to the claim forms and totally ignored Plaintiff's attempts to defend herself against the erroneous criminal charges.

80. When the Plaintiff repeatedly tried to call Ms. Bryan-Torsiello, the investigator failed to return the Plaintiff's phone calls.

81. Plaintiff made telephone calls to request copies of her interview with AFLAC and all relevant documentation, and to secure a clarification of the differences between full-time and part-time, and light duty and limited duty work classifications.

82. The Plaintiff needed such information to properly defend herself against any anticipated criminal charges, yet Investigator Bryan-Torsiello failed to respond to the Plaintiffs' many requests.

83. Plaintiff had learned that her job status, *i.e.*, "being on light duty," was a major factor in any potential criminal accusations.

84. Agent Young, in her June 11, 2010, interview with the FBI, had characterized AFLAC's policy concerning "light duty" as being "screwed –up."

85. Agent Young testified that there was nothing in the AFLAC policy book concerning "light duty," but the Plaintiff needed such information to properly defend herself against any anticipated criminal charges because it would enable her to claim that there was inherent confusion about these different job classifications.

86. AFLAC knew or should have known that its' in-house investigator would try to secure the indictment of PFPA officers to cover up the criminal conduct of the AFLAC agents and, in doing so, avoid further embarrassment for the Pentagon.

87. Investigator Bryan-Torsiello was successful in her efforts to protect the AFLAC agents and helped to secure the indictment of the Plaintiff pursuing the interest of her employer, AFLAC, at all relevant times.

88. As a result of AFLAC's retention of agents Young and Aikens, and its negligent investigation, the Plaintiff was never afforded a fair investigation.

89. The indictment of the Plaintiff was also brought about, in part, due to AFLAC's negligent supervision of the agents.

90. As detailed herein (see paragraph 18) the agents would routinely destroy original insurance documents, including some of the Plaintiff's records.

91. As a result, the Plaintiff could not access certain original medical records to prove that she did not alter forms. The alteration of forms was the lynchpin of the indictment.

92. As a direct and foreseeable result of (a) AFLAC retaining agents Young and Aikens; (b) investigator Bryan-Torsiello's conduct; and (c) the destruction of original insurance documents, the Plaintiff was never afforded a fair investigation of the charges made against her.

WHEREFORE, the Plaintiff hereby seeks entry of judgment in the amount of not less than Two Million Five Hundred Thousand ($2,500,000.00) dollars against AFLAC and for other relief that this Court deems just and appropriate.

### COUNT III: CONSTRUCTIVE FRAUD

93. The Plaintiff hereby repeats and re alleges paragraphs 1 through 92 as if fully recited herein.

94. PFPA senior officials in 2005 discussed with AFLAC securing an affordable supplemental disability insurance coverage for its members.

95. AFLAC viewed this opportunity of selling disability insurance to PFPA officers as being quite lucrative.

96. At all relevant times, however, AFLAC knew that PFPA officers did not need supplemental disability coverage.

97. AFLAC knew or should have known by virtue of its due diligence regarding the PFPA client pool, that the officers already had disability insurance coverage courtesy of their employment with the U.S. Department of Defense.

98. AFLAC intentionally failed to disclose to the PFPA officers that were interested in buying its disability insurance policy that they did not need such insurance coverage.

99. AFLAC also intentionally failed to warn the PFPA officers that they could be subject to criminal prosecution by authorizing the agents to file claims under the disability insurance policy even if their injuries were legitimate.

100. In marketing its disability policy, AFLAC had no intention to disclose that the PFPA officers had no need for such coverage, and in fact, were exposing themselves to criminal prosecution by procuring such insurance, and by authorizing the agents to file claims under the policy.

101. AFLAC knew that if it disclosed either of these facts to the officers, the officers would terminate their disability policies and refuse to pay for future premiums.

102. As a result, AFLAC would have lost substantial revenue.

103. The older officers would also have warned the new PFPA officers against buying such insurance coverage—further adversely impacting AFLAC's revenue stream.

104. As a result of AFLAC's intentional failure to disclose the aforementioned material facts, it defrauded the PFPA officers when selling them the disability insurance policy.

105. Plaintiff has been damaged in an amount not less than $2.5 million.
WHEREFORE, the Plaintiff hereby seeks entry of judgment in the amount of not less than Two Million Five Hundred Thousand ($2,500,000.00) dollars against AFLAC and for other relief that this Court deems just and appropriate.

## COUNT IV: NEGLIGENT MISREPRESENTATION

106. The Plaintiff hereby repeats and re alleges paragraphs 1 through 105 as if fully recited herein.

107. In 2005, PFPA senior officials discussed with AFLAC securing an affordable supplemental disability insurance coverage for its PFPA members.

108. AFLAC viewed this opportunity of selling disability insurance to PFPA officers as being quite lucrative.

109. At all relevant times, however, AFLAC knew that PFPA officers did not need such supplemental disability coverage.

110. To secure lucrative premiums, AFLAC intentionally told the PFPA officers interested in buying its disability insurance policy that they did need such insurance coverage.

111. Various PFPA officers, including the Plaintiff, signed up for such coverage.

112. AFLAC knew that in selling the disability insurance policies to the PFPA officers that the officers would likely file claims under the disability insurance policy if they were injured.

113. AFLAC failed to disclose, however, that the officers could be subjecting themselves to criminal prosecution by authorizing the agents to file such claims even though their injuries were legitimate.

114. Indeed, the Plaintiff was injured on a number of occasions and authorized the agents to file claims on her disability insurance policy and was subsequently the subject

of criminal charges for insurance fraud in the U.S. District Court for the District of Columbia.

115. Based on the aforementioned conduct, AFLAC made an affirmative misrepresentation to the PFPA officers, including the Plaintiff, when selling them the disability insurance policy.

116. The misrepresentation was that the PFPA officers did need and would benefit from such insurance coverage.

117. AFLAC also failed to disclose to the PFPA officers that they could be subjected to criminal prosecution for authorizing the agents to file claims under AFLAC's disability policy.

118. Because the plaintiff authorized the agents to file such claims, the Plaintiff was indicted for insurance fraud and has been damaged in an amount not less than $2.5 million.

WHEREFORE, the Plaintiff hereby seeks entry of judgment in the amount of not less than Two Million Five Hundred Thousand ($2,500,000.00) dollars against AFLAC and for other relief that this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

The PLAINTIFF requests trial by Jury.

*/s/ Martin McMahon*

Martin F. McMahon, Esq.
 # 196642
Attorney for the Plaintiff
1150 Connecticut Ave. N.W.
Suite 900
Washington, DC  20036
202-862-4343

Dated**: January 15, 2013**