In The Matter Of:

## *Cooke vs. American Family Life*

---

## *Paul Amoruso, Vol. I*

May 30, 2014

---

## Tiffany Alley Global Reporting & Video

730 Peachtree Street NE

Suite 470

Atlanta, GA 30308

770.343.9696

www.tiffanyalley.com



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

TEIKA COOKE

    Plaintiff

  v.        Civil Action File
            No. 1:13-CV-00060 JDB

AMERICAN FAMILY LIFE

ASSURANCE COMPANY A/K/A

"AFLAC"

    Defendant

Volume I

Deposition of PAUL F. AMORUSO

Washington, DC

Friday, May 30, 2014

9:31 a.m.

Reported by:  Jacquelyn C. Jarboe, RPR

.

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

Page 2

1           Volume 1, deposition of PAUL F. AMORUSO,
2    held at the offices of:
3
4
5           MARTIN F. McMAHON & ASSOCIATES
6           1150 Connecticut Avenue, Northwest
7           Suite 900
8           Washington, DC 20036
9           (202) 862-4343
10
11
12
13
14           Pursuant to notice and agreement, before
15   Jacquelyn C. Jarboe, Registered Professional Reporter
16   and Notary Public in and for the District of Columbia,
17   who officiated in administering the oath to the
18   witness.
19
20
21
22
23
24
25

Page 4

1                  C O N T E N T S
2    EXAMINATION OF PAUL F. AMORUSO                    PAGE
3        By Mr. Spires                                    5
4        By Mr. McMahon                                 169
5        By Mr. Spires                                 172
6
7
8                  E X H I B I T S
9           (Attached to the Transcript)
10   DEFENDANT'S DEPOSITION EXHIBIT                     PAGE
11   #1    Application for Short-Term Disability
12         Insurance                                      6
13   #2    Sickness Claim Form                            9
14   #3    American Family Life Assurance Company
15         of Columbus (AFLAC) Associate's Agreement     13
16   #4    Letter dated 4-5-10 (D 000345 - D 000346)    102
17   #5    Rule 26(b) Expert Statement from Paul
18         Amoruso                                      109
19   #6    Payroll Account Acknowledgment
20         (D 000378 - D 000383)                        115
21
22
23
24
25

Page 3

1                  A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF:
3        MARTIN F. McMAHON, ESQUIRE
4        MARTIN F. McMAHON & ASSOCIATES
5        1150 Connecticut Avenue, Northwest
6        Suite 900
7        Washington, DC 20036
8        (202) 862-4343
9
10   ON BEHALF OF THE DEFENDANT:
11       HARRISON W. SPIRES, ESQUIRE
12       THOMAS CARLOCK, ESQUIRE (Present
13       telephonically)
14       CARLOCK, COPELAND & STAIR, LLP
15       191 Peachtree Street, Northeast
16       Suite 3600
17       Atlanta, Georgia 30303-1740
18       (404) 522-8220
19
20   ALSO PRESENT:
21       MICHAEL J. CYGANEK
22
23
24
25

Page 5

1                P R O C E E D I N G S
2    Whereupon,
3            PAUL F. AMORUSO
4    having been first duly sworn, testified as follows:
5        MR. SPIRES:  This will be the deposition of
6    Paul Amoruso, taken by defendant for all purposes of
7    discovery, cross-examination, and for any other
8    purpose permitted under the Federal Rules of Civil
9    Procedure.  This deposition is being taken by
10   agreement and notice.  We agree to reserve all
11   objections except to form of the question and
12   responsive to the answer until such time as the
13   deposition is used as evidence.
14       Is that okay, Martin?
15       MR. McMAHON:  Yes.
16         (Discussion off record.)
17       MR. SPIRES:  What do you want to do about
18   reading and signing?
19       MR. McMAHON:  Oh, I want him to sign, I
20   mean, to read first.
21       MR. SPIRES:  Okay.
22       MR. McMAHON:  We're not waiving signature.
23       MR. SPIRES:  Okay.
24       EXAMINATION BY COUNSEL FOR THE DEFENDANT
25   BY MR. SPIRES:

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

Page 6

1   Q   Mr. Amoruso, I'm Harrison Spires.  We met
2   beforehand, before the deposition.  I represent AFLAC,
3   as does Tom Carlock, who's on the phone here.
4        I want to start off with just some basics
5   about the AFLAC disability policy that's at issue in
6   this case.  Are you familiar with the policy I'm
7   referring to?
8   A   I've read it.
9   Q   Okay.  Let me show it to you.
10       (Defendant's Deposition Exhibit 1 was marked
11   for identification and was attached to the
12   transcript.)
13   BY MR. SPIRES:
14   Q   It's actually the application and the
15   policy, so turn about three or four pages in.
16       Do you have any criticisms of the policy
17   itself?
18   A   No.  It's a disability policy.
19   Q   Okay.  Are you familiar with whether the
20   policy covers off-the-job or on-the-job injuries?
21   A   It covers both.
22   Q   This policy?
23   A   It does not cover on-the-job injuries, I'm
24   sorry.
25   Q   Okay, it only covers --

Page 7

1   A   Off-the-job injuries.
2   Q   Okay.  Are you familiar with the -- what
3   I'll refer to for the rest of the deposition as the
4   80-percent rule?
5   A   Yes.
6   Q   Okay.  And what's your understanding of the
7   80-percent rule?
8   A   While not clearly stated in the policy but
9   is in the claim form, that you can collect up to
10   80 percent of your salary from your employer and still
11   be entitled to the AFLAC policy benefits.
12   Q   Okay.  What do you mean not clearly stated
13   in the policy?
14   A   I had trouble determining that language in
15   the policy.  I saw it clearer in the claim form where
16   it asked the question if you're collecting more than
17   80 percent.  That was my -- my only place I saw it.
18   Q   Okay.
19   A   I really did not analyze the policy as an
20   insurance contract.  My role was to look at AFLAC's
21   role and responsibility regarding their agents.  I'm
22   not being proffered as a policy expert in this case,
23   and my Rule 26 disclosure makes no assertion that the
24   policy is inadequate.  But I do concentrate on AFLAC's
25   deficiencies in monitoring their agencies and the

Page 8

1   agency's own actions.
2        MR. McMAHON:  Mr. Amoruso, we had an
3   agreement with counsel that, to make sure we don't
4   mislead anybody, we're going to refer to them as
5   representatives, because an agent connotes a certain
6   measure of law.  So for the purposes of this
7   deposition we're not conceding anything, but if you
8   can refer to them as AFLAC representatives.  And I
9   think we should identify the two reps.
10       THE WITNESS:  If I do use the word "agent,"
11   then it would be something I'd have to change later.
12   But after 45 years, the guy that sells is the agent or
13   broker.  So I will try to use the representative
14   concept.
15   BY MR. SPIRES:
16   Q   Okay.  So I take it from your testimony that
17   you're not going to offer any opinions as to the
18   policy itself or language in the policy.
19   A   No.
20   Q   Do you understand when a claim, a disability
21   claim is filed by a policyholder there are four claim
22   forms that are sent in to AFLAC?  Are you familiar
23   with what I'm referring to?
24   A   Just in relation to this issue.
25   Q   Okay.  I'll show you.  This is --

Page 9

1        MR. McMAHON:  And, Harrison, I'll just say
2   these are the claim forms that were in effect during
3   the 2005 to 2009 time period when Teika Cooke was
4   sending in --
5        MR. SPIRES:  Correct.
6        MR. McMAHON:  -- or representatives?
7        MR. SPIRES:  Correct.
8        MR. McMAHON:  Okay, good.
9   BY MR. SPIRES:
10   Q   I'm actually going to show you, I guess I'll
11   call it an example claim form, although this is one of
12   Teika Cooke's claim forms, actually, dated 11-9-06.
13   This is Exhibit 2.
14       (Defendant's Deposition Exhibit 2 was marked
15   for identification and was attached to the
16   transcript.)
17   BY MR. SPIRES:
18   Q   Mr. Amoruso, are you familiar with these
19   claim forms?
20   A   I've seen this one before, yes.
21   Q   Okay.  In general, do you understand the
22   first page here, the sickness claim form, a form
23   that's filled out by the policyholder himself or
24   herself?
25   A   Yes, sir.

Page 10

1    Q   Okay.  And then the second page, physician's
2   disability statement, do you understand this form as a
3   claim form that's filled out by the policyholder's
4   physician?
5    A   Yes, sir.
6    Q   Okay.
7    A   Well, when you say understand, I'm looking
8   at the form.  I have no comment, you know, good or
9   bad.  This is a form that I've seen.
10   Q   I'm talking in general, for a physician's
11  disability statement do you understand, is it your
12  understanding that that is supposed to be filled out
13  by the physician?
14   A   This is a form that a physician would fill
15  out in relation to a sickness disability claim, yes.
16   Q   Okay.  And then the third page, employer
17  disability statement, do you understand that this is
18  filled out by the employer?
19   A   This should be signed by the employer, yes.
20   Q   Filled out by the employer?
21   A   Usually, yes.
22   Q   Okay.  Are there circumstances when the
23  employer doesn't have to fill this out?
24   A   No.  It should be filled out by the
25  employer.

Page 11

1    Q   Okay.  And then I said there is a fourth
2   form which is not included in this, and that's the
3   medical records authorization that's sent in by the
4   policyholder.
5    A   That I've seen, and it's standard, standard
6   language.
7    Q   Okay.  I actually refer to Lisa Young and
8   Kim Aikens as sales associates, but I know that we're
9   going to have different terms.
10       MR. McMAHON:  Well, whatever your preference
11  is, I just want to be consistent.  I told Tom I would
12  stay with representative, although I screw it up
13  sometimes.  But whatever you prefer.  Do you want him
14  to talk about, representatives, sales associates?
15       MR. SPIRES:  Sales associates.
16       THE WITNESS:  Knowing me, I'll probably call
17  them agents, but that's just after too many years of
18  this.  So we'll look at sales, representatives, I
19  don't really care.
20  BY MR. SPIRES:
21   Q   Okay.  Explain to me your understanding of a
22  sales associate's role in regard to selling insurance
23  policies.
24       MR. McMAHON:  That's in general?
25  BY MR. SPIRES:

Page 12

1    Q   In general.
2    A   In general.  Are we talking about selling?
3   Just selling.  A sales associate would make contact
4   with insureds, make contact with groups of
5   individuals, i.e., in this case a group of policemen
6   union, to offer a product to them and say I've got a
7   product that could work for you and be something that
8   you could use in your employee benefits.  It may be a
9   disability policy, an accident policy, a medical
10  policy, and I think you can get some benefit out of
11  it.
12       At that point you'd have to explain what the
13  benefits would be to the individual.  You don't carry
14  policies around with you.  This isn't an automobile
15  policy where I'm going to cover your car.  This is --
16  has got some definition to it.  If you're sick you
17  could get sick benefits when you are ill.  If you fall
18  off a bull when you're in a riding contest this could
19  be a policy that pays you benefits when you are
20  injured.  If you need to maintain your salary, this is
21  the type of policy you might be interested in.
22       MR. McMAHON:  But his question is what does
23  a sales associate do, I think.
24   A   Make representations, contact people, put
25  the people together with the company.

Page 13

1   BY MR. SPIRES:
2    Q   Okay.  And what is your understanding of the
3   sales associate's relationship with the insurance
4   company?
5    A   They're selling the product of the insurance
6   company.  In this case it's AFLAC's policy.  They're
7   distributing what AFLAC's contract says it will do to
8   private people in the street.
9    Q   Do you understand that sales associates are
10  independent contractors?
11   A   Most of them are, yeah.
12   Q   Okay.
13   A   I don't have a problem with that.
14   Q   All right.  Would it be fair to characterize
15  them as entrepreneurs?
16   A   I wouldn't use that word, no.
17   Q   Okay.
18   A   This is not -- I think we go too far when we
19  try to say an entrepreneur business.  They're
20  businesspeople that are running a business.  They are
21  people that bring -- sales associates bring customers
22  off the street to the company to sell the contracts
23  that the company offers.
24       MR. SPIRES:  This is Exhibit 3.
25       (Defendant's Deposition Exhibit 3 was marked

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

Page 14

1 for identification and was attached to the
2 transcript.)
3 BY MR. SPIRES:
4     Q   This is a sales associate's agreement, a
5 contract with AFLAC and -- between AFLAC and a sales
6 associate.  This actually is Lisa Young's.
7         Have you seen this before, sir?
8     **A   Yes.**
9     Q   Have you seen associate's agreements between
10 sales associates and an insurance company outside
11 of --
12        MR. McMAHON:  That's in general?
13 BY MR. SPIRES:
14    Q   In general.
15    **A   In general, I've seen them and written them.**
16    Q   Okay.
17    **A   I've actually orchestrated them.  This is**
18 **pretty -- most of what I saw here was usual**
19 **boilerplate.**
20    Q   Okay.
21    **A   Not a lot different from other agencies.**
22 **I've actually set up my own insurance company's agency**
23 **system, and write -- writing the contract to -- for**
24 **the benefit of the agents, using the term "agents,"**
25 **sales associates, whatever you want to call them, and**

Page 15

1 the company.
2     Q   And you understand the contract, it
3 basically defines a relationship between the insurance
4 company and the sales associate?
5     **A   It -- yes, it does.  It's a contract running**
6 **between the associate and the company explaining what**
7 **the company wants and the responsibilities of the**
8 **agent and the responsibilities of the company.**
9     Q   Okay.
10        MR. McMAHON:  Harrison, I think she signed
11 other agreements with AFLAC.  Can we assume that all
12 the agreements are along the same line?
13        MR. SPIRES:  Yes.
14        MR. McMAHON:  Okay.
15 BY MR. SPIRES:
16     Q   Is there a difference in sales associates,
17 their role or how the relationship is between the
18 sales associate and the company in different insurance
19 industries, for example, property and casualty versus
20 director and officer, when they're selling one type of
21 policy versus another?  Are the sales associates the
22 same across the board in the insurance industry?
23    **A   There are different policies that have**
24 **different agency requirements.  There are some**
25 **policies that require the agency to set up premium**

Page 16

1 collection systems where you're based on the amount of
2 loss, that are based on the amount of premium you pay,
3 how much the claim is going to actually end up costing
4 the policyholder.  So there are different
5 relationships here.
6        But in general, most of the relationships
7 **are a business relationship between a company and an**
8 **agent, sales associate, or however you want to define**
9 **it, conveying the product of the company to someone in**
10 **the street, so to speak.  They're pretty much all the**
11 **same.**
12    Q   Some companies have captive sales
13 associates; is that correct?
14    **A   They have employees, they have captive --**
15        MR. McMAHON:  Excuse me, could you identify
16 that term, "captive"?
17 BY MR. SPIRES:
18    Q   Employees.  I think they're referred in the
19 insurance industry as captive.
20    **A   Well, captive and employees are two**
21 **different things.**
22    Q   Okay.
23    **A   An employee is an employee of the company.**
24 **I worked for a company for 20 years that had employee**
25 **sales staff, Liberty Mutual.  We also have captive**

Page 17

1 agencies in the industry that only sell certain
2 products of the company.  In this agreement you can
3 sell other companies' products, you're not a captive.
4     Q   Okay, and that's what I was getting to next.
5        Do you understand the -- I'll call it the
6 hierarchy in the sales force, the state sales
7 coordinator, the state trainer, the regional sales
8 coordinator, the district coordinator, are you
9 familiar with those terms?
10    **A   Well, from this case I am familiar with**
11 **terms that people are using.  I've not seen everyone's**
12 **job definition and everyone's explanation of what they**
13 **do, so I'm not 100-percent sure what a sales**
14 **coordinator might do.  I'm not even sure what your SIU**
15 **lady did with her title of SIU investigator.**
16        **So each company has different definitions of**
17 **what those persons' jobs are.  There's no real**
18 **industry standard for a state sales coordinator.  That**
19 **could be a marketing rep in some companies, the same**
20 **person does the same job.  So I'm waiting until all**
21 **the depositions are done and all the 30(b)(6)'s are**
22 **explained so that I can get a better handle of that so**
23 **that I personally know.  But I do know there are many**
24 **different titles in the industry that are defined by**
25 **the company.**

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

Page 18

1    Q   Okay.  So do you not have an understanding
2  of, for example, what a state sales coordinator is in
3  this particular case?
4    **A   No.  Again, I haven't seen the deposition of**
5  **that person yet, so I'm waiting to see it.  But I do**
6  **believe I know.  They in 2014 go out and they do some**
7  **field audits or go into the office, and there is some**
8  **relationship between one person, the company, and a**
9  **state -- person that's got a state under their**
10 **auspices.**
11   Q   Okay.  What about --
12     MR. McMAHON:  Maybe, Harrison, you can
13 identify, who was the state supervisor that was
14 involved in the Teika Cooke matter?
15     MR. SPIRES:  I'm just talking right now --
16     MR. McMAHON:  In general?
17     MR. SPIRES:  -- in general, his
18 understanding based on his background of the hierarchy
19 in the sales force.
20   **A   In AFLAC's case each person seems to have**
21 **different definitions of their job responsibility.**
22 **I'm sort of holding that until everything is done and**
23 **I can better understand what they're doing.**
24 BY MR. SPIRES:
25   Q   Okay.  In the insurance industry are you

Page 19

1  familiar with how a sales force hierarchy works?
2    **A   I'm familiar, yes, with their -- if you want**
3  **to compare, for example, Allstate to AFLAC, you have a**
4  **totally different set of terms in different people's**
5  **names and their job titles.  I've also looked at**
6  **Allstate and their sales force staff, what they do.**
7  **There's totally a difference, so I have to concentrate**
8  **only on one thing, what AFLAC is doing.  That's the**
9  **only thing I'm interested in here.  I've done multiple**
10 **companies, investigating what they do, who these**
11 **people are.  But the definitions do move around.**
12   Q   Okay.  With regard to Allstate, you said
13 you're familiar with their sales force hierarchy.  Do
14 you understand that there's a bottom-level individual
15 selling policies, there's someone above them selling
16 policies, and then it sort of goes up the ladder like
17 that?
18   **A   There is a ladder, there is a ladder of**
19 **progression of people from the initial agent, sales**
20 **rep, broker, whatever you want to call them, to the**
21 **president of the company.  In the sales area marketing**
22 **sometimes gets involved and becomes part of the sales**
23 **force to promote the product of the company, to get**
24 **groups, i.e., unions, police unions, to buy your**
25 **product in bulk.  That might not be the ability of one**

Page 20

1  **local salesperson, that might be the state sales**
2  **coordinator that may handle a whole area.**
3    Q   Okay.
4    **A   So there's differences in their**
5  **responsibilities.  The local salesperson usually**
6  **doesn't market to large groups.**
7    Q   Okay.  So you don't know the responsibility
8  of a state sales coordinator or regional sales
9  coordinator?
10   **A   I'm just holding my position on that.  I've**
11 **got an understanding, I think.  But you're still**
12 **taking depositions on this case, and I'm going to go**
13 **forward after I get a better -- seeing everyone's**
14 **definition come out on paper will be helpful.**
15   Q   What is your understanding of the role of a
16 state sales coordinator?
17   **A   They're just the next level over the office**
18 **staff that reports to the company the goings and**
19 **comings of the agency.**
20   Q   The next level over the district coordinator
21 or the regional sales coordinator?
22   **A   When you're talking about district, I**
23 **couldn't you the difference between the two.**
24   Q   Okay.  All right.  So I take it you're just
25 not familiar with the sales force and their roles --

Page 21

1    A   No.
2    Q   -- with regard to AFLAC.
3    **A   I'm looking at AFLAC, and it's still**
4  **developing.  I mean, they're taking depositions of a**
5  **couple of people in the sales staff, and I'll wait**
6  **until I get -- everything is done so I can get an**
7  **understanding of everyone's responsibility and what**
8  **they think their roles are.**
9    Q   Okay.  So sitting here today, you don't have
10 an understanding of the roles of the various
11 positions?
12   **A   Give me a name of someone.**
13   Q   Well, I'm not talking about somebody
14 specific.  I'm talking about the state sales
15 coordinator in any of the 50 states.  Do you know what
16 that individual's role and responsibilities are?
17   **A   No, I've not seen that job description.**
18   Q   Okay.  Same question with regard to the
19 regional sales coordinator.
20   **A   No.**
21   Q   Same question with regard to a district
22 sales coordinator.
23   **A   I've not seen the job description.**
24   Q   Okay.  You understand or you've heard the
25 term "special investigations unit," correct?

Cooke vs. American Family Life        Paul Amoruso, Vol. I        05/30/2014

Page 22

1    A   Yes.

2    Q   Okay.  You said earlier that that was only
3  specific to AFLAC?

4    A   No.

5    Q   Okay.

6    A   SIU units at office level, I started the
7  first SIU unit in Massachusetts for Liberty Mutual
8  back in 1981.  We created investigative teams to go
9  out and look at potential fraud, wrongdoings, claim
10  irresponsibility issues back in the early '80s, and
11  from there they've grown.

12        When I was involved in running and owning a
13  company we created one statewide to -- at the home
14  office level to investigate our agents, to investigate
15  our staff, to investigate anybody that would be
16  involved in any wrongdoing, any act that could be
17  considered wrongdoing.

18    Q   Okay.  Expand on that a little bit.  What is
19  your understanding of the purpose of the special
20  investigations unit in an insurance company?

21        MR. McMAHON:  And that's in general?

22  BY MR. SPIRES:

23    Q   Yes.

24    A   In general, their role is to investigate,
25  bring up the facts as to how they relate to a specific

Page 23

1  set of accusations, statements.  All facts don't have
2  to be facts once you've investigated them.  Someone
3  gives a phone call and says that Susie Q is stealing
4  money from AFLAC because she's submitting claims that
5  are inappropriate, that's the start of an
6  investigation.  As in any criminal investigation, you
7  make no determination at the start.  You go forward
8  and develop facts and look at where they lead you to.

9    Q   Okay, I want to back up.

10        You said, first of all, just in general
11  investigate.  Is that specific to certain areas such
12  as fraud with regard to claim forms, or is it just
13  across the board, anything, any wrongdoing of the
14  company?

15    A   Any -- anything that is inappropriate with
16  an organization should be investigated.  You can't --
17  you can't tunnel it and say we're only going to look
18  at fraud.  SIU units are notorious for developing
19  procedural changes when people -- it may not be fraud.
20  It may just be something that's not working right, it
21  may be something that is being miscommunicated.  So
22  it's not a criminal activity or a civilly wrong
23  activity, it's an area that develops information from
24  investigation.

25    Q   Okay, I'm still not -- don't think I've got

Page 24

1  an answer to my question.

2        With regard to the SIU, is their
3  investigation an investigation as to forgery with
4  regard to policyholders, or does it also entail
5  investigation of anything under the sun that happens
6  at the company or with regard to the company?

7    A   Their normal role is some sort of illicit,
8  incorrect activity is the initial reporting.  From
9  there it can develop into an investigation into fraud,
10  into the fact that it is not fraud.  So it's an
11  investigation based on some sort of statement, claim,
12  accusation.

13    Q   Okay.  Is it your understanding that most if
14  not all states require insurance companies to report
15  fraud, fraudulent claims by policyholders to
16  authorities?

17    A   I couldn't answer that.  It's a legal
18  question that -- give me a state and I'd research it
19  and see if I had the responsibility to do so or not.

20    Q   Okay.

21    A   I don't know.

22    Q   How about Maryland, do you know whether they
23  require, Maryland requires reporting?

24    A   I wouldn't know.

25    Q   Virginia?

Page 25

1    A   I couldn't tell you.

2    Q   Washington, DC?

3    A   I don't know that it is something -- it's
4  not something that I really gave any thought to.

5    Q   Okay.  Do you know whether states require
6  insurance companies to set up special investigations
7  units?

8    A   Many do.

9    Q   Okay.  Would it be fair to say that a
10  special investigations unit's purpose is not to
11  determine whether or not a claim is payable?

12        MR. McMAHON:  I'm sorry, are you asking
13  whether that's one of the functions of an SIU?

14        MR. SPIRES:  Well, let me rephrase it.

15  BY MR. SPIRES:

16    Q   SIU, is one of their responsibilities to
17  determine whether a claim is payable?

18    A   I would not make that as to one of their
19  high points of their investigation.

20    Q   Okay, well, that's not what I'm asking.
21  SIU, is one of their responsibilities to determine
22  whether a specific claim is payable?

23    A   It could be part of their investigation if
24  the facts are -- your question's not something I can
25  really give a yes or no to.  The role of payable or

Cooke vs. American Family Life        Paul Amoruso, Vol. I        05/30/2014

Page 26

1  nonpayable is a claims department function.
2     Q   Okay, so explain to me the difference
3  between a claims department and SIU.
4     A   In usual and customary handling, the claims
5  department receives a notice of claim, investigates
6  it, makes a payment or denial based on the facts that
7  they have developed.  If, in fact, the claims
8  department thinks that there's something wrong with
9  the claim outside of their investigation, they could
10  refer it to the SIU people to investigate.
11        They might further determine that that
12  avenue was not a provable one, so you have no real
13  basis to say no, and you might end up paying the
14  claim.  There's a lot of differences in what an SIU is
15  set up to do.  They're an investigative body to learn
16  facts.  The paying or not paying a claim really isn't
17  their portrait.  But it certainly could become
18  information that the payers, the claims department,
19  could use to pay or not pay a claim.
20     Q   Your referred to the SIU unit earlier,
21  referencing it as a criminal investigation.  Are you
22  saying that an SIU unit is basically a criminal
23  investigations unit?
24     A   No, I'm not.  I'm saying that an SIU unit
25  could determine if it's potentially criminal.  That's

Page 27

1  a job for the authorities in law enforcement, to
2  determine criminal activity.  It could be civilly
3  wrong, it could be contractually wrong, it could be a
4  misrepresentation of facts that make the contract
5  questionable as to whether it's payable.
6        Anything could determine the SIU's course of
7  investigation, depending on what they learn.  I'm not
8  aware of SIU having claims payment authority as a
9  normal day-to-day function, but they certainly have
10  the input to the person that signs the check.  That
11  would have been me.  I'm the highest level that I knew
12  of for years that listened to them.  If I didn't like
13  what the SIU people developed, I might not sign the
14  check.
15     Q   Okay.  You said earlier when the claims
16  department discovers something wrong with the claims
17  notice or the claim form.  What were you referring to,
18  quote, wrong?
19     A   That it's not right.
20     Q   Well, can you elaborate?  Are you talking
21  about a forgery, are you talking about just simply
22  somebody failed to fill out the form completely?  Or
23  what exactly are you telling me?
24     A   All of those.
25     Q   Okay.  So if somebody just happened to not

Page 28

1  fill out a date or put their name in a slot do they
2  automatically kick it up to the SIU unit?
3     A   No.
4     Q   Okay.
5     A   That's the claims payment authority system,
6  is the claim ready to be paid in accordance with the
7  contract's provisions.  That's the claims department's
8  role.  If investigation is needed that is in the area
9  of your SIU unit, you might want to refer it to them.
10  Maybe the claims department can do -- a claims
11  department can do the same investigation as an SIU
12  unit.  They may or may not have the same set of
13  experience levels.  Depends on the people you're
14  telling with.
15     Q   When does the claims department refer it to
16  the special investigations unit?
17     A   That's on the people that are doing the
18  investigation.
19     Q   Okay.  Are you telling me that some claims
20  departments actually investigate fraudulent claim
21  forms?
22     A   I did.
23     Q   Okay.
24     A   I set up more than six separate SIU units.
25  I'm a claims guy, I never considered myself an SIU

Page 29

1  person.  I would investigate it, I referred criminal
2  activity to state and local police people.  So it's
3  pretty much based on your experience and what you can
4  do and what your investigation leads.
5     Q   Okay.
6     A   Where it leads.
7     Q   I still don't think you're answering my
8  question.  Are you telling me that the claims
9  department itself will investigate a fraudulent claim
10  from a policyholder?
11     A   It certainly happens all the time.
12     Q   Okay.
13        MR. McMAHON:  I think what he's saying is
14  that's not the only thing the claims department
15  focuses on.
16     A   No, that's a part of their investigation.
17  They're more than capable in usual circumstances of
18  investigating a claim that has fraud connotations, and
19  then they can take whatever action they think
20  necessary.  But that's -- their role is to pay claims
21  under the contract.  That's what a claims department
22  is set up for.  You make a claim, you investigate it,
23  you pay it or you don't pay it.
24        SIU units have only been around since --
25  companies had them going back about 25, 30 years,

Page 30

1  maybe more than that.  But offices got them in the mid
2  '80s or early '80s, I know that.  And it just became
3  another focused arm of an investigation, not something
4  that you would want to base your payment or denial
5  system on.  That's not what they were set up for.
6  Half of the people I hired were ex-police officers or
7  part-time police officers.  So I wouldn't want them to
8  do day-to-day claims work.  But they certainly could
9  investigate from a criminal side, from something
10  that's not right side.
11  BY MR. SPIRES:
12      Q   When you say "they," are you saying the
13  claims department?
14      A   People -- no, people in SIU.
15      Q   Okay.
16      A   You need a definition between the two that
17  really -- in some companies a regular claims guy is
18  the SIU of the company.  He's got a lot of experience,
19  he knows what he's doing, he investigates the claim
20  for fraud, for forgery, for agent activity,
21  malfeasance, or you refer it to SIU.  I mean, it's six
22  of one, half a dozen of another, depending on the
23  people that you're dealing with here.
24      Q   Okay, maybe I'm not clear on what you're
25  saying here.  Why don't you just give me an

Page 31

1  explanation of the difference between SIU and the
2  claims department.
3      A   A very clear definition is claims
4  departments pay claims.  SIU people as a usual and
5  customary rule do not pay or deny claims, they develop
6  facts.  So, from that basic definition between the
7  two, can they have overlapping functions, yes.
8      Q   Okay.
9      A   Many.
10      Q   Can you tell me what kind of facts they're
11  developing, why they're developing facts, SIU?
12      A   Fraud, forgery, malfeasance of someone
13  outside of the claims system, someone who is not
14  submitting the claim but is outside of the system.
15  SIU should be able to pick that up.  That's their --
16  that's their all-encompassing role.
17          Claims people look at somewhat of a tunneled
18  vision of, yes, you should pay this claim or you
19  should deny this claim, this disability happened
20  during this period, the medical records say that it
21  happened.  All right, one, two, three, write the
22  check.
23          SIU might look at it and look at Teika
24  Cooke's signature and say, holy mackerel, lady, I see
25  four claims forms and three different signatures,

Page 32

1  something's wrong here.  I talk to people, I do
2  things.  SIU, once you've got them involved, they
3  should be open in their investigation to all
4  possibilities.
5      Q   Okay.  When a claim comes to SIU, for
6  example, a potentially fraudulent claim comes to SIU,
7  what is SIU's role with regard to investigating that
8  potential forgery?
9      A   There is no defined role.  They have to
10  investigate each claim individually and look at it.
11  What do we have here.  They could go as far as an
12  all-encompassing underwriting involvement.  Now, in
13  the insurance world you've got underwriters outside of
14  the claim staff, but underwriters are information
15  gatherers.
16          So SIU may look and say, wait a minute, I've
17  got 40 or 50 or 100 policemen here and we're looking
18  at a -- these people are submitting a lot of claims.
19  But there's another problem.  I'm looking at the
20  benefits that this person was getting, they should not
21  have been able to collect on these claims because
22  they're already getting paid by the Federal
23  Government.
24          So there's a problem here in letting -- in
25  defining what they should do or what they should not

Page 33

1  do.  You're fact gathering.  And SIU can encompass it.
2  They're really less interested in paying the claim
3  than developing facts surrounding what the accusations
4  were, are they provable, are they not provable.
5      Q   Okay, and when you say are they provable or
6  not provable, does the SIU develop the facts to
7  present to the authorities to go and look to see
8  whether the individual was actually -- or what
9  individual is responsible for the forgeries, or is the
10  SIU responsible for actually figuring out who is
11  responsible for the forgeries?
12      A   SIU will reach a point where it's best
13  turned over to the criminal investigation bodies we
14  have in this country.  They're not police people per
15  se.  I may have used police people, state cops, or
16  whatever you have, but I don't want them to become
17  state cops, I want them to be my investigators to turn
18  it over to people who will then prosecute through the
19  district attorney's office.
20      Q   Okay.  Before I get into your opinions that
21  are written in your expert statement, I want to
22  just -- sitting here today, I want you to give me a
23  list of your criticisms of AFLAC.  And I want to
24  separate it into two different columns.
25          I understand you are criticizing Lisa Young

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

Page 34

1  and Kim Aikens and their role in this whole scenario,
2  and I also understand you are criticizing the SIU
3  investigator and her role in this scenario.
4        Is there anybody else, individual that you
5  are criticizing?
6     A  I'd prefer not to use the word
7  "criticizing."
8     Q  Okay.
9     A  I'd prefer to say that I looked at it and I
10  formed an opinion on their actions.
11     Q  Okay.  Is there anybody else, any other
12  individual who you've formed an opinion about their
13  actions in this scenario?
14     A  If you gave me a question as to what they
15  did and if they did things right or wrong, I'd be
16  better able to answer that.
17     Q  My question was simply is there any other
18  individual --
19     A  Well, AFLAC's a big company.
20     Q  Okay.
21     A  Could I criticize the president of the
22  company who comes out and says that, you know, our
23  promise is to our people and we want to do things
24  fairly and squarely for everybody and then doesn't
25  have any sort of system to check and see if your

Page 35

1  agents are doing things the way they should, I would
2  say that was wrong.  I mean, I have ideas of what
3  people did wrong and I've stated them in my 26(b)
4  report.
5     Q  Okay.
6     A  And I might even amend that as things
7  continue.
8     Q  Let me stop you.  My question was not could
9  you form an opinion about someone or criticize someone
10  else.  Have you criticized or formed an opinion about
11  any other individual associated with AFLAC outside of
12  the AFLAC investigator Shara Bryan or Lisa Young and
13  Kim Aikens?
14     A  At this point I'm still developing my final
15  opinions.
16     Q  At this point have you?
17     A  I haven't done -- I haven't gone farther
18  than my 26(b) report.
19     Q  Okay.  So if the name is not in the 26(b)
20  report, it's safe to say you haven't formed an opinion
21  about anybody else?
22     A  Well, I'm not process of forming some
23  opinion, as -- there are depositions that are being
24  taken daily on this case, and I may form an opinion on
25  them as it's coming in.

Page 36

1     Q  Okay.  My question is have you, sitting here
2  right now, formed an opinion or criticized anybody's
3  actions outside of Shara Bryan or Lisa Young and Kim
4  Aikens?
5     A  Sure.
6     Q  Okay.  Who?
7     A  Cooke.
8     Q  Okay.
9     A  The supervisor.  I don't think he --
10        MR. McMAHON:  Wait a minute, did you say
11  Cooke?
12        THE WITNESS:  I said Cooke, but it's Kapps.
13        MR. McMAHON:  Kapps.
14     A  He didn't properly supervise her.
15  BY MR. SPIRES:
16     Q  Wait, who didn't properly supervise who?
17     A  Kapps didn't properly supervise his
18  investigator, the SIU.  I'm going to call her
19  Torsiello, is that how you're pronouncing her name?
20     Q  We can call her Shara.
21     A  Shara.  I don't think he properly supervised
22  her.  I can say that my 26(b) report should stand the
23  way it is.  I mean, I may develop more information or
24  opinions on people as things develop, but things are
25  still developing.  If coordinators go to an office and

Page 37

1  don't investigate things that I think are appropriate,
2  I may change that.  I'm not ready to give you a final,
3  because you haven't reached the final point yet.
4     Q  Well, have you developed opinions sitting
5  here today that are final?
6     A  Not that I'm willing to put in paper.
7     Q  Well, you've put them in paper right here in
8  the 26(b) report.
9     A  Right.  And I'll amend it, if necessary.
10     Q  I'm asking you --
11     A  I'm not ready to amend it yet.
12     Q  Will you listen to my question.
13     A  I am.
14     Q  Okay.  Sitting here today --
15     A  You're asking me for the future, and I can't
16  do that.
17     Q  Have I asked you for the future once?  I'm
18  sitting here asking you right now, at this moment --
19  it's, what, 10:00 o'clock.
20     A  Go ahead, I'm just getting some water.
21     Q  Have you formed an opinion about anybody
22  outside of Mr. Kapps, Shara, Lisa Young, or Kim
23  Aikens?
24     A  I haven't formed any other opinions other
25  than those people.

Cooke vs. American Family Life  Paul Amoruso, Vol. I  05/30/2014

Page 38

1 Q  Okay.  Back to my two columns, I'm going to
2 put Lisa Young and Kim Aikens in one column and I'm
3 going to put Kapps and Shara in another column.
4 Starting with Lisa and Kim, give me a list of your
5 opinions as to their actions.
6 **A  All right.**
7 MR. McMAHON:  Can we break it down that we
8 have Kim first and then --
9 BY MR. SPIRES:
10 Q  We can break it down, yes.  We'll start with
11 Kim Aikens.
12 **A  We'll start with the salesperson, then the**
13 **supervisor?**
14 MR. McMAHON:  Yes.
15 **A  Okay.  We had -- by her own admission, she**
16 **altered documents.**
17 BY MR. SPIRES:
18 Q  You're saying Kim Aikens?
19 **A  Yes.**
20 Q  Okay.  And you referred to her as the
21 salesperson?
22 **A  She is -- I'm going to call her the agent,**
23 **as far as I can, my purpose in this, the AFLAC**
24 **representative.  She altered documents.**
25 Q  Okay.  What documents?

Page 39

1 **A  The claims forms.**
2 Q  Okay.  Whose claim forms?
3 **A  Teika Cooke's claim forms.**
4 Q  Okay.  Do you know which ones?
5 **A  On her admission to the FBI, she admitted to**
6 **altering documents.**
7 Q  Did she admit to altering Ms. Cooke's
8 documents?
9 **A  She admitted to altering documents.**
10 Q  Okay, so the answer to my question is no?
11 **A  I believe she did.**
12 Q  Okay.  So you believe that Kim Aikens
13 admitted to the FBI to altering Teika Cooke's
14 documents?
15 **A  Yes.**
16 Q  Okay.  Do you know what she altered?
17 **A  Claims forms.**
18 Q  Okay, what portion of the claim form?  You
19 can pull up Exhibit 2, which is the example claim
20 forms I gave you.
21 MR. McMAHON:  I'd just like to state for the
22 record, Harrison, that I don't think there was a
23 proffer as to which specific documents she altered
24 when she accepted the plea agreement.  So I think
25 that's why he's at a loss to specify the documents.

Page 40

1 **A  I am.  I don't see the one I'm looking at.**
2 **There was a claim form in here, whether or not she was**
3 **receiving 80 percent of her salary or whether it was**
4 **an on-the-job injury.  There are claims forms in here**
5 **that I don't see.**
6 BY MR. SPIRES:
7 Q  I'm going to get to the specific claim forms
8 and we can address those at that time.
9 **A  Good.**
10 Q  But I'm asking if you're talking -- which
11 portion of the claim form Kim Aikens, or your
12 understanding, that Kim Aikens altered?
13 **A  The ones that she was charged with by the**
14 **FBI for doing.**
15 Q  Which ones are those?
16 **A  I leave that to the FBI.  She pleaded guilty**
17 **to that.  That's bad enough.  I don't think**
18 **specifically they mentioned any one, but she did plead**
19 **guilty to that.**
20 Q  Okay.  You don't know if there was --
21 **A  Your investigator terminated them for --**
22 **that was one of the reasons they were terminated for,**
23 **for altering documents.  I'll leave it to -- I haven't**
24 **seen everything yet, and I'm sure it's going to come**
25 **out.  But your people terminated them for -- that's**

Page 41

1 **part of their termination problem that they had when**
2 **they lost their job.  So that was a pretty strong**
3 **assertion of -- AFLAC was satisfied that they did**
4 **something wrong.**
5 Q  So you don't know sitting here today which
6 portion Kim Aikens admitted to altering?
7 **A  I didn't go farther than the admissions.**
8 Q  Okay.  Did you read the 302 statements?
9 **A  Did I read who?**
10 Q  Did you read the 302 statements?
11 **A  Yes.  The FBI statement.**
12 Q  The FBI statement or 302.
13 MR. SPIRES:  Is there something different,
14 Martin?
15 **THE WITNESS:  No.**
16 BY MR. SPIRES:
17 Q  Okay.
18 **A  That's why -- I just want to make sure we're**
19 **talking about the right form.  We're very specific on**
20 **forms today.**
21 Q  Okay.  And you can't tell me from the 302
22 statements what Kim Aikens admitted to altering, which
23 portion --
24 **A  It was a half-inch thick piece of material,**
25 **pages of material.  And she admitted to it.  I didn't**

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

Page 42

1  go farther than that.
2      Q   Okay.  So no?
3      A   I didn't go farther than that.  I couldn't
4  tell you which form -- the FBI read it, but I don't
5  remember which one.
6      Q   Okay.  Or which portion?
7      A   Is it important?
8      Q   Or which portion?
9      A   I couldn't go farther than -- there was,
10 there was information in there specifically that the
11 FBI agent asked her did you lie to me when you first
12 said that you did not change.  And yes, she admitted
13 to that, I lied, I did change this.  I don't remember
14 which one.
15     Q   Okay.  All right.  You don't think that part
16 is important?
17     A   The lying?  I think that's very important.
18     Q   The portion or -- whose claim form or which
19 portion of the claim form Kim Aikens admitted to
20 altering.
21     A   It could be important.  I'm not giving it
22 any less or more value than the fact that the FBI got
23 her to say, yeah, I did lie to you when you asked me
24 if I changed any documents, I did.  And they were
25 specific documents they were talking about.  I really

Page 43

1  wasn't looking at which one they were talking about.
2      Q   Okay.
3      A   This was a woman who altered documents of an
4  unsuspecting claimant who brought forms to her, and
5  for her own ulterior motive she changed them so they
6  wouldn't cancel their policies or admit that the
7  policies they sold them were relatively worthless.
8      Q   Okay.  But you don't know which form she
9  altered.
10     A   I did not -- I don't remember it at the
11 time.
12         MR. McMAHON:  That's been asked and answered
13 a couple times.
14         MR. SPIRES:  Okay, and I just haven't gotten
15 an answer.
16     A   I thought I said I don't remember the
17 specific proffer that was in the FBI's report.
18 BY MR. SPIRES:
19     Q   Okay.
20     A   It's there.
21     Q   All right.  You said criticism of Kim Aikens
22 altering claim forms.  Anything else?
23     A   Wasn't properly trained.
24     Q   Okay.  Is that a criticism of her?
25     A   Yes.

Page 44

1      Q   Okay.
2      A   She took a job she was doing and she was not
3  trained to do it right, and she attempted to do it.
4  The easy answer is I don't know how to do it.
5      Q   I actually want to get the full list and
6  we'll come back and address each one.
7          Anything else with Kim Aikens?
8      A   Other than what's in my 26(b) report, no.
9      Q   Okay.  How about Lisa Young?
10     A   Young?
11     Q   Yes.
12     A   She burned documents, destroyed originals,
13 sold policies that really should not have paid
14 benefits to the policies' recipients, encouraging
15 people to file claims.  Let's see.  Failed to train
16 the associate and supervisor that was working for her.
17     Q   Who was that?
18     A   That was Aiken.  Oh we're talking about
19 Young, right?
20     Q   Right.
21     A   Right.
22     Q   You're saying failed to train --
23     A   Train and supervise Aiken.
24         Other than what I've said before in my
25 report, I don't have any comments at the moment.

Page 45

1      Q   How about Shara?
2      A   Shara?
3      Q   Yes.
4      A   The SIU lady.  It's probably the most -- the
5  worst SIU investigation I've ever read.
6      Q   Okay, let's go through the criticisms.
7      A   She did not think it was necessary to talk
8  to the other agents.
9      Q   Who are you referring to as other agents?
10     A   The other police officers, the other 96 who
11 submitted claims during this period of time.  She
12 focused strictly on Teika Young's opinion --
13         MR. McMAHON:  Teika Cooke.
14     A   Teika Cooke, I'm sorry, Teika's opinion that
15 she did not alter these claims forms, instead of
16 having -- instead of looking at the forms and saying,
17 wait a minute, maybe that's not her signature.  She
18 believed that Teika Cooke was guilty of something
19 without properly investigating it.
20 BY MR. SPIRES:
21     Q   All right, well, going through the --
22     A   I'm not giving them in any order, I'm just
23 randomly hitting --
24     Q   All right, well --
25     A   A question like that is broad, and in all

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

Page 46

1  fairness it requires concentration and specific
2  relation to a very large file.  So --
3      Q   Well, let's concentrate and look at --
4      A   Okay, right now I'm looking at the
5  investigator.
6      Q   Okay, right, we're looking at the document.
7      A   And she had -- she just did a very slipshod
8  investigation.  She poorly interviewed people, she
9  didn't ask enough questions, she didn't talk to the --
10  call them the sales associates.
11      Q   Are you talking about Lisa and Kim?
12      A   Yes.  She didn't learn actually what the
13  benefits were available to the police force people.
14  She didn't understand the 80-percent rule.  Her
15  investigation was just -- and everything that she did
16  other than starting day one, I'd probably criticize
17  from that point forward.
18      Q   All right, here's what I've got so far.
19  One, didn't talk to other -- the other 96 police
20  officers.
21      A   That submitted claims.
22          MR. McMAHON:  That should be 98, according
23  to --
24      A   Well, I'm just taking these two way away,
25  I'm taking -- that's right, no, it would be 97,

Page 47

1  because I took Teika away.  So 97 police officers.
2  BY MR. SPIRES:
3      Q   All right.  One, didn't talk to the other 97
4  police officers; two, poorly interviewed people;
5  three, didn't talk to Lisa and Kim; four, didn't learn
6  the benefits available to the police officers; five,
7  didn't understand the 80-percent rule.  Is there
8  anything else?
9      A   I don't think she focused on whether or not
10  a police officer could collect benefits twice.
11      Q   What do you mean by that?
12      A   Well, how can they collect an AFLAC benefit
13  if they're already getting it from their employer?
14      Q   Explain --
15      A   In dealing with the Federal Government, you
16  have to ask the question, is it legal.
17      Q   All right.  Is that it?
18      A   That's all I can think of at the moment.  I
19  might think of more.
20      Q   How about with Bill Kapps?
21      A   Kapps seemed to be an experienced
22  investigator who did not properly supervise Torisello
23  or -- what's her name again?
24      Q   Shara.
25      A   Shara.  I just have the name Torisello in my

Page 48

1  mind, and that's not even her real name.
2      Q   It's difficult to pronounce and spell.
3      A   He did not supervise her.  In his final
4  report he almost admitted in a shame fashion that, you
5  know, there were things that she did that were just
6  not -- she wasn't trained.  He didn't train her.  He
7  probably had a lot of experience, but I don't think he
8  paid any attention to really what she was doing.  So I
9  criticize him as the supervisor for that.
10      Q   Is that it?
11      A   That's all I can think of at the moment.
12      Q   All right, I'm going to run through these
13  individually.  Let's start with Shara.  You said
14  didn't talk to the other 97 police officers.
15      A   Right.
16      Q   Tell me what you're referring to as the
17  other 97 police officers.
18      A   There were 98 people that submitted claims
19  under this policy out of, I don't know, a couple of
20  hundred.  It would have been a good idea to look at
21  other people and at least look at their records and
22  see what developed in their records to see if they
23  were submitting claims.
24      Q   Okay.
25      A   It's an investigation.  Talking to them

Page 49

1  would have been good.  She's an investigator from
2  AFLAC, so she has some rights in this, too, to look at
3  all of the Capitol police that were submitting claims.
4  Her investigation could have gone in a much different
5  direction with proper -- proper question asking.
6      Q   Why don't I start with this.  What is your
7  understanding, and just give me it basically as a
8  story, of how Teika Cooke's claims went from the
9  claims department to Shara, what particular claim form
10  was at issue, who in the claims department referred it
11  up to Shara, what that person did in terms of calling
12  and investigating Ms. Cooke's claim forms.  Can you
13  just give me a rundown of your understanding?
14          MR. McMAHON:  And before you answer that, I
15  think you're asking for his opinion or information he
16  has about how AFLAC, the investigator specifically,
17  was alerted to potential irregularities in your claim
18  forms.  But that's sort of in AFLAC's province, isn't
19  it.
20          MR. SPIRES:  I'm not asking for his opinion,
21  I'm asking for the facts on which he's basing his
22  opinions.  And the facts of how Ms. Cooke's claim
23  forms came to Shara I think are very important.  If he
24  just doesn't understand or has no idea on how they got
25  to Shara, then that's another issue.

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

Page 50

1        MR. McMAHON:  Well, I think you can testify
2   if you have knowledge about how claims department
3   sends up a Teika Cooke file or some portion thereof to
4   Shara.
5        MR. SPIRES:  That's not my question.  That's
6   not my question.
7      A   In this particular case --
8        MR. McMAHON:  Wait a minute, that's not his
9   question.
10  BY MR. SPIRES:
11     Q   Go ahead.
12     A   In this particular case, Shara's supervisor
13  referred the claim to her.  Other than that, I don't
14  know where it came from.
15     Q   Okay.  Shara's supervisor, being Bill Kapps?
16     A   No, there was another woman's name mentioned
17  in her deposition.  She said -- she used the term
18  "supervisor," but she didn't know why or how, she just
19  got a referral from a woman.
20     Q   Do you know why it was referred to Shara?
21     A   No, I don't.
22     Q   Okay.
23     A   I don't.  It's not in something that I've
24  developed yet.  I may learn.  Again, there's more
25  depositions and more information coming, but I don't

Page 51

1   know why it -- who made the call, who did what and saw
2   what, I don't know that yet.
3      Q   So at this point, after writing this 26(b)
4   statement, you have no idea why Shara got Ms. Cooke's
5   claims?
6      A   I don't consider that important at all.
7      Q   Okay.
8      A   It happened, didn't it?  You have to admit
9   that it happened, that Shara started investigating
10  her.  That's the point where I start to look at what
11  she did.
12     Q   Okay.
13     A   And what happened from that point?  From
14  that point you saw a slipshod investigation which
15  basically said Teika Cooke is guilty.  But your
16  investigation failed to turn up facts which eventually
17  proved that she was innocent.  Your investigation did
18  not end the problem for Teika Cooke; that she was
19  eventually indicted.  So someone may have dropped a
20  dime to the FBI and called her.  I don't know how that
21  happened, either.  But the FBI got involved.  Then
22  what happened?  The indictment occurred and it was
23  dropped, because facts were developed that the AFLAC
24  employees were the culpable parties in this.
25         Those were the simple facts that I

Page 52

1   concentrated on when I made my report and found out
2   what was going on.  I don't think -- I think those are
3   all definite facts.
4      Q   All right, I'm going to get to some of the
5   things you just said, but I want to go back to the
6   line of questioning where I was.
7         Wouldn't it be important to know what Shara
8   was investigating before you can actually criticize
9   her investigation?
10     A   No.
11     Q   Okay.
12     A   Not for a second.
13     Q   All right.
14        MR. McMAHON:  Well, you know, Harrison, he
15  knows that she was investigating Teika Cooke and
16  irregularities in the forms.
17        MR. SPIRES:  Martin, that's the question I'm
18  asking.
19     A   No, it's not.  No, that's not how I
20  interpreted it.  I interpreted it, you want to know
21  who dropped the dime and what was the basis of someone
22  saying she did something wrong.  I don't care or know
23  anything about that.  I do know when Shara's
24  investigation started she was investigating that this
25  woman was collecting money when she shouldn't have

Page 53

1   been collecting it.  She wasn't entitled to it.  That
2   was what her investigation centered on.  At the end of
3   her investigation she said she owes us $27,000 plus
4   back.  Okay, that's what I concentrated on.
5   BY MR. SPIRES:
6      Q   But you don't know why Shara was referred
7   Ms. Cooke's claim file by the claims department?
8      A   Maybe I'm missing something.  Was it
9   referred by the claims department?  I didn't see that.
10     Q   Okay.
11     A   Can you tell me that that -- that would be
12  helpful to me to know.
13     Q   All right.  So you don't know where the file
14  was referred from?
15     A   Not at this time.
16     Q   All right.  And you don't know why it was
17  referred?
18     A   Not at this time.  Well, I do know that
19  someone said there were some irregularities going on.
20     Q   Okay.
21     A   I don't know how, or who the person was, or
22  what happened.
23     Q   Do you know what those irregularities were?
24     A   No.
25     Q   Okay.

Page 54

1     A   I do know that she was collecting benefits
2  when she shouldn't have.  But your file is so poorly
3  posted that you can't tell.
4     Q   Okay.  Why would it have been important for
5  Shara to interview the other 97 police officers who
6  filed claims?
7     A   Well, let's see.  You've got one police
8  officer who's collecting benefits, are there other
9  police officers collecting benefits, too?  This is a
10  group, they all have the same policy, they all do the
11  same job.  They're pretty much focused in one area,
12  they're all Washington, DC, police officers.  It
13  wasn't hard to determine that there was 98 people that
14  submitted claims.  Good SIU investigation would look
15  at this specific area and find out what was going on.
16     Q   All right.  So are you telling me that the
17  standard requires the SIU department to investigate
18  every claim file in a group if one policyholder in
19  that group files a fraudulent claim?
20     A   No, I am not telling you that.
21     Q   All right.
22     A   I'm telling you that that's good
23  investigation in this claim.
24     Q   Okay.
25     A   I would have.  All my investigators -- when

Page 55

1  I teach SIU classes to people, and I do that, and I
2  will be doing it next week, that will be part of my
3  class, not to pitch and hold your investigation into
4  some dead end.  Be open-minded, be broad.  This has
5  got nothing to do with paying or denying claims.  Not
6  a claims function.  You're investigating.  And they
7  needed to investigate.  And that certainly seems
8  reasonable to me.
9     Q   Okay.  If the SIU's investigating a forged
10  signature in one policyholder's claim form, why is it
11  important to talk to every policyholder within that
12  group?
13     A   Well, let's see.  Her answer was I didn't
14  forge my signature, that's not my signature, I didn't
15  do it.  So there is no -- there's no book, the A plus
16  B equals C or one plus one equals two.  There's an
17  investigation, open-minded.  When you're doing an
18  investigation you have to look at all the
19  possibilities that are in front of you.
20         Teika Cooke said I didn't do it, I did not
21  do anything wrong, I didn't submit these claims with
22  the intent of trying to collect extra money which I
23  wasn't entitled to.  As far as I knew, I was entitled
24  to collect this money.  Wait a minute, if Teika Cooke
25  is saying that, there's no basis to believe that she's

Page 56

1  outright lying.  Well, maybe there is, but it's not
2  posted in your file that I disbelieve Teika Cooke
3  because A, B, and C is there, so therefore it's not
4  true.
5         There is no facts present in your file to
6  determine that this was a straight line investigation,
7  we're going to go from A to B to C.  Everything that I
8  have talked about today was good claims judgment, good
9  claims reasoning.  This would be something that an
10  experienced -- or an investigator with at least over
11  the basics of applying for the job should know.
12     Q   Okay.  Well, tell me this, what does the
13  standard of care in the insurance industry require
14  Shara to do immediately -- strike that.
15         What does the standard of care in the
16  insurance industry, what would it require Shara to do
17  once she received Ms. Cooke's file?
18     A   Determine the facts.
19     Q   Okay, give me step by step.
20     A   Well, each case is different.
21     Q   Okay, well, I'm talking about this case.
22     A   So in this case right here, in this case she
23  would interview Teika Cooke.
24     Q   Okay, we start with she should have
25  interviewed Teika Cooke.

Page 57

1     A   Right.
2     Q   Okay.
3     A   She should have followed the claims process
4  from how the claim was submitted so that she
5  understood things like the 80-percent rule, which she
6  said she didn't.  She should have learned what the
7  organization was that was submitting -- Teika Cooke
8  was part of a group of policemen.  I'm not sure she
9  functioned on that until well after her initial
10  investigation.
11     Q   All right.
12     A   So without knowing who dropped the dime and
13  who said what was going wrong, she went down and she
14  said, all right, Teika Cooke says she didn't do it,
15  she's not responsible, this is not her -- she didn't
16  do anything wrong, she was told to submit these
17  things.  Why didn't she talk to the two sales
18  representatives involved in this?  I have no idea.
19  She said that it wasn't part of something she was
20  supposed to do.  She -- when asked why didn't you just
21  talk to the other policemen, it wasn't something I was
22  supposed to do, which is all wrong in an investigation
23  to learn the facts.
24     Q   All right.
25     A   I don't know what each -- I don't know the

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

Page 58

1  answer to every single question, because I can only
2  ask them.  And she should have gone further than talk
3  to Teika Cooke and just say, all right, end of the
4  line, she owes us $27,000.  These are claims she
5  submitted.
6       I don't think she even understood that she
7  shouldn't have been allowed to collect them under the
8  Washington, DC, police officers benefit policies.
9  That never came out.  It's just that she couldn't
10  collect the AFLAC policy.  Well, how is that true?
11  How did she determine that?  Your file is so poorly
12  posted that an experienced reviewer like me could not
13  find it.
14       Q   Couldn't find what?
15       A   That she had reasons for doing what she did.
16       Q   Okay.
17       A   It's not there, when Teika Cooke called her
18  or didn't call her.  Teika Cooke says I called her.
19  There's no reference to phone conversations, she
20  called, I chose not to answer.  That's perfectly
21  legitimate at times, you know, you don't have to
22  answer every call.  But you post it and give a reason.
23  The documentation is so lacking that it just leads to
24  more questions.
25       Q   Do you know whether Shara and Teika Cooke

Page 59

1  ever spoke?
2       A   Yes, I think they spoke once.
3       Q   Okay.  Do you know anything about that
4  conversation?
5       A   I thought it was a recorded statement.  I
6  kept looking for the results of the transcribed
7  statement and I don't see it.
8       Q   You haven't read the statement?
9       A   No, no.
10       Q   Okay.  So you're criticizing Shara for the
11  interview that you haven't read?
12       A   No, I'm criticizing her -- I haven't
13  criticized her for the interview that I haven't read,
14  I'm criticizing her for things that she didn't do.
15       Q   But you just told me that Shara should have
16  called and discussed whatever you've said in your
17  testimony with Teika Cooke.
18       A   She should have called the two salespeople
19  and discussed the allegations that she asked -- that
20  she asked Teika Cooke in her statement.  She asked her
21  basic questions, and those questions led to the need
22  to ask other questions, especially of the agent and
23  her supervisor.  Did she -- she said that she was told
24  she could collect these benefits.  That's a fair
25  thing, Teika Cooke says that in her deposition.  So

Page 60

1  the next question is did the agents tell her that.  I
2  don't see where that is there, because she didn't need
3  to speak to them.
4       Q   Okay, let me back up.
5       You just gave a couple examples.  You said
6  that Shara asked Teika Cooke just basic questions.
7  How do you know that without --
8       A   Just looking at Teika Cooke's deposition.
9       Q   That's not -- let me finish my question.
10       A   I looked for the questions that --
11       Q   Let me finish my question.
12       A   Oh, I'm sorry.
13       Q   How do you know what kind of questions Shara
14  asked Teika Cooke if you haven't read the transcript?
15       A   I read Teika Cooke's --
16       MR. McMAHON:  Transcript of what?
17  BY MR. SPIRES:
18       Q   Of the statement Teika Cooke gave Shara.
19       A   Have you produced that?
20       Q   We have.
21       A   I read Teika Cooke's deposition.
22       Q   All right.  And you testified the standard
23  of care required Shara to interview Lisa and Kim; is
24  that correct?
25       A   In this case that would have been a

Page 61

1  necessity.
2       Q   Do you know whether Shara interviewed them?
3       A   She said she didn't in her statement.
4       Q   Does it change your opinion about, or would
5  it change your opinion about Shara's investigation if
6  she interviewed Kim and Lisa Young?
7       A   Shara could have interviewed them later, but
8  up to the time she submitted her first report in 2009
9  I don't think that she had interviewed them.
10       And what I'm basing that on is there seemed
11  to be some sort of snowball effect here.  After the
12  interview with Teika Cooke after the SIU
13  investigation, the FBI becomes involved, or initially
14  they were involved, but indictments were brought down.
15  I think that a competent investigator would have
16  interviewed them much earlier.  She might have talked
17  to them later, but I don't see anything past her
18  investigation middle September, middle of 2010.  But
19  the indictment came down later.  And facts were known
20  at that point that might have helped Teika Cooke avoid
21  all of this problem in her life that AFLAC could have
22  changed.
23       Now, facts came out later.  The FBI
24  investigation, it took them a little while and they
25  had to dig.  There were a couple of interviews,

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

Page 62

1  because the employees were lying, and they turned up
2  facts.  And what happened?  The indictment was
3  dropped.  But she was indicted, she went through a
4  long period in her life where she was in trouble.  She
5  lost her job.
6          So these were things that AFLAC could have
7  developed much earlier in their investigation when
8  they took on the role of investigating it.  At the end
9  of the SIU investigation report, she owes us 27,000
10  bucks.
11      Q   You don't know whether Shara talked to Kim
12  and Lisa, do you?
13      A   Just what her deposition said, she didn't
14  think she needed it.
15      Q   Okay.
16          MR. McMAHON:  I'll state for the record that
17  Mr. Kapps' deposition transcript is not yet available,
18  but he did testify that there was one call with the
19  agents, and the investigator was present but asked no
20  questions.  That's what I know of the record as of
21  right now.  But he hasn't read that transcript, Kapps'
22  transcript.
23          MR. SPIRES:  Okay.
24  BY MR. SPIRES:
25      Q   Do you know when Teika Cooke was indicted?

Page 63

1      A   I don't know the date, no.
2      Q   Okay.
3      A   It was after the --
4          MR. McMAHON:  I think it was June of 2010.
5      A   Yeah, I don't have any -- I take what was
6  given to me.
7  BY MR. SPIRES:
8      Q   Okay.  Do you know when her indictment was
9  dismissed?
10      A   Later.  No, I don't.  I didn't pay attention
11  to the date.
12      Q   Okay.
13      A   I know that it was grand jury involvement, I
14  do know that she was indicted, and she went through a
15  period of time when she wasn't allowed to work.  And
16  then she was -- I did not concentrate on that damage
17  area, I'll leave that to others to do that.  But I do
18  know that she was and it was withdrawn.  Why?  Because
19  the facts were wrong.
20      Q   Okay.  Do you know why it was dismissed?
21          MR. McMAHON:  Well, he said because the
22  facts were wrong, but --
23          MR. SPIRES:  Well, Martin, let him --
24      A   The facts -- she was indicted and the facts
25  were -- for whatever reason the attorneys, the

Page 64

1  district attorney decided to drop the indictment.  I
2  wasn't in their mindset.  But they were wrong facts.
3  Teika Cooke did not fraudulently do things to meet the
4  definition that she could have been indicted,
5  continued to have been indicted for.
6  BY MR. SPIRES:
7      Q   So you don't know why the indictment was
8  dropped?
9      A   I can just say that it was dropped, it was
10  dropped.
11      Q   Okay, but you don't know why?
12      A   No.  Not important to me.
13      Q   Okay.  And when it was dropped is not
14  important to you?
15      A   It was dropped later, later on.  I mean, she
16  went through six, eight months.  There was a period of
17  time when she did not have her job.
18      Q   Do you know about any interviews or
19  conversation that Shara had with federal
20  investigators?
21      A   Just referring to her deposition, she didn't
22  even know that there was a federal investigation at
23  the time she was doing her investigation.  Her name
24  appears on one of the -- the FBI report, I believe.
25  And I'm not sure if because they referred to her

Page 65

1  investigation or that she talked to them.  But it was
2  after the fact that she concluded her investigation
3  with AFLAC.
4      Q   Okay.  Do you know when she concluded her
5  investigation?
6      A   The specific date, it was in early 2010.
7  She started it in, I think, November-December and it
8  was completed, I know, February, April, March.
9      Q   How do you know that?
10      A   I'm just trying to remember the date.  I'm
11  looking at -- I read through the thing maybe
12  yesterday, I tried to remember the date, but I
13  don't -- I don't remember right now.
14      Q   You said that Shara poorly interviewed
15  people.  Who are you referring to?
16      A   Teika Cooke.
17      Q   Okay, you haven't read her -- the transcript
18  of that statement.
19      A   I read Teika Cooke's transcript of what she
20  said she asked her and her conclusions.
21      Q   Okay, let me -- for the record, let me
22  clarify what you're testifying.  You're saying you
23  read Teika Cooke's deposition transcript in this case,
24  and from that you derived that Shara's interview of
25  Teika Cooke was poorly done?

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

Page 66

1   A   That and also Shara's -- a summary of her
2   deposition. I haven't read her deposition yet.
3      Q   Her, being Shara?
4      A   Shara's yes.
5      Q   Okay. Based on the summary probably drafted
6   by the attorney in this office?
7      A   Right now, yeah. There were pretty obvious
8   questions, did you interview the employee, did you
9   interview the agents? No, I didn't see a need. Did
10  you interview any of the other participants in the
11  plan? No, I didn't see a need.
12      MR. McMAHON: You're referring to the police
13  officers?
14      THE WITNESS: Police officers, yes.
15  BY MR. SPIRES:
16      Q   Okay.
17      A   So, I mean, I will have more availability to
18  make a more detailed decision, but I just felt it was
19  not done well.
20      Q   Do you know who Shara interviewed throughout
21  her investigation?
22      A   Teika Cooke.
23      Q   That's all?
24      A   She made a phone call to a doctor's office,
25  I think she called the supervisor.

Page 67

1      Q   The supervisor, do you know that person's
2   name?
3      A   No.
4      Q   Supervisor --
5      A   Of Teika Cooke.
6      Q   Okay.
7      MR. McMAHON: At the time it was Sergeant
8   Robinson, I believe.
9      A   Robinson, all right, the guy who -- they had
10  to -- in order for the form to go forward, his
11  signature had to be there.
12  BY MR. SPIRES:
13      Q   Okay.
14      A   And she made a phone call to him.
15      Q   Do you know what that phone call was about?
16      A   I don't remember at this moment.
17      Q   Not important?
18      A   No, it's probably important, but I just
19  don't remember, when you asked me that question. I
20  don't know why.
21      Q   You have no idea why, sitting here today,
22  why Shara called Trevor Robinson?
23      A   Well, no, it's something you would want to
24  do. Sure, you'd call him, but you'd go into a lot of
25  detail. You would use him as a stepping stone

Page 68

1   potentially to find out what the benefits were for the
2   police officers, what other police officers were
3   getting benefits, is there some sort of pattern here.
4   He's an inside person, supposedly uninvolved, so he's
5   a good person to get information from. And she said
6   she really wasn't interested in those things. It
7   wasn't part of her investigation, is how she said it.
8   She didn't say she wasn't interested, she just said it
9   wasn't part of her investigation to determine whether
10  or not police officers could collect AFLAC disability
11  payments when they were getting 100 percent of their
12  pay from the Federal Government. She never learned
13  that they were getting 100 percent of their pay from
14  the government.
15      Officer Robinson would have been a good
16  source to find out what's going on. She didn't know.
17  If she didn't know. She said she didn't.
18      Q   Do you know what Shara and Trevor Robinson
19  talked about?
20      A   Just what was in the deposition summary that
21  I read. No.
22      Q   What was that?
23      A   I may get more of an opinion when I read her
24  deposition. But I do know that she --
25      Q   What is your understanding sitting here

Page 69

1   today of what Shara and Trevor Robinson talked about?
2      A   All right, I know what she didn't ask.
3      Q   How do you know what she didn't ask?
4      A   Because she said she wasn't interested and
5   did not know. She didn't know what the 80-percent
6   rule was.
7      Q   And is your understanding, what you're
8   telling me right now, is that derived solely from the
9   summary of Shara's deposition that you read?
10      A   So far, yeah.
11      Q   Okay. And I take it that summary was a week
12  ago that you read it.
13      A   Yeah.
14      Q   Way after you typed up this expert report?
15      A   Didn't change my mind.
16      Q   Okay. So at the time you typed up this
17  expert report, you had no idea about Trevor and
18  Shara's conversation or what was discussed?
19      A   Just what Teika Cooke had said.
20      Q   Okay. And you also had no idea why -- and
21  sitting here today you still don't -- no idea why
22  Shara was referred Teika Cooke's file?
23      A   I don't know that.
24      Q   Okay.
25      A   Can you tell me?

Cooke vs. American Family Life        Paul Amoruso, Vol. I        05/30/2014

Page 70

1    Q   Let's keep going.
2        All right.  You said that you know of Shara
3  interviewing Teika Cooke and Trevor Robinson, you
4  don't know the substance of those conversations except
5  for what's written in a deposition summary by your
6  attorney, or the attorney who hired you; is that
7  correct?
8        MR. McMAHON:  He also testified that he read
9  Teika Cooke's deposition.
10   **A   I read Teika Cooke's deposition.**
11  BY MR. SPIRES:
12   Q   Okay.
13   **A   So while facts may change, I may come up**
14  **with another opinion, and I said that I could.  But**
15  **facts are developing in this case.  Nothing has**
16  **happened to change my opinion.  Could it happen?**
17  **Anything's possible.  But I don't see it changing yet.**
18  **    I do know the important facts in my mind,**
19  **that Teika was indicted, that Teika Cooke went**
20  **through mental anguish and lost her job, that Teika**
21  **Cooke was rehired, her indictment was dropped, and**
22  **she's now free.**
23   Q   But you don't know why her indictment was
24  dropped; is that correct?
25   **A   Her indictment was dropped.  AFLAC could**

Page 71

1  **have had it dropped a long time ago, before she was**
2  **indicted.  They could have come up with the facts of**
3  **this case based on their investigation.**
4   Q   Are you telling me --
5   **A   They could have supervised their agents**
6  **better so that they were not changing documents, were**
7  **not burning them in your backyard, were selling**
8  **policies that people could actually legitimately**
9  **collect and use.**
10   Q   All right.  Outside of Ms. Cooke and
11  Sergeant Robinson, do you know if Shara talked to
12  anybody else?
13   **A   At this moment I don't remember.**
14   Q   Okay.  So when you criticize Shara saying
15  she poorly interviewed people, you're referring to her
16  interviews with Teika Cooke and Sergeant Robinson?
17   **A   I'm referring to her opinion that she didn't**
18  **need to go further when, obvious to me, facts**
19  **developed from the interviews that I concentrated on.**
20  **She could have gone into other areas.  So she did not**
21  **want to go further because she was not assigned, that**
22  **is a bad answer.**
23   Q   Anybody other than Trevor Robinson and
24  Cooke -- let me strike that.
25       My question was outside of Robinson and

Page 72

1  Cooke, is there anybody else that you know of that
2  Shara interviewed?
3   **A   I can't remember now.**
4   Q   Okay.  And your criticism of Shara with
5  regard to Robinson and Cooke are that she didn't go
6  far enough?
7   **A   That's one of them, yes.**
8   Q   Okay.  And when you say far enough, tell me
9  what you mean.
10   **A   I mean that there were obvious flags raised**
11  **in -- starting with the Teika Cooke questions that I**
12  **read.  You've got an allegation of fraud, Teika Cooke**
13  **said I did not commit fraud.  All right.  Was the**
14  **policy that was being sold to these people a**
15  **collectible policy.  That wasn't her area.  But it**
16  **wasn't.  Was the reasons -- was the agent, two agents**
17  **involved in this claim burning documents, falsifying**
18  **documents?  I don't know.  She didn't know.  It all**
19  **came out.  Were things being done wrong that were**
20  **probably more than provable initially with a good**
21  **investigation?  Yeah, there was lots of them.**
22  **    So to concentrate on whether Amoruso**
23  **remembered how many people she interviewed, I remember**
24  **two right now.  Doesn't change the fact that AFLAC was**
25  **giving a policy to people, which they can do, I'm not**

Page 73

1  **criticizing that, I am criticizing they were giving it**
2  **to DC policemen who realistically should not be able**
3  **to file a claim under that policy and that the people**
4  **that were processing the claims were doing that.  You**
5  **can't collect if you are getting your full pay.  And**
6  **that's what was happening.  Could have learned that.**
7  **That's not a hard thing to do.**
8   Q   Well, tell me this.  If Shara is
9  investigating a possible forgery of a signature, why
10  is it important for her to go figure out if the
11  benefits are collectible, if -- how much all these
12  other officers are making, whether they're actually
13  entitled to benefits, tell me why that matters when
14  she's investigating a forged signature?
15   **A   First rule of --**
16       MR. McMAHON:  An alleged forged signature.
17   **A   Alleged forged signature.**
18   **    The first rule of insurance is is the policy**
19  **that you sold me valid and collectible.  That's the**
20  **first rule.  Is it collectible, did it happen during**
21  **the periods of its coverage.  That's what an**
22  **investigator starts with.  Was there coverage, first**
23  **of all.**
24  **    If the forgery occurred, fine.  But the**
25  **first thing that an insurance person looks at, I'm**

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

Page 74

1  investigating an insurance policy, is it a valid
2  policy, is it collectible.  Guess what, it wasn't.  So
3  in order to do that you've got to start with the
4  premise that if the policy is not collectible, that
5  throws -- that sends this into a different area
6  completely.
7       I don't care that the fact is an alleged
8  forgery, are benefits being -- she's not filing a
9  claim on payable benefits.  I don't know what the
10  reason was.  I do know that she started investigating.
11  But rule number one, is the policy in force, is it
12  collectible, did it happen during the periods of
13  coverage, those are the first things that a good
14  insurance person looks at before they jump to other
15  conclusions.
16  BY MR. SPIRES:
17      Q   Are you telling me that the standard of care
18  in the insurance industry requires an SIU investigator
19  when he or she receives a claim of alleged forgery,
20  signature forgery, to first determine whether the
21  group's policy is payable and whether the claim is
22  payable, and then -- then go into whether there was
23  actually a forgery?
24      A   First question, could it be payable.  Not
25  whether it was, that's not her role.  Her role is

Page 75

1  would it be payable if facts were present in the
2  policy -- is it a valid policy.  That's -- in order to
3  investigate a fraud, you've got to have a policy
4  that's being fraudulently attacked.
5      Q   Why?
6      A   Because you can't collect on something
7  that's nonexistent.
8      Q   Does it change the fact that a signature's
9  forged, whether the policy is enforceable or not?
10      A   She's working for AFLAC under AFLAC's policy
11  that they issued.  You have to determine if that's a
12  collectible policy.
13      Q   Why does that matter if --
14      A   If it's possibly collectible.  She doesn't
15  determine that it is or it isn't.  All right, the
16  first thing you look at, did it happen during the
17  dates of -- maybe the policy's not valid, or the
18  coverage, it falls outside of the coverage period.
19       So therefore, her role in looking at a --
20  you can't have a forged document on something that's
21  not there, because it's not forged if it's not related
22  to a policy that's collectible.
23      Q   Okay, so you're telling me that --
24      A   I'm telling you that the insurance
25  investigator's first role is do I have an insurance

Page 76

1  policy.
2      Q   Okay.  So you're telling me that if the SIU
3  investigator receives a forgery, a forged signature,
4  and --
5          MR. McMAHON:  An alleged forged signature.
6  BY MR. SPIRES:
7      Q   And then determines as the initial step that
8  the policy is invalid or that the claim might not be
9  payable, then they just disregard the four signatures?
10      A   No, I didn't say that.  I said the first
11  thing they do is determine if they have a valid,
12  collectible policy.  It's nothing more than the first
13  step in the investigation.  You might find out that
14  your agents were fraudulently selling policies that no
15  one could collect, heavens to be.
16       So what the investigator then becomes
17  investigating, an alleged forged signature, if that
18  was the reason that started all this, there's other
19  avenues, there's other problems here.  When a police
20  person starts investigating a crime they don't say I'm
21  just going to investigate you for an attempted
22  burglary, they look at did a burglary happen, what
23  happened, what went on, what are the facts that
24  started this whole issue.  They made the
25  determination.  In this case it's an insurance policy,

Page 77

1  the forgery surrounded something to do with an
2  insurance policy.  The first thing anybody looks at is
3  whether or not the policy's there, valid, and
4  collectible.
5      Q   Okay.
6      A   Not whether they can pay it.  That's not the
7  investigator's job.  Is it there.  How can you have a
8  forgery of something that's not there?
9      Q   But you have a signature that's --
10      A   On what?
11      Q   On a piece of paper.
12      A   Okay, but that's not a forgery if it's not a
13  policy that you're trying to forge.
14      Q   All right.  That's fine.
15          MR. McMAHON:  You're entitled to take a
16  break any time.
17          MR. SPIRES:  Yeah, sure.
18          THE WITNESS:  I'm not -- I'm just looking at
19  the time, that's all.  I'm not tired or hungry.  I
20  enjoy this.
21  BY MR. SPIRES:
22      Q   In this scenario if Shara initially learned
23  that there might be an issue with the policy, how does
24  that change her investigation as to the alleged forged
25  signature?

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

Page 78

1    A   It might not.  But it's just another part of
2    an SIU investigation.
3    Q   Okay.
4    A   It's necessary to determine that you have a
5    valid, collectible policy.
6        So what I'm saying is that this was a fact
7    available to AFLAC through their people's
8    investigation that could have sent this case in
9    another way.  I'm just saying that it would have
10   resulted in another investigation.  If the forgery
11   happened, it happened.  I'm just saying that that is a
12   very big thing to make other facts known to you.
13   Q   Was it important for Shara to investigate
14   the alleged forged signature?
15   A   I'm not even sure why she was there.  But
16   yeah, that would have been, if it was forged, where
17   did the forgery come from, yeah.  It would have been a
18   question to ask.  I know she asked it, and the lady
19   said no.
20   Q   What lady?
21   A   Teika Cooke.
22   Q   Okay.  Do you know that Trevor Robinson said
23   it wasn't his signature?
24   A   Right.
25   Q   Okay.

Page 79

1    A   But he didn't say Teika Cooke forged it,
2    either.
3    Q   No?
4        MR. McMAHON:  And just to clarify the
5    record, he didn't say that all of the signatures were
6    forged.
7        THE WITNESS:  Were forged, right.
8        MR. McMAHON:  And he also never testified
9    that I'm aware of that Teika Cooke did any of the
10   forgery.
11   BY MR. SPIRES:
12   Q   I'm still lost as to how determining whether
13   benefits are available, whether the policy is
14   effective has any impact on an alleged forgery
15   investigation.
16   A   Okay.  Again --
17       MR. McMAHON:  I think he's answered that
18   before, but I'll let him do one more.  But I think
19   he's -- I think this is asked and answered a number of
20   times.  You don't like the answer, perhaps, but -- so
21   give it one more shot.
22   A   That -- the forgery is one issue.  But while
23   you're doing an investigation, facts come up that are
24   relevant to bigger picture issues.  And that was the
25   legitimate time for AFLAC to find out what was going

Page 80

1    on.  They could have determined at that point that
2    policies were being sold and there were other avenues
3    of problems that they didn't even know about.
4        But it was a very good thing that this
5    investigation started when it did.  And it started on
6    a claimed forgery issue, but what was the biggest
7    concern of the investigators?  That -- all I'm
8    interested in is a forgery, but wait a minute, you've
9    got to find out is the policy valid.  What's going on?
10   But she limited herself by making a straight line with
11   her investigation and said I'm not interested in
12   anything else.
13       This would be the perfect time for AFLAC to
14   determine that there was a problem.  And it was missed
15   big time by their investigator, later discovered by
16   the FBI.  It wasn't any more of an issue than asking
17   questions.
18       And what happened.  Teika Cooke was
19   indicted.  She was indicted for committing insurance
20   fraud, wire fraud, and what was one other thing,
21   insurance fraud, I believe.  But her indictment was
22   fraudulent, it should not ever have been.  It sounded
23   good.  But AFLAC was the person to look at it and say
24   wait a minute, I can stop this.  They didn't.  They
25   had the chance.  And it was more than a reasonable

Page 81

1    chance.  It was something that any competent
2    investigator -- your own supervisor, Mr. Kapps, said
3    this was poorly done from day one.  He was embarrassed
4    by -- and I'm again reading transcript comments here,
5    but I'll read his full deposition.  But it was just
6    poorly done.  And what would have happened?  We
7    wouldn't be here today if this was known.  I would
8    hope we wouldn't be here, anyway.
9    BY MR. SPIRES:
10   Q   Well, I'll tell you Mr. Kapps didn't say
11   that.  But in any event, do you know whether Ms. Cooke
12   was indicted for forgeries?
13   A   No, I don't think she was, no.  Insurance
14   fraud and wire transfer fraud or something.
15   Q   So you don't know -- you're saying she was
16   not indicted for anything related to a forged
17   signature of Trevor Robinson?
18   A   I don't think she was, no.
19   Q   Okay.  Would it change your opinion --
20       MR. McMAHON:  Which opinion?
21       MR. SPIRES:  I guess there are a lot.
22       MR. McMAHON:  Well, he's given, I think, at
23   least three opinions in that statement that he filed,
24   the 26(b) statement, so I think it would be helpful if
25   you focused on which opinion you're asking him

Page 82

1  questions on.
2      MR. SPIRES:  Well, right now I'm going off
3  of what he's listed here today.
4  BY MR. SPIRES:
5      Q    Where do you get your basis that Shara
6  didn't understand the 80-percent rule?
7      A    She said she didn't.
8      Q    Where?
9      A    At her deposition.
10     Q    You read her transcript?
11     A    I read her summary.
12     Q    Okay.
13     A    Simple question, asked and answered, asked
14  that question, no, I didn't.  She understood it later.
15  But at the time she was doing her investigation, it
16  wasn't something she understood.
17     Q    Okay.  Do you know if Shara talked to
18  anybody other than Sergeant Robinson and Ms. Cooke
19  during her investigation?
20     A    She talked to her supervisor, some lady, I
21  forget her name, but I don't remember the context.
22  No, I don't remember anybody else at this time.  It
23  doesn't say that she didn't, but I just didn't give it
24  any thought.
25     Q    Okay.

Page 83

1      A    I'll probably get a better opinion when I
2  read her deposition.
3      Q    And your testimony is that your
4  understanding is her investigation ended at the early
5  part of 2010, January, February, March?
6      A    April, something in there, yeah.  It was
7  short, to the point, incomplete.
8      Q    All right.  Mr. Kapps, you said that he
9  didn't properly train Shara.
10     A    Right.
11     Q    Okay.  Explain to me your basis for that.
12     A    Well, again, reading her summary, she
13  started as a file clerk.  She had some investigation
14  experience, but I never understood where that came
15  from.  It wasn't detailed in what I saw.  But he
16  didn't do it.  She started working for them, and he
17  never gave her any specific training, SIU training.
18  He didn't supervise her.
19     Q    Is it just because he didn't give her any
20  specific SIU training?
21     A    If you've got a case of claimed forgery, a
22  supervisor would noticeably give you some sort of
23  bullet point, take a look at this and this and this
24  and this.  What does the supervisor do.  I've been a
25  supervisor at one time in my life.  If you have a

Page 84

1  relevant -- this was her first SIU case of forgery,
2  what are you going to go to do, how should you handle it?
3  You bullet point some sort of instructions to your
4  subordinate as to what you're looking for, what you
5  need.
6      Q    Your understanding is that this was Shara's
7  first SIU case for forgery?
8      A    For forgery, I believe it was.
9      Q    Okay.  Do you know Shara's background in
10  investigating?
11     A    No.  She'd worked for -- again, reading
12  summaries, she had about, supposedly ten years of
13  something, and I'm not sure what it was.
14     Q    Do you know how long Shara had been with the
15  AFLAC SIU?
16     A    She was an SIU-1 at the time.  I don't know,
17  no.  I forget.  It's in my notes, I mean, the notes
18  that counsel sent me, but I don't remember.
19     Q    Okay.
20     A    I just took the opinion that she was in need
21  of help.
22     Q    Based on what?
23     A    When I read the summary of her deposition.
24     Q    Okay.
25     A    I may formulate more of an opinion when I

Page 85

1  get the whole deposition.
2      Q    What part of the summary of her deposition
3  led you to believe that Shara needed more help?
4      A    When she --
5          MR. McMAHON:  I think he's already testified
6  to that, but go ahead.
7      A    That she -- when asked questions of why
8  didn't you talk to the two sales associates, it wasn't
9  my responsibility.  Did you know that there was an FBI
10  investigation going on?  No, I never would have
11  thought of that.  Do you know anything about the
12  80-percent rule?  No, I didn't.
13         It's just a sense that someone who's done
14  this for 45 years can look at what went on to say how
15  experienced, unknowledgeable this person was.  I may
16  have more opinion when I read it, but I doubt it.
17  BY MR. SPIRES:
18     Q    You've been in Bill Kapps' role before; is
19  that correct?
20     A    Yes, sir.
21     Q    Okay.  When an investigator --
22         MR. McMAHON:  Bill Kapps' role being that he
23  supervised --
24     A    Supervised an SIU person, that's how I'm
25  interpreting.

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

Page 86

1    BY MR. SPIRES:
2       Q    When one of your investigators that you're
3    supervising has a file --
4       A    Assignment.
5       Q    Okay, assignment.  Do you ever assist that
6    individual with the assignment?
7       A    That's my job.
8       Q    Okay.  Do you ever interview people in
9    addition to that, the investigator you're supervising?
10      A    I might.
11      Q    Okay.  Would it be improper if you
12   interviewed somebody and not the investigator you're
13   supervising?
14      A    First thing I do is tell them to interview
15   them first.
16      Q    Okay.  Do you ever go with your
17   investigators to interviews?
18      A    I've trained a few that way.
19      Q    Have you asked questions in interviews?
20      A    Yes.
21      Q    Okay.
22      A    I'm very pushy.
23      Q    Okay.  Do you think it's improper or a
24   breach of the standard of care if you as the
25   supervisor asked all the questions to the potential

Page 87

1    witness or the witness versus the investigator?
2       A    Supervisor manual 101, tell your employee
3    what to do, give them direction, give them a path to
4    head to, and see what happens.
5       Q    Okay, I'm not talking about in terms of
6    training, I'm talking about the investigation itself.
7    Is it a poor investigation and a breach of the
8    standard of care if the supervisor, you, interviews a
9    witness rather than the subordinate investigator?
10      A    No.
11      Q    Okay.
12      A    No.
13      Q    All right.  Do you know if Bill Kapps
14   interviewed anybody?
15      A    I'm waiting for his deposition.  I just got
16   some summary notes.  I'd like to read what he said.
17      Q    Okay.
18      A    I'll get it.
19      Q    You're basing the fact that, or your
20   criticism of Bill Kapps that he didn't train Shara
21   solely on Shara's summary?
22      A    My criticism of Mr. Kapps is her
23   investigation results.
24      Q    Okay.
25      A    That's there, it's already produced.  It's

Page 88

1    as bad an investigation as I've ever seen.
2       Q    But you don't know what Mr. Kapps did and
3    didn't do in terms of training Shara, do you?
4       A    I do know what she said he did, what courses
5    she took, how she answered questions relating to her
6    experience.  I am making some assumption on Mr. Kapps
7    which may or may not change.  But what's not going to
8    change is the fact that AFLAC had a chance to
9    determine the facts, they didn't do so, and this lady
10   was indicted.
11      Q    What -- well, let me strike that, let me go
12   back to my original question.
13           Is it true you don't know what Bill Kapps
14   did or didn't do as far as training Shara?
15      A    I know what he didn't do.
16      Q    Okay.  How do you know what he didn't do?
17      A    Because she came across acting -- she had no
18   clue for an SIU investigation.
19      Q    Okay.
20      A    So therefore, she was ill-trained.  Or
21   therefore, no one was following what she was supposed
22   to do, or no one gave her direction.  I can only go by
23   what's in her file and the material produced.  There
24   is no direction to her.  Her answers that she was not
25   assigned that job or that was not something she was

Page 89

1    responsible for are so out of the norm of an
2    investigator that nobody either read it or nobody even
3    asked the question.  So somebody blew it, somebody
4    missed it big time.
5       Q    What job was she not assigned?
6       A    She wasn't assigned to interview the two
7    agents.  She wasn't assigned to find out what the
8    policy was supposed to pay for and what it was not
9    supposed to pay for.  Those are things that were
10   outside of her scope.
11      Q    Okay.  Lisa Young criticism, first one,
12   burned documents, destroyed originals.  Where did you
13   get the information that Lisa Young burned documents
14   or destroyed originals?
15      A    In the FBI file.
16      Q    What FBI file?
17      A    302.
18      Q    Okay.  Is it standard for an insurance
19   company or a sales agent's office to keep every single
20   claim form original that comes in to them over the
21   course of the years?
22      A    We're in 2008.  At that time they would have
23   a scanned copy of the original.  Of the original, not
24   of an alternate.  Yeah, they'd have some sort of
25   reproduction of all original documents.  Some

Cooke vs. American Family Life       Paul Amoruso, Vol. I          05/30/2014

Page 90

1 companies, depending on their level of scanning and
2 how they can look them up, some kept them, some
3 didn't. So it depends. Today I'd say 90 percent scan
4 things.
5    Q   Okay.
6    A   They're scanning originals. It's bad to
7 take an original out and replace it with another
8 document. That would be bad.
9    Q   I understand. I'm asking is it a breach of
10 the standard of care in the insurance industry to
11 dispose of the original paper document but still
12 maintain a copy, a scanned copy, for example?
13   A   Is that AFLAC's procedure? When I look at
14 document production and examination, and I've done
15 several, you have to have a procedure to tell your
16 people what to do and what not to do. I have not seen
17 AFLAC's procedure.
18       I would say that under normal, usual, and
19 customary circumstances it would be violation without
20 any specific AFLAC guideline that, yes, you can burn
21 the documents in your backyard.
22   Q   All right. So what is the usual and
23 customary standard with regard to claim forms for the
24 insurance industry?
25   A   We're in 2008, 2006, 2005?

Page 91

1    Q   Correct.
2    A   Most of them would have had a lot of
3 originals still kicking around then.
4    Q   I'm not saying what was going on, I'm saying
5 what does the standard require at that time period
6 with regard to keeping original paper copy claim
7 forms?
8    A   The standard is a process. The standard is
9 what the company has decided to do with them, and you
10 follow what the company has done. There are certain
11 states that require originals, even today. So
12 companies have to -- they develop destruction document
13 standards, and you would do that in accordance with
14 the state where you are at. There isn't any standard
15 for all 50 states. There is a standard in each state
16 as to what you can do. And many companies have taken
17 it upon themselves to create their own policy and the
18 commissions of insurance have accepted it.
19       So it all depends what the standard was. I
20 don't know what AFLAC's was. I do know that
21 documents, original documents were not in the file and
22 that the originals had been destroyed. And those
23 originals would have been helpful in an investigation.
24   Q   You don't know what the insurance industry
25 at the time of this, what the insurance industry

Page 92

1 standard with regard to destruction of originals?
2    A   I just said what it is.
3    Q   No, you didn't.
4    A   Yes, I did.
5    Q   You said --
6    A   I said that there are 50 states, some allow,
7 some don't. The ones that don't, the companies -- and
8 I have done probably every major company in this
9 country -- have some sort of written procedural
10 standard, what you can destroy and what you can't
11 destroy. And commissioners have accepted it and they
12 file those notices, this is what we've got to do,
13 folks.
14       So the idea is to have some form of replica
15 of the original document. That's what you want. And
16 if it's scanned, a double-sided scan, a single-page
17 scan, there's all sorts of rules out there.
18   Q   Is your testimony that the standard of care
19 at the time of these events all depended on the
20 standard that the insurance company issued with regard
21 to destruction of original insurance claim forms?
22   A   My testimony regarding this case is you
23 don't burn documents in your backyard.
24   Q   All right, you're not answering my question.
25   A   I can't tell you what the standard was for

Page 93

1 this case, other than to say that you are responsible
2 to have the standard document. Your finite question,
3 you've got to have the -- you've got to have an
4 original. How it was kept as an original, I leave
5 that to the company's position and what was accepted
6 in the state. There are two-sided scans, there are
7 one-sided scans. You've got to have some form of
8 reproduction of the original document. Some states,
9 they'll take scans sometimes, and other times they
10 need the original. So it varies on what the document
11 is.
12   Q   Okay. All right. I still don't know what
13 you're saying in terms of the standard, but --
14   A   That's my answer.
15   Q   Okay. Does it meet the standard of care if
16 the insurance company or the sales associate's office
17 is keeping originals in scanned form?
18   A   Might.
19   Q   It might?
20   A   Might.
21   Q   Okay. Well, tell me this, don't a lot of
22 policyholders fax in copies of the sales -- their
23 forms to the insurance company or to the sales
24 associates?
25   A   That's what happened in this case.

Cooke vs. American Family Life        Paul Amoruso, Vol. I        05/30/2014

Page 94

1    Q   Okay.  Would it be standard of care for the
2  insurance company or the sales associates have to have to
3  go to the policyholder's house and get the original to
4  keep?
5    **A   No.**
6    Q   Okay.
7    **A   No.**
8    Q   So you're telling me an electronic version
9  of the original is fine?
10   **A   Never said it wasn't.**
11   Q   Okay.
12   **A   I just said as long as it is the original.**
13   Q   All right.  Second criticism, sold policies
14  that should not have been sold.  Explain that to me.
15   **A   Policies that had no potential collection.**
16  **You can't sell a disability policy if the government**
17  **is paying you 100 percent of your benefits to begin**
18  **with.**
19   Q   Okay.
20   **A   How can you collect on it if the policy is**
21  **not a policy you can collect from?  Because guess**
22  **what, folks, it's illegal to collect benefits twice.**
23   Q   Okay, how are they collecting benefits
24  twice?
25   **A   The employee would collect benefits from**

Page 95

1  **AFLAC and also collect 100 percent of their pay from**
2  **the government on their disability policy.**
3    Q   Okay, maybe we're mixing words.  I don't see
4  an individual who's collecting 100 percent of their
5  salary and benefits from AFLAC as actually collecting
6  benefits twice.  Is that fair?
7    **A   No.**
8    Q   Okay.
9    **A   They are collecting benefits twice, because**
10  **if you are collecting -- if the government is paying**
11  **you 100 percent of your base salary, that's what**
12  **you're entitled to collect as a government employee,**
13  **and then you turn around and you collect another**
14  **100 percent of that salary from someone else, you're**
15  **collecting your salary twice.**
16       MR. McMAHON:  I'll state for the record that
17  that was the reason why she was terminated, double
18  dipping, basically.
19  BY MR. SPIRES:
20   Q   Is it your understanding that the policies
21  that were sold to the Pentagon police officers by Lisa
22  Young and Kim Aikens were not collectible?
23   **A   The disability policies.  They were not**
24  **collectible if they collected government benefits at**
25  **the same time.**

Page 96

1    Q   Okay, well, you're telling me -- you're
2  criticizing Lisa Young for selling policies that
3  should not have been sold, and your testimony is that
4  they shouldn't have been sold because they were not
5  collectible; is that correct?
6    **A   Those policies were not collectible because**
7  **the policy itself is not supposed to pay you if you're**
8  **getting more than 80 percent of your benefits.**
9    Q   And that's your understanding of the entire
10  policy?
11   **A   That is an understanding of the policy.**
12   Q   All right.  Do you know whether there is --
13  you have the ability to collect regardless of the
14  80-percent rule?
15   **A   And collect government benefits?  No.  Can't**
16  **do both.**
17   Q   That's not my question.
18   **A   I know it's not, but that's the answer,**
19  **because you can't -- you're a government employee and**
20  **you're injured riding a bull, and you're making $1,000**
21  **a week.  Okay.  You file a claim, I'm injured, I can't**
22  **work, here's my doctor's excuse, my doctor's report.**
23  **I'm injured, I hurt my back.  Your salary will**
24  **continue under the government's policy.  Nothing's**
25  **going to change.  You're out of work.  Got to have a**

Page 97

1  **reason, you point that out, the government pays your**
2  **salary.**
3       **At the same time you go to AFLAC and you**
4  **collect -- you file a claim.  On the claim form it**
5  **says are you collecting any other benefits.  Well,**
6  **Lisa, the two supervisors, the two sales associates**
7  **modified the forms and said no.  And what happens, she**
8  **gets a check.  I got a check for $4,000 one day, says**
9  **Teika Cooke.  Should I cash this check?  Oh, I don't**
10  **know, says AFLAC.  Yeah, it's perfectly good, you**
11  **filed the claim, it's your check.  You sure I can?**
12  **Yes, you can.**
13   Q   All right.  Back to my question.  Is it your
14  understanding that the AFLAC policy is only geared
15  towards -- well, strike that.
16       Do you understand that the AFLAC policy will
17  pay if you are entirely out of work?
18       MR. McMAHON:  And you're assuming they're
19  not getting 100 percent of their salary?
20   **A   I have to make some assumptions here.  Let's**
21  **say me.**
22  BY MR. SPIRES:
23   Q   Okay, let me start over then.
24   **A   Okay.**
25   Q   All right.  Is your only understanding that

Page 98

1  the AFLAC policy pays individuals who return to work
2  but are making less than 80 percent of their salary?
3      A   If you're not a government employee?  Me,
4  let's talk about Paul Amoruso.  AFLAC came to my
5  wife's school, she's a teacher --
6      Q   I'm not --
7      A   -- they tried to sell me this policy --
8      Q   Look, this deposition will take all day.  I
9  just want -- I want answers to my questions.
10     A   I can't answer that question without -- I'm
11 talking about the case involved here.  Let's talk
12 about Teika Cooke.
13     Q   I'm talking about the AFLAC disability
14 policy.
15     A   Yes.
16     Q   And --
17     A   For Teika Cooke.
18     Q   For Teika Cooke or any of the police
19 officers.
20     A   Okay.
21     Q   Or any other policy.
22     A   All right.  Let's talk about the government
23 employees that we're talking about here.  Now I can
24 put it in my perspective.
25     Q   Is it your understanding that the policy

Page 99

1  only pays if the employee returns to work and is not
2  making 80 percent of their salary?
3      A   I can only answer that question and say are
4  they collecting government benefits or not.
5      Q   Okay.
6      A   If they're not collecting government
7  benefits, then the policy would pay.
8      Q   Okay.  Do you know whether the individuals,
9  the police officers, would collect government benefits
10 if they were out of work entirely?
11     A   And are not collecting government benefits?
12     Q   I'm saying do you know whether they -- they
13 being the police officers -- if they were out of work
14 entirely due to an injury would collect government
15 benefits?
16     A   They would collect -- they would collect
17 government benefits, yes.
18     Q   They would collect government benefits the
19 entire time they're out of work?
20     A   Yes.  Not their full salary, because their
21 salary has a base and then adds to it.
22     Q   Okay.  So is it your testimony that for the
23 individuals who are entirely out of work that were not
24 collecting their entire salary were not entitled to
25 benefits under this policy?

Page 100

1      A   I don't understand your question.
2      Q   All right.  If an individual police officer
3  was --
4      A   Give me a name, give me a circumstance.
5      Q   I've given you a circumstance.  It doesn't
6  have to be a name.  Joe Smith.
7      A   Give me Teika Cooke.
8      Q   If Teika Cooke was entirely out of work and
9  not receiving her entire salary, would she be entitled
10 to benefits under the policy?
11     A   She might be entitled to receive some.
12     Q   Okay.  So is it fair to say that the policy
13 was not entirely unpayable?
14     A   No.
15     Q   I mean, I'm sorry, that it wasn't entirely
16 worthless?
17     A   All right.  Something I have here --
18         MR. McMAHON:  You know what, Harrison, it
19 might be appropriate for you to track the opinions
20 he's articulated in his 26(b) statement.
21         MR. SPIRES:  I am.
22         MR. McMAHON:  I'm not sure this is even
23 referenced in the 26(b) statement, this area of
24 inquiry now.
25         THE WITNESS:  May I -- this is a letter I

Page 101

1  pulled out of the file.
2          MR. McMAHON:  You're going to have to
3  identify it for the record.
4          THE WITNESS:  I'm sorry, it's from Wayne
5  A-N-T-O-I-N-E.  It's a letter on April 6, 2010, sent
6  to Bill Kapps from AFLAC.  And Mr. Weiman -- am I
7  pronouncing it -- no --
8          MR. McMAHON:  Wayne.
9          THE WITNESS:  Wayne's letter says, hey, I
10 bought this policy from AFLAC, and my purpose was that
11 I would be able to substitute my salary.  I make about
12 140, $150,000 a year because I do a lot of overtime,
13 I've got five kids to support so I'm constantly
14 working.  But when I go to submit a claim I find out,
15 first of all, you're only going to pay me on my base
16 salary, which is 67,000 a year, and I'm already
17 collecting that from the government, so I can't
18 collect anything.
19         MR. SPIRES:  Let's make this an exhibit, and
20 I'll just -- I'll let the letter speak for itself.
21         THE WITNESS:  I only have one copy.
22         MR. McMAHON:  Well, we'll make copies.  But
23 give that to the lady to mark it.  Is this Exhibit
24 Number 1 for him?
25         THE WITNESS:  I don't usually produce

1  exhibits, but --
2        MR. McMAHON:  No, I mean the others --
3        MR. SPIRES:  I want to make it an exhibit.
4        MR. McMAHON:  The others were part of
5  depositions and everything, but -- so this will be
6  Number 1?
7        MR. SPIRES:  No, this is, what, Number 4?
8        THE REPORTER:  4.
9        MR. McMAHON:  Oh, 4.
10        THE REPORTER:  4 for this deposition.
11        MR. McMAHON:  Well, these -- I'm sorry, if
12  we can go off the record.
13        (Defendant's Deposition Exhibit 4 was marked
14  for identification and was attached to the
15  transcript.)
16        MR. McMAHON:  You've seen this, haven't you?
17        MR. SPIRES:  Yes.
18        MR. McMAHON:  Wayne Antoine, or Antoine
19  Wayne.  I just want to have the record reflect that
20  the expert witness here has identified a particular
21  document that Mr. Wayne authored in response to a
22  specific question from counsel.  And we'll let the
23  document speaks for itself.  But I think what he was
24  going to tell you, that that letter gives him a basis
25  for rendering opinions in this case or answering your

1  questions about the collectability of the insurance
2  policy.
3  BY MR. SPIRES:
4      Q   You said Lisa Young failed to train and
5  supervise Aikens.
6      A   Yes.
7      Q   What's your basis for that opinion?
8      A   Read her deposition.  What she did
9  was she --
10      Q   Who's her?
11      A   Who?
12      Q   You said I read her deposition.
13      A   I read Lisa Young's deposition.  I read
14  Aikens' statements to the FBI, what she was told to
15  do, what she was trying to do.  And other than
16  fraudulent acts of changing documents and keeping a
17  same story, I just found it reprehensible.
18      Q   All right.
19      A   I don't think that a legitimate supervisor
20  would want an employee -- and I go back again to
21  Mr. Kapps, who seemed to have some responsibility to
22  the SIU lady, as to things he would do or train to
23  her.  I didn't even see those or any other things I
24  mentioned that I thought he lacked in no
25  communication, no written communication, no telephone

1  logs, all the things you would see in a normal agency
2  for history preservation, for records retention.  I
3  saw none of that in any of the material produced, and
4  they said they didn't even have any.
5      Q   Are you talking about with Mr. Kapps or
6  Ms. Young?
7      A   No, no, I'm talking about between Young and
8  Aiken.  I referred to Mr. Kapps, I shouldn't have
9  brought him in there, but that was another supervisory
10  role there that I think failed.  But I'm just saying
11  this one was even worse.
12      Q   Are you telling me that because you don't
13  see it in the documents that we've produced -- we
14  being the defendant -- then you just assume it didn't
15  happen?
16      A   No, I assume --
17        MR. McMAHON:  What is it didn't happen?  I'm
18  sorry.
19  BY MR. SPIRES:
20      Q   Supervise or train Aikens.
21      A   This is their deposition testimony and the
22  FBI's 302 statements of Aiken, the one who was
23  interviewed, as to what she did and what she was told
24  to do, what they did in her office.
25      Q   Okay.  What would proper training of Aikens

1  entail?
2      A   Not changing documents.  Not pushing
3  policies that really didn't have any coverage.
4      Q   Now, you're talking about actions and I'm
5  talking about the training for Young herself.
6      A   Right.
7      Q   Not Aikens' actions, I'm talking about Young
8  herself.  What does the standard require Young to do
9  in this scenario in terms of training Aikens?
10      A   Just about everything she said tell her not
11  to do it.  Make sure she didn't do it, make sure she
12  documents what her actions were, make sure they find
13  out what is going on in the agency, understand the
14  policies that she's selling.  Make sure that your
15  subordinate is properly educated.  I don't believe
16  Aiken ever took any insurance courses other than the
17  one necessary to get her license.
18      Q   Do you know what sort of training Aikens
19  received throughout her time as a sales associate or
20  working for sales associates associated with AFLAC?
21      A   I just saw none.
22      Q   Okay.  So you don't know whether she
23  received any or not?
24      A   I saw none from her actions or what she
25  answered -- how she answered questions.  I can only

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

Page 106

1  look at what -- if she did receive any training, then
2  it did not take and nobody found out that she didn't
3  understand it.  But when she was asked questions by
4  the FBI and in her depositions, both of their
5  depositions, I found no training, no courses.
6         I teach.  I teach the licensing course in
7  Massachusetts, I teach agency production courses in
8  Massachusetts, and I know what salespeople need to
9  know in order to maintain a policy:  history, record,
10  how you talk to your people, what you're entitled to
11  do with them.  I saw none of that there.
12     Q   Okay.
13     A   And I'm being very general and very -- you
14  know, I mean, I understand that people don't always
15  have to do everything the same way, but at least you
16  keep a telephone log of what comes in the office and
17  what goes out of the office, at least you report what
18  the benefit -- when a policyholder calls and asks you
19  a question, at least you don't check off a form that's
20  not true.
21     Q   Okay.  So that was my next question, is
22  assuming Aikens didn't receive proper training, what
23  would proper training have changed in this scenario?
24     A   When they submitted claims forms they would
25  not have checked off are you receiving -- are you

Page 107

1  receiving benefits from other people.  You'd make the
2  claims form yourself -- you'd make the claims form the
3  document from the person, not make it fit a claim so
4  someone could get paid.
5     Q   I'm not following you.
6     A   They made claims documents tailored to a
7  need so that people could get paid.  Their fear was,
8  and Aikens said this, that they were going to cancel
9  the policy, and they wanted people to maintain their
10  policies.
11     Q   All right.  So are you saying that proper
12  training would have prevented -- I'm not even
13  following that.  Are you talking about the allegations
14  that Aikens altered the claim forms?
15     A   One of them.
16     Q   Okay.  So are you telling me that proper
17  training of Aikens would have prevented her from
18  altering claim forms?
19     A   Could have.
20     Q   Okay.
21     A   It wasn't done.  She did it.
22     Q   You don't know?
23     A   I don't know, no.
24     Q   All right.
25     A   I know she wasn't trained.  You don't go

Page 108

1  from answering the phones to processing claims without
2  some understanding of what you're processing and your
3  role in the big picture of working for a major company
4  like AFLAC.
5     Q   What do you mean processing claims?
6     A   She processed the claim through the system.
7  When people walk into her office, give her the claims
8  material, she'd either help them fill them out or she
9  would get them to the claims department to handle the
10  claim.  But she was part of the system.
11     Q   Isn't the claims department responsible for
12  processing the claim?
13     A   Well, processing the claim is more than just
14  the claim.  You've got to have it from the
15  policyholder to the claims department.  Her role was
16  getting it to.  I consider that part of the processing
17  system.
18     Q   All right.  I think you wrapped up Aikens'
19  two criticisms are altering documents and not properly
20  trained.  I think we addressed that when talking about
21  Lisa Young.
22         MR. SPIRES:  All right, let's move -- why
23  don't we take a quick break and keep going, we can
24  move into the statement.
25         MR. McMAHON:  The 26(b) statement?

Page 109

1         MR. SPIRES:  26(b), yes.
2         MR. McMAHON:  Oh, good, good.
3         (A brief recess was taken.)
4         MR. SPIRES:  We were just discussing off the
5  record that we agree, in an attempt to help
6  Mr. Amoruso make his plane, to expedite part of the
7  deposition by not going through individually each of
8  the 40-plus cases he has listed on his 26(b)
9  statement.  And in lieu of that Mr. Amoruso has agreed
10  to provide in writing a statement on each case,
11  whether he was working for the defendant or the
12  plaintiff, and then a brief statement as to the issues
13  and facts involved in the cases that he remembers, and
14  whether he testified at deposition and/or trial.  All
15  right.
16         Let's mark this expert statement.
17         (Defendant's Deposition Exhibit 5 was marked
18  for identification and was attached to the
19  transcript.)
20         MR. McMAHON:  He says it's missing the
21  signing page, but --
22         MR. SPIRES:  Oh, is it?
23         MR. McMAHON:  I know he signed it.
24         MR. SPIRES:  All right, that's fine.
25  BY MR. SPIRES:

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

Page 110

1    Q   If you'll turn to page 9, I want to start
2  asking a few questions. I'm trying not to rehash some
3  of the opinions that we discussed earlier.
4        And, Martin, I know -- or Mr. Amoruso, you
5  told me on a number of occasions that as you read more
6  depositions coming in, other things come to light,
7  that you might have revised or new opinions.
8        MR. McMAHON:  He stated that in his 26(b)
9  statement at the end.
10 BY MR. SPIRES:
11    Q   In the event you do, would you please tell
12 Mr. McMahon so that we can be informed and then have
13 another opportunity to question him about those
14 opinions?
15        MR. McMAHON:  Revised opinions.
16 BY MR. SPIRES:
17    Q   Yes?
18    A   Yes. I'm sorry. I'm reading.
19    Q   All right. Let's go to number 3, opinions
20 reached. About four lines down you state, "The issue
21 is disability insurance policy sold to Ms. Cooke by
22 AFLAC while she was a Pentagon police officer, which
23 should not have been processed by AFLAC's Pentagon
24 staff, resulting in payment to her." Do you see that
25 sentence?

Page 111

1    A   Yes, sir.
2    Q   Okay. Who are you referring to as AFLAC's
3  Pentagon staff?
4    A   The two employees, the two sales employees.
5    Q   Are you talking about Lisa and Kim?
6    A   Lisa and Kim, yes.
7    Q   All right. Why should AFLAC not pay Ms.
8  Cooke's claims?
9    A   Because she was getting 100 percent of her
10 benefits from the United States Government.
11    Q   Okay. Do you know whether Ms. Cooke was
12 entitled to any of the benefits she received from
13 AFLAC?
14    A   I left my opinion to the fact that she
15 wasn't entitled to the ones she was collecting,
16 because she was collecting benefits from the
17 government.
18        MR. McMAHON:  Nothing to do with the bona
19 fides of her injury, though.
20        THE WITNESS:  No, I'm not criticizing -- it
21 was just strictly the availability of collection.
22 BY MR. SPIRES:
23    Q   When you say processed by Kim and Lisa, what
24 do you mean?
25    A   As I said before, they were part of the

Page 112

1  processing system. They took information from her and
2  sent it along to AFLAC claims department.
3    Q   Do you know whether Ms. Cooke ever sent her
4  claims forms directly to AFLAC headquarters rather
5  than through Kim and Lisa?
6    A   I don't believe she did.
7    Q   Okay.
8        MR. McMAHON:  I think there was one occasion
9  in which she did actually fax it to AFLAC, but --
10        THE WITNESS:  Could be.
11        MR. McMAHON:  You'd have to check her
12 deposition testimony.
13        THE WITNESS:  I would. It was a while ago
14 that I read that.
15 BY MR. SPIRES:
16    Q   All right. Next sentence, "Ms. Cooke was
17 assured by the Pentagon staff of AFLAC the policies
18 the claims were submitted on were collectible when, in
19 fact, they weren't, and AFLAC should have known it."
20 All right. I believe we sort of addressed this
21 earlier, so I can maybe shorten this.
22        Focusing on the part AFLAC should have known
23 it, how would AFLAC have learned what the officers
24 were making when they would be injured, go out on
25 light duty, would not go to work?

Page 113

1    A   Ask the question.
2    Q   Okay.
3    A   AFLAC's sales staff should have asked the
4  question, what benefits are you collecting under your
5  government employment.
6    Q   Okay. Do you know whether --
7    A   They do, by the way. AFLAC does ask those
8  questions.
9    Q   Sure.
10    A   But they didn't here.
11    Q   How do you know they didn't?
12    A   Because Teika Cooke said she had no -- she
13 did not -- they processed claims which would not have
14 been payable. AFLAC as a company is not going to
15 process intentionally documents, claims that are not
16 payable. They deny claims all the time. Their
17 underwriting process, their claims process would catch
18 it. I submitted a claim for a situation that's not
19 covered. That's the claim process.
20    Q   And I'm asking you how would AFLAC
21 headquarters learn that an individual would not be
22 making or would be making over 80 percent of his or
23 her salary even if she was injured or he was injured?
24        MR. McMAHON:  I'll clarify for the record,
25 we're not talking about an individual here, we're

1  talking about 300 police officers who signed up for
2  this disability policy.
3     A   They asked the question when they sold the
4  policy, their sales staff would ask the question what
5  were you -- what are you eligible to collect from your
6  employer.
7  BY MR. SPIRES:
8     Q   Okay.  Doesn't --
9     A   That is an AFLAC question today, by the way.
10    Q   Doesn't the employer have to approve and
11 actually specifically assign or approve the policies
12 that the sales associates can sell the employees?
13    A   I understand this was considered a private
14 venture outside of the employer/employee relationship,
15 it was done through the union.  There was an
16 authorization from personnel for making salary
17 deductions.  But other than that, it was a private
18 venture.  That's how AFLAC looked upon it.
19    Q   So are you saying that Lisa and Kim didn't
20 get permission from the employer to sell disability
21 policies to the individual employees?
22    A   They did, because they got a space inside of
23 the building and a parking spot to sell these, to park
24 their car.  But what they didn't do was find out what
25 the benefits were.  They sold more than just

1  disability policies, they sold copayment policy,
2  medical payment policy.  There were other policies
3  involved here.  And the star is the disability policy
4  that they couldn't collect.
5     Q   Have you seen the application that's filled
6  out by Arthur Penn to permit Lisa and Kim to sell
7  disability policies to the individual police officers?
8  This is Exhibit 6.
9     MR. McMAHON:  And can you identify that
10 document, the date?  Does it have a Bates stamp?
11    MR. SPIRES:  Bates stamp D000378.
12    MR. McMAHON:  378.
13    MR. SPIRES:  And it is titled Payroll
14 Account Acknowledgment, dated April 15th, 2005.
15    (Defendant's Deposition Exhibit 6 was marked
16 for identification and was attached to the
17 transcript.)
18    A   I have seen that document.
19    MR. McMAHON:  And your question then is --
20 I'm sorry.
21 BY MR. SPIRES:
22    Q   My question is -- well, that was my -- just
23 my question.  But now my next question is do you see
24 at the bottom of the first page that the employer
25 authorized Lisa and Kim to sell disability?

1     A   Yes, sir.
2     Q   Okay.
3     MR. McMAHON:  Now, hold on.  When you say
4  employer authorized it, this is Mr. Penn, I guess, in
5  his capacity as the president of the union?
6     THE WITNESS:  President of the union.
7     MR. McMAHON:  Where does it say employer?
8     MR. SPIRES:  Well, the person of authority
9  to permit Lisa and Kim to sell these insurance
10 policies.
11    MR. McMAHON:  And he's with the union, he's
12 not the employer.  He works for the employer.  I
13 thought you said in your question something about the
14 employer sort of blessing this transaction.
15 BY MR. SPIRES:
16    Q   Would Arthur Penn be someone who understands
17 how the officers are paid?
18    A   Arthur Penn is a union representative, and
19 that was my understanding of his role in this.  The
20 only employer/employee relationship I noticed when I
21 reviewed the file was an authorization by the employee
22 to allow deductions for the payment from their salary.
23 That was it.  I did not see United States Government
24 sign this form as the United States Government.  Or
25 the Pentagon Police as the United States Government.

1  I did not interpret it that way.
2     And when I read through the material that
3  was given to me in this, this appeared to be a group
4  policy sold to people out through the union, and
5  that's -- they actually referenced the word "union,"
6  that it was not a government-sponsored benefit, but it
7  was sold through the union where the only
8  responsibility from the employer was to allow the
9  salary deduction.
10    I don't think Arthur Penn is the United
11 States Government and I don't think he -- as the
12 union, fine, he wanted his employees to have this
13 system available to him.  But I don't think the United
14 States Government, who is their employer, signed this
15 document.
16    Q   Where was AFLAC supposed to get information
17 about what these police officers would receive when
18 they would go on light duty?
19    MR. McMAHON:  When you say AFLAC, are you
20 talking about the representatives?
21    MR. SPIRES:  I'm talking about AFLAC
22 headquarters.
23    MR. McMAHON:  Okay.
24    A   AFLAC got a form with the information on it
25 signed by the employer supervisor, employee

Page 118

1  supervisor, describing the injury, where they were in
2  a police department role.  That's how they got their
3  information.
4  BY MR. SPIRES:
5      Q   Okay, and --
6          MR. McMAHON:  I think his question is how
7  did AFLAC headquarters in Georgia get the information
8  that --
9          MR. SPIRES:  Well, let's --
10         MR. McMAHON:  -- benefits were not
11 collectible, right?
12 BY MR. SPIRES:
13     Q   You did answer my question.
14         MR. McMAHON:  How would AFLAC know that?
15 BY MR. SPIRES:
16     Q   To sell the policy, when a sales associate
17 in general sells the policy to a group, where is the
18 sales associate supposed to get information about the
19 pay structure of the employees?
20     A   Ask them.
21     Q   The individual employees?
22     A   Could, yeah.
23     Q   Okay.  Is it enough to ask the individual
24 employees in a form?
25     A   I don't know how they'd want to do it.

Page 119

1  They'd have to ask them so that if the policy is ever
2  going to be used, whether or not they can make a
3  collection on it, the employee can make a collection
4  on the policy.
5      Q   Okay.  Well, don't the claim forms ask
6  whether the individual is making 80 percent?
7      A   The claims form asks, but it was usually
8  left blank by the employer.  That's where Young and
9  other people said no.
10     Q   Okay, well, I'll represent to you that some
11 claim forms were sent by Ms. Cooke directly to AFLAC
12 headquarters, not going through Lisa and Kim, that had
13 the box checked no, I'm not making 80 percent of my
14 salary.  I mean, I'm sorry, yes -- strike that.
15         MR. McMAHON:  We understand you.
16     A   I understand the question.
17 BY MR. SPIRES:
18     Q   Yes, okay.
19     A   I understand your question.
20     Q   So, and my question is --
21     A   I'm not sure this was not run through the
22 agent first, or this was what she was told how to fill
23 it out.  Because 80 percent, there could have been
24 some confusion in the employee's mind, as Mr. Roland
25 there, what's his name here --

Page 120

1          MR. McMAHON:  Wayne Antoine.
2      A   Wayne Antoine, I'm calling him the wrong
3  thing, had in his mind as to really what 80 percent
4  is.  It's 80 percent of your base salary, not of what
5  you make.
6          So without a clarification on that, you
7  could be making a base salary of, say, $60,000 a year.
8  This gentleman was making $107,000 a year.  He was not
9  going to be getting 80 percent of his salary.  But, in
10 fact, all the policy would pay would be 80 -- he was
11 going to get -- 100 percent of $60,000 a year is
12 normal, but it wouldn't pay for his extras.
13         That's where the confusion comes in as to
14 why Ms. Cooke could have confusion.  And that's why
15 you have sales agents, so you can answer these
16 questions.  And there was a lot of discussion between
17 these people about this.
18 BY MR. SPIRES:
19     Q   Well, doesn't --
20         MR. McMAHON:  I think you've answered the
21 question.
22 BY MR. SPIRES:
23     Q   Doesn't the policy and the brochures explain
24 what the 80-percent rule means?
25         MR. McMAHON:  I think you should identify

Page 121

1  specifically the brochures.
2          THE WITNESS:  I'd like to see that.
3          MR. McMAHON:  The brochures that were --
4          MR. SPIRES:  All right.  Well, first we'll
5  look at the policy.
6  BY MR. SPIRES:
7      Q   Quickly, if you'd turn to page 4 and you
8  look at --
9      A   What's the Bates number?
10     Q   I don't think there is a Bates number.
11     A   On the bottom right?
12     Q   Oh, I'm looking at the policy.  This is
13 Exhibit --
14         MR. McMAHON:  Page 4?  Page 4, you have a
15 question for him?
16 BY MR. SPIRES:
17     Q   Page 4 of -- Exhibit 1, I believe, is the
18 policy.
19         MR. McMAHON:  Well, which one do you have
20 marked?  This?
21         THE WITNESS:  That's 6.
22         MR. McMAHON:  This is Number 6.
23         THE WITNESS:  I don't have any exhibits
24 here.  Here's one.
25         MR. McMAHON:  Where does it say page 4?

Cooke vs. American Family Life        Paul Amoruso, Vol. I        05/30/2014

Page 122

1    **THE WITNESS:  Is this it?  This says page 4.**
2        MR. SPIRES:  Let me see this.  Page 4 of the
3    policy --
4        MR. McMAHON:  Now, I want to know, is this
5    the policy that Teika Cooke signed and bought from
6    AFLAC or is this a specimen?
7        MR. SPIRES:  This is the policy that was in
8    effect at the time.
9        MR. McMAHON:  Okay, so you're assuming that
10   she got this policy.  Do you have a -- by the way, do
11   you have an original insurance policy that she
12   accepted from AFLAC?
13   BY MR. SPIRES:
14   Q    Let me ask the questions right here.
15   **A    Okay.**
16   Q    Totally disabled, do you see that?
17   **A    Yes.**
18   Q    Okay.
19       MR. McMAHON:  What paragraph is that?
20       MR. SPIRES:  That's P.
21   BY MR. SPIRES:
22   Q    All right, we'll start at the second --
23   third sentence, which is, "If you are unable to
24   perform the material and substantial duties of your
25   full-time job but are able to work at any job, you

Page 123

1    will continue to be considered totally disabled as
2    long as your earnings are less than 80 percent of your
3    base pay earnings at the time you become totally
4    disabled."
5        All right, flip back one page, to page 3,
6    base pay earnings.
7        MR. McMAHON:  Could you tell me what that
8    says, for training purpose only?
9        MR. SPIRES:  Let's -- let me ask the
10   questions.  If you have some follow-ups or you want to
11   examine these documents later on, you can.
12   BY MR. SPIRES:
13   Q    "Your gross salary or wages for full-time
14   job.  This does not include federal pay such as
15   overtime, bonuses, or other incentives."
16       So is that something that is confusing as to
17   whether it includes overtime or not?
18   **A    I would say no.  I don't know if this is**
19   **part of the policy, though.**
20   Q    Okay.
21   **A    That's something I don't know.**
22   Q    Okay.  Let's move to --
23   **A    Where are we?**
24   Q    We're on the statement.
25   **A    Oh, okay.**

Page 124

1    Q    Okay.  The next sentence, following along,
2    and starting with "As a result of AFLAC's actions."
3    **A    Yes.**
4    Q    Okay.  Where do you get your basis as to why
5    Teika Cooke was indicted?
6    **A    Because the agents submitted forms that**
7    **caused her to be paid when she should not have been**
8    **paid.**
9    Q    Did the U.S. Attorney specifically tell you
10   or have you read a deposition of the U.S. Attorney
11   saying we indicted --
12       MR. McMAHON:  Of course not.
13   BY MR. SPIRES:
14   Q    We presented evidence because --
15   **A    No, I have not.**
16   Q    Okay.  How about the grand jury?
17   **A    I have not seen it.**
18       MR. McMAHON:  Can't get grand jury
19   transcripts.  But we'll agree we never read the grand
20   jury transcripts.
21   BY MR. SPIRES:
22   Q    So where do you get your information as to
23   why Ms. Cooke was indicted?
24   **A    She was indicted for insurance fraud and**
25   **transmittal of -- using wire fraud, using -- using**

Page 125

1    **wire fraud, i.e., fax, to transmit documents that**
2    **caused her to get payments when she shouldn't have.**
3    Q    And how do you know AFLAC was involved in
4    any of that?
5    **A    Because her -- AFLAC's staff allowed the**
6    **documents to go from their office to the claims**
7    **department, saying that she was not getting payments.**
8    Q    But didn't we just discuss some of Ms.
9    Cooke's claim forms that went directly from Ms. Cooke
10   to AFLAC?
11   **A    We talked about one claim.  I only know of**
12   **one that she might have submitted by herself.  But I**
13   **don't know that she was under the opinion or was told**
14   **by her staff.  This is how they told her to fill out**
15   **the form.**
16       MR. McMAHON:  I'll state this for the
17   record, just because she sends in claim forms doesn't
18   mean that the agents didn't alter certain portions of
19   that claim form.
20   **A    She was not indicted for insurance fraud or**
21   **altering claims documents.  She was indicted for two**
22   **things that I remember, and they were withdrawn.  The**
23   **policies that she was paid on were AFLAC policies.  If**
24   **the AFLAC staff had not changed the documents or added**
25   **untruths to them, she would not have been indicted.**

Cooke vs. American Family Life        Paul Amoruso, Vol. I        05/30/2014

Page 126

1  She wouldn't have been collecting.  And she would have
2  canceled the policies.
3  BY MR. SPIRES:
4     Q   How do you know that?
5     A   I know that.  I'll state that as my opinion.
6     Q   Okay.  But you don't have any facts to base
7  that on?
8     A   AFLAC would not --
9        MR. McMAHON:  Well, he read Teika Cooke's
10  deposition.
11     A   I read her deposition.  Those claims would
12  not have been payable, the claims department would
13  have questioned them.
14  BY MR. SPIRES:
15     Q   All right.  And how about the claim forms
16  that Ms. Cooke sent directly to AFLAC headquarters?
17  And I'll represent to you that, one, Ms. Cooke
18  testified that those claim forms never went through or
19  touched the hands of Lisa and Kim Aikens, the ones
20  that Cooke sent directly to AFLAC; and two, I'll
21  represent to you that there were more than just one,
22  there were three or four.
23        MR. McMAHON:  And your question is?
24  BY MR. SPIRES:
25     Q   And my question is, how does AFLAC, or how

Page 127

1  does --
2        MR. SPIRES:  What was my question?  Can you
3  read it back?  Did I have one on the table?
4        (The reporter read the record as follows:
5        "Q   And how about the claim forms that
6  Ms. Cooke sent directly to AFLAC headquarters?
7  And I'll represent to you that --")
8        MR. SPIRES:  Okay.
9        MR. McMAHON:  And your question is how is
10  AFLAC involved in that?
11  BY MR. SPIRES:
12     Q   Right, how was AFLAC involved in any
13  wrongdoing associated with those claim forms?
14     A   They paid the benefits when they shouldn't
15  have been paid.
16     Q   But they paid the benefits based on the
17  representations that Ms. Cooke sent them.
18     A   From your agents.
19     Q   I'm talking about the claim forms that were
20  sent directly from Ms. Cooke.
21     A   Ms. Cooke was schooled and taught by your
22  agent.  If she was schooled incorrectly -- Ms. Cooke
23  was not indicted for any insurance-related issues
24  after they dropped their charges.  She didn't do
25  anything wrong.  AFLAC paid claims that the agents

Page 128

1  should have stopped from day one.  They didn't.
2     Q   Okay.  Maybe I missed it.  I don't know in
3  that answer if I really got an answer to my question
4  with regard to the claim forms that Cooke sent
5  directly to AFLAC headquarters, how AFLAC --
6        MR. McMAHON:  AFLAC is involved.
7  BY MR. SPIRES:
8     Q   -- was responsible for any wrongdoing in
9  submitting those claim forms.
10        MR. McMAHON:  And he's testified that
11  they're the ones that sold the insurance and the
12  representatives are the one that altered the claim
13  form.  I mean, he's testified to that.
14  BY MR. SPIRES:
15     Q   Then both of you all are missing my question
16  in both of your testimony.  Which just Paul is here to
17  testify today.
18        But the question is, in the claim forms that
19  Ms. Cooke sent directly to AFLAC that did not go
20  through Lisa and Kim, therefore there was no
21  alterations from Lisa and Kim, how does AFLAC have any
22  involvement in the wrongdoing associated with those
23  claim forms?
24     A   Two reasons.
25        MR. McMAHON:  And let me just specify

Page 129

1  something.  The claim forms you're talking about with
2  respect to the 80-percent rule were not filled out by
3  Teika Cooke, it was filled out by Sergeant Robinson or
4  another supervisor.
5        MR. SPIRES:  I'm getting -- I'm getting to
6  that.
7        MR. McMAHON:  Well, they were the ones
8  responsible for saying that she was making 80 percent
9  or she wasn't making 80 percent of her salary.
10        MR. SPIRES:  I agree.
11        MR. McMAHON:  It wasn't a representation
12  made by Teika.
13  BY MR. SPIRES:
14     Q   And not AFLAC, either, was it?
15     A   AFLAC had the responsibility to know what
16  the federal benefits were when they sold the policy.
17  You can't sell an insurance policy and not know what
18  the employee's -- what day-to-day benefits are.
19     Q   Isn't it the employee's --
20     A   The sergeant that signs the form for -- he's
21  not a part of the policy, he's just saying she's not
22  making 80 percent.  She's not making 80 percent
23  because her base salary is one thing and her gross
24  salary is another.
25        So where the problem started is when AFLAC

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

Page 130

1 sold the policies and the employees, AFLAC's
2 employees, knew that these people were not or should
3 not have been getting them. They changed documents so
4 that they could get paid. There was a conspiracy
5 here. They lied to the FBI, they created a false
6 trail.
7     Q   Look, let me stop you. We're not talking
8 about -- you keep reverting back to alterations and
9 Lisa and Kim's involvement. I'm not talking about
10 those claim forms.
11    A   Okay.
12    Q   I'm not talking about anything associated
13 with Kim and Lisa. I'm talking about the claim forms
14 that Ms. Cooke faxed directly to AFLAC headquarters.
15    A   Okay.
16        MR. McMAHON: Assuming there's proof in the
17 record as to that, can you answer that question?
18 BY MR. SPIRES:
19    Q   And there is plenty of proof. Ms. Cooke
20 admitted it.
21    A   I can only say that all of the damage
22 started when the policies were sold that should not
23 have been sold.
24    Q   Okay.
25    A   That's my answer.

Page 131

1     Q   That's your answer?
2     A   Yes.
3     Q   All right.
4         MR. McMAHON: And do you recall that Teika
5 Cooke testified that she never would have bought the
6 disability policy if she knew about this?
7 BY MR. SPIRES:
8     Q   So is your testimony that aside from any
9 misrepresentations made in the claim forms by Ms.
10 Cooke sent to, directly to AFLAC headquarters, that
11 she wouldn't have made those misrepresentations if
12 only she hadn't been provided a policy?
13    A   That's part of -- the policy shouldn't have
14 been sold in the first place. But that's not the
15 reason why. You had a state of confusion here that
16 was perpetrated by the AFLAC employees. They schooled
17 her, they told her what to do, they got her involved
18 with processing forms. They admitted to altering
19 documents. She thought what she was doing was right.
20    Q   Okay. And let me ask --
21    A   And where were those people? They were
22 AFLAC people.
23    Q   Let me ask you this. Have you ever read
24 Trevor Robinson's deposition?
25    A   What did he do? What was his role?

Page 132

1     Q   He was Ms. Cooke's supervisor.
2     A   No.
3     Q   Okay. Do you know of anything, document or
4 testimony, that states that Trevor Robinson was
5 confused about how much Ms. Cooke was making?
6     A   I don't think -- I never -- I don't remember
7 reading his deposition, but I do know that he would
8 not normally be a part of the AFLAC policy as to what
9 she can collect and what she couldn't collect.
10    Q   Okay. Is there anything you've read from
11 Trevor Robinson that he was confused as to whether Ms.
12 Cooke was making 80 percent of her salary when she was
13 injured?
14    A   I believe he signed documents, and I'm not
15 sure that he was a party to knowing the definition of
16 all of the forms and the documents.
17    Q   Okay. Wasn't Ms. Cooke's supervisor, Trevor
18 Robinson, responsible for filling out the claim form?
19    A   Yes. Yeah, he had to sign it.
20        MR. McMAHON: On behalf of the employer.
21    A   On behalf of the employer.
22 BY MR. SPIRES:
23    Q   So it was his understanding that ultimately
24 mattered as to the 80-percent rule; isn't that
25 correct?

Page 133

1     A   It was his understanding that she was
2 disabled, and he was satisfied with that. I don't
3 think he makes the decision as to what AFLAC is going
4 to pay. AFLAC was going to pay based on their policy,
5 which he's not party of.
6     Q   He's party to the claim form which provides
7 AFLAC the information on which it relies to determine
8 whether the claim is payable.
9     A   But Mr. Robinson did not have the knowledge
10 to know what was payable and not payable under the
11 AFLAC policy. His employee was injured, she was
12 missing her job, this is what -- that's all the
13 information he had to supply. AFLAC has the
14 responsibility to get the rest of the answers, to
15 realistically look at the policy they were selling,
16 their staff was selling, which really wasn't
17 collectible. I don't think anyone would disagree with
18 that today.
19    Q   Well, I'm still confused. If Mr. Robinson
20 is signing a claim form and checking a box on a claim
21 form showing that Ms. Cooke is not making 80 percent
22 of her salary, how is AFLAC supposed to know that
23 Mr. Robinson is lying?
24    A   Did Mr. Robinson know what the definition
25 was of AFLAC's policy, is he part of the claims

Cooke vs. American Family Life         Paul Amoruso, Vol. I                    05/30/2014

Page 134

1  process, or is he an information supplier?
2      Q   Well, I think we just established earlier
3  that --
4      A   If the question is poorly asked, that he is
5  answering it she makes 65,000 base, she -- actual
6  salary is a hundred thousand.  She's not making
7  80 percent.
8      Q   Is your testimony that Ms. Cooke during her
9  disability periods was not making 80 percent of her
10  salary?
11     A   No, I'm not saying that.  I'm saying that
12  she was receiving 100 percent from the United States
13  Government.
14     Q   Okay.
15     A   Of her base salary.
16     Q   Okay.  Are you telling me that if I take Ms.
17  Cooke's claim forms and I compare the months -- I
18  mean -- I'm sorry, strike that.
19         If I take Ms. Cooke's paystubs during the
20  months she was injured and I compare those paystubs to
21  paystubs during the months when she was not injured
22  that the first set is going to show her making
23  80 percent less inclusive of everything?
24     A   I can't answer that question.
25     Q   Okay.  But you testified earlier that she

Page 135

1  was making less than 80 percent, so I'm wondering
2  where you got that information.
3      A   She was indicted by the government.
4      Q   That doesn't make sense to me.
5      A   For insurance fraud.  Government said that
6  she was not eligible to be collecting.  That's the
7  whole issue.
8      Q   You just testified that Ms. Cooke was making
9  less than 80 percent of her pay when she was disabled.
10  And I'm trying to figure out where you got that
11  information, because it certainly wasn't her paystubs.
12     A   Ms. Cooke was not entitled to receive any of
13  the benefits from AFLAC.
14     Q   You're not answering my question, but we'll
15  move on.
16         4, "This indictment was dismissed when the
17  true facts came out regarding the AFLAC agent's
18  responsibility in processing the claims and altering
19  documents."  You don't really know why the indictment
20  was dismissed, do you?
21     A   Just leave what I have there.  That's my
22  opinion.
23     Q   That doesn't give me any basis on which you
24  formed this opinion.
25     A   I have to ask the question, was the

Page 136

1  indictment dismissed?  Yes.
2      Q   Do you know when it was dismissed?
3      A   No, I forget.  I've actually got the
4  indictment, and it's someplace in that pile of paper.
5  But it was dismissed, the government chose not to
6  continue with the issues against her.  And guess what,
7  she got her job back.
8      Q   I'll represent to you that Ms. Cooke was
9  indicted in June of 2010.
10     A   2010, all right.
11     Q   The 302 statements in which the sales
12  associates admitted to some alterations were in
13  June-July of 2010.
14     A   Yeah.
15     Q   Ms. Cooke's indictment was not dismissed
16  until February of 2011.
17     A   '11, right.  All right, I agree with that.
18     Q   Okay.  And based on that scenario right
19  there, that factual scenario, you're assuming that it
20  was dismissed just because Lisa and Kim admitted to
21  altering documents?  That was six months before it was
22  dismissed.
23     A   They admitted to altering documents, they
24  admitted that they were the culprits in causing this
25  problem.  I will let a jury decide what was the -- my

Page 137

1  opinion is that the indictment was dismissed because
2  the government decided they could not win.
3      Q   Okay, that's speculation.
4      A   I'm entitled to my opinion.  I processed, I
5  don't know, maybe 50 or 60 criminal cases against
6  people, and I know when indictments are dismissed.
7  The government does not like to admit they were wrong.
8      Q   You're not entitled to speculate as to why
9  it was dismissed.
10     A   I just did.
11         MR. McMAHON:  Well, it's not speculation if
12  he's testifying he had 60 criminal cases.
13     A   Right.  I have actually submitted -- I've
14  been involved in probably more than 60 in the course
15  of my 45 years, and I have seen where it didn't prove
16  out, they didn't have enough to convict them.  I
17  wanted them to be --
18  BY MR. SPIRES:
19     Q   Have you ever indicted an individual?
20     A   I don't indict anyone.  I turn facts over
21  and I follow the case.  My money.
22     Q   So you actually have played no role in
23  indicting an individual in front of a grand jury?
24     A   No, I just submit facts.
25     Q   Okay.

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

Page 138

1     A   But I follow it.
2     Q   You're not -- have never been a lawyer,
3  never had a law license?
4     A   Oh, no. I don't need one.
5          MR. McMAHON:  Thank God.
6  BY MR. SPIRES:
7     Q   You've never worked for the U.S. Attorney
8  Office?
9     A   No, I've just worked for them.  Yeah, I've
10  worked for them.
11     Q   You've worked directly for them?
12     A   Yeah, they've called me as an expert witness
13  twice on cases.  I just did one for a public
14  defender's office last year.
15     Q   Okay.  Only as an expert witness, though?
16     A   Right.
17     Q   All right.  "AFLAC's investigation into this
18  issue was substandard, without any depth, and lacked
19  an attempt to find a cause of the problem, which was
20  AFLAC's own staff inadequacies who were improperly
21  trained."  Did we cover all your opinions associated
22  with that particular sentence earlier?
23     A   Yes.
24     Q   Okay.  All right, the next, we've got A(1).
25  Rather than reading the whole thing, if you'll read 1

Page 139

1  until the end of the first sentence on page 10.
2     A   Okay.
3     Q   Did we cover all your opinions associated
4  with Lisa Young and Kim Aikens and any failure to
5  train, monitor them earlier?
6     A   I could not add anything to what I've said.
7     Q   All right.  Next sentence, "As reflected in
8  her deposition testimony, Agent Young had no interest
9  in supervising Agent Aikens."  What portion of
10  Ms. Young's deposition are you speaking of?
11          MR. McMAHON:  I can give you the page cite
12  for that.
13          MR. SPIRES:  Okay.
14          MR. McMAHON:  But I don't have it at my
15  fingertips.  But she testified in her deposition that
16  she did not want to supervise Kim.
17  BY MR. SPIRES:
18     Q   Will you provide me with that page?
19     A   I'll provide you with that page number.
20          MR. McMAHON:  I'll get it.
21  BY MR. SPIRES:
22     Q   All right.  Okay, next sentence, "She failed
23  to examine Agent Aikens' work product or any of the
24  responsibilities assigned to Aikens in any usual and
25  customary manner as a supervisor."  What is your basis

Page 140

1  for that?  Is there testimony or documents you're
2  relying on, or are you just assuming it based on
3  actions that happened later on?
4     A   Based on my review, as I said before, we
5  covered this, of how she was supervised and what she
6  failed to do.
7     Q   Okay.  So this is what we covered earlier
8  on?
9     A   Yes.
10     Q   "It was obvious the forms were being
11  altered, yet Supervisor Young did not discover and
12  pass the information on to AFLAC."  What was obvious
13  about the forms being altered?
14     A   The question in the claims form regarding
15  are you collecting disability benefits from your
16  employer.  She checked no.
17     Q   How is that obvious?
18     A   Because she was collecting disability
19  benefits from her employer.
20     Q   So the question, the 80-percent rule
21  question that we were referring to?
22     A   Yes, sir.
23     Q   Okay.  It was obvious to everybody that the
24  question should be checked yes --
25     A   Yes.

Page 141

1     Q   -- I am making over 80 percent; is that
2  correct?
3     A   Yes.
4     Q   That's your testimony.  Okay.
5          "In addition to her coordinating activities
6  between AFLAC and the PFPA, Agent Young had the
7  responsibility of supervising the work product."  Have
8  we addressed everything in that sentence earlier, all
9  your opinions?
10     A   I couldn't add anything to that.
11     Q   All right.  "Aikens testified in her
12  deposition," will you provide me the cite in this?
13     A   Page number.
14     Q   The page number?
15          MR. McMAHON:  Which reference?
16  BY MR. SPIRES:
17     Q   "Aikens testified in her deposition that she
18  had destroyed original insurance documents, something
19  no agent should do without recording the name of the
20  document, when it was destroyed, and purpose of
21  destruction."  I think we hashed the destruction
22  conversation earlier.
23     A   Yes.
24          MR. McMAHON:  We did.
25  BY MR. SPIRES:

Page 142

1    Q   But just quickly, it seems --
2        MR. McMAHON:  She said that in the 302.
3        MR. SPIRES:  Well, this references her
4    deposition, that's what I was wondering.
5    BY MR. SPIRES:
6    Q   You added here that agents -- it's customary
7    that agents should, if they destroy documents, record
8    the name of the document and when it was destroyed and
9    the purpose of destruction.
10   A   **Right.**
11   Q   That's all required?
12   A   **Yeah, that's pretty much industry standard**
13   **when you're destroying documents.  So you keep a**
14   **record of what you destroyed.  Sometimes you have to**
15   **keep these things for 10, 20 years.**
16   Q   If a sales associate takes an original,
17   scans it into the computer, and then throws the
18   original piece of paper away, does the sales associate
19   record --
20   A   **I'll go back, if AFLAC has a destruction**
21   **policy that allows that, that's perfectly acceptable.**
22   Q   Okay.  "Due to the action of AFLAC's staff
23   in destroying those documents, information a PFPA
24   officer like the plaintiff could use to prove her
25   innocence was lost forever."  What was on, or what do

Page 143

1    you believe was on the original claim forms that were
2    destroyed that would have proved Ms. Cooke's
3    innocence?
4    A   **Because the fact that they were destroyed.**
5    **I think it's a two-sided question.**
6    Q   But that doesn't --
7    A   **Why were the documents destroyed?  There was**
8    **a purpose for their destruction.  There was no reason**
9    **to destroy them, AFLAC had no policy to destroy them.**
10   Q   How do you know what AFLAC's policy is?
11   A   **Because they were not -- we destroy these**
12   **documents and we can.  There's nothing in the material**
13   **that I read to show that AFLAC approved people**
14   **destroying documents.  They're material to their**
15   **agent, they're going to keep the material.  It doesn't**
16   **say that they can't keep a representation of it or a**
17   **fax, it's somewhat vague.  But why in the hell would**
18   **you burn documents in your backyard?  She admitted to**
19   **that.  I'm just looking at that as just one fact.**
20   Q   You're just speculating as to why the
21   documents were burned?
22   A   **I'm giving you my professional opinion that**
23   **there was a reason for it and I don't like it.  That's**
24   **all I'm saying there.**
25   Q   Okay.  All right, let's jump down to the

Page 144

1    bottom of page 10.  "Agent Young also testified that
2    never once in the five years of the office's
3    operations did an AFLAC official come out to audit the
4    office's insurance sales activities."
5        MR. McMAHON:  Do you want the page number
6    from her depo?
7        MR. SPIRES:  Yes, please.
8    BY MR. SPIRES:
9    Q   What is required in terms of an audit on
10   sales associates' offices as the standard of care
11   would require in the insurance industry?
12   A   **Usual and customary practices require that**
13   **the company monitor and make sure that the agent**
14   **continue the practices that they signed up to do.  I**
15   **actually created organizations to do this, I've done**
16   **it for the State of Vermont, gone in and looked at**
17   **what the company rules are and what -- if you have**
18   **certain rules and things that you're doing, you're**
19   **supposed to come out and look at them.  You're**
20   **supposed to check.  You're taking it on blind faith**
21   **that you're not.**
22       **These are independent people, I understand**
23   **that, but they have a contract back to selling AFLAC**
24   **policies.  Are you selling the policies in accordance**
25   **with AFLAC's standards?  To make an assumption that**

Page 145

1    **they are without any proof is just plain wrong.  The**
2    **industry standard is for you, the company, to be sure**
3    **that they are.  Now, how you do that is take their**
4    **word and say, I don't know, I go to an AFLAC seminar**
5    **every year and say I affirm that I am living -- being**
6    **a good guy?  That's not acceptable.**
7    Q   When you say AFLAC official, are you
8    referring to an AFLAC employee?
9    A   **I am referring to the people selling AFLAC**
10   **policies under the rules AFLAC set out.  This is not a**
11   **Lisa Young insurance policy, it's an AFLAC policy with**
12   **their rules, their requirements on it.  And AFLAC had**
13   **the responsibility to make sure that their policy was**
14   **being sold.**
15   Q   Okay, that's not my question.  My question
16   is --
17       MR. McMAHON:  Excuse me one second.
18       (Discussion off record.)
19   BY MR. SPIRES:
20   Q   I'm asking you in your 26(b) statement, when
21   you refer to not once in five years of the office's
22   operations did an AFLAC official, when you say AFLAC
23   official, are you referring to an AFLAC employee?
24   A   **Someone that -- the term "official" is kind**
25   **of broad in my world in this case.  They could have**

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

Page 146

1  hired an outside contractor, I've done it for people.
2  So I'm not an AFLAC official, but I've gone in and
3  looked at companies' procedures, make sure they're
4  doing what they're supposed to.
5      Q   Would it be proper if a state sales
6  coordinator or a regional sales coordinator was also
7  an independent contractor?
8      A   Could be.
9      Q   Okay.
10     A   It could be someone that is making sure that
11 they live up to what they say they were going to live
12 up to.
13     Q   Okay.  Do you know whether a state sales
14 coordinator or regional sales coordinator came to Lisa
15 Young's office?
16     A   She said no in her deposition, and I saw no
17 results submitted to say that we audited her and she
18 was fine.
19     Q   Okay.  The reason I ask is because this is
20 referencing AFLAC official, and I don't know in her
21 deposition even if this, what is said right here, is
22 correct in terms of what she said in her deposition,
23 whether it was referring to an AFLAC employee, or a
24 state sales coordinator, or a regional --
25     A   Someone AFLAC controlled, paid for, and had

Page 147

1  a specific job.  They become an AFLAC official.
2      Q   We'll move on.
3          "While AFLAC was instrumental in setting up
4  the agent's access to PFPA officers," how did AFLAC
5  set up Lisa and Kim's access to the Pentagon police
6  officers?
7      A   The two salespeople were the AFLAC employees
8  that sold the policies to these people.  They were
9  AFLAC.
10     Q   Well, that's -- read your sentence.  "AFLAC
11 was instrumental" --
12     A   Right.
13     Q   -- "in setting up the agent's access."
14     A   Okay.
15     Q   Okay.  So you're saying and what your
16 testimony just said, Lisa and Kim were instrumental in
17 setting up Lisa and Kim's access to PFPA.
18     A   They were instrumental in setting up --
19 AFLAC had insurance policies.  AFLAC insurance
20 policies were sold by these two people.  These people
21 are AFLAC.
22     Q   What did AFLAC headquarters do in terms of
23 setting up Lisa and Kim's access to Pentagon police
24 officers?
25     A   They allowed them to sell policies to these

Page 148

1  people.
2      Q   Okay.  Are you saying by simply entering
3  into an independent contractor agreement that we
4  discussed earlier with Lisa and Kim, that's your basis
5  for saying that AFLAC was instrumental in setting up
6  Lisa and Kim's access to the police officers?
7      A   These aren't Lisa and Kim insurance
8  policies, these are AFLAC insurance policies.  These
9  are policies sold by them with AFLAC's rules and
10 regulations on how to sell them.  And these people are
11 AFLAC in the selling of the policies.  These weren't
12 Lisa and Kim policies they were selling.
13     Q   So is your testimony simply because they
14 were AFLAC policies, that's AFLAC's only involvement
15 in terms of setting up, or instrumental in setting up
16 the agent's access to PFPA officers?
17     A   Without those policies they could not have
18 done what they did.
19     Q   Yes or no?
20     A   No.  I'm saying that they could not have
21 sold the policy.  I guess the answer is yes, without
22 AFLAC's policies they could not have sold anything.
23     Q   All right, you're not answering my question
24 at all.
25         While AFLAC was instrumental in setting up

Page 149

1  the agent's access to PFPA officers, list how AFLAC
2  was instrumental in setting up Lisa and Kim's access
3  to the police officers.
4      A   They had insurance policies that these
5  agents sold.
6      Q   So just because Lisa and Kim were selling
7  the AFLAC policy, that's it?
8      A   That's it.
9      Q   Okay.  "After this occurs, it is quite
10 obvious the agents were on their own."  Explain to me
11 what you mean by being obvious Kim and Lisa were on
12 their own.
13     A   They received no training, they received no
14 follow up, they received no auditing.  It's pretty
15 much of a do what you want, folks, send us the money,
16 or have someone send it to us.
17     Q   Okay.  "It appears AFLAC's sole concern was
18 to sell policies and the agents were very concerned
19 only about retaining their commissions."
20     A   Yes.
21     Q   Where do you get --
22     A   He'll give you the page cite on that.
23     Q   Okay.
24     A   I don't have it.
25     Q   Yes, I want that.

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

Page 150

1      All right, the next, if you'll read the next
2  three sentences, pretty long.
3      **A   Okay.**
4      Q   All right.  The third sentence, "Auditors
5  could have also compared forms to check for
6  irregularities such as mismatching signatures from
7  doctors or supervisors."
8      **A   Yes.**
9      Q   All right.  What claim forms are you talking
10  about in that sentence?
11     **A   Claims -- the forms in the claims process**
12  **that Robinson admitted were not his signatures.**
13     Q   Okay.
14     **A   There was original documents that were**
15  **missing.**
16     Q   When an auditor goes out in, as you
17  testified, the usual practice for an audit of the
18  sales associate's office, when that audit occurs, do
19  the auditors go out and sit there with every claim
20  form and look to see if signatures match?
21     **A   I'm not a signature comparison, I don't**
22  **do -- but it was obvious to me in different that**
23  **documents that we're talking about different**
24  **signatures.  I would have spotted that.  And when I**
25  **have audited -- I've done probably more than 100 --**

Page 151

1  **agencies, that's one of the things you look for.  And**
2  **I'm not looking for a signature, it's just something**
3  **that sticks out at me.**
4      Q   Okay, you're saying that signatures --
5      **A   Just signatures, irregularities, dates that**
6  **are missing, forms that are uniformly done.  Lots of**
7  **reasons.**
8      Q   Let me finish.  You're saying in this
9  sentence that signatures on Ms. Cooke's claim forms,
10  particularly Trevor Robinson's, could have been --
11         MR. McMAHON:  Could have been detected.
12  BY MR. SPIRES:
13     Q   -- discovered --
14     **A   Detected, discovered, yes, sir.**
15     Q   -- by the auditors --
16     **A   Yeah.**
17     Q   -- if they had not destroyed the documents.
18  I'm sorry --
19         MR. McMAHON:  No, no.
20  BY MR. SPIRES:
21     Q   I just read the wrong sentence.
22         MR. McMAHON:  Yeah.  They could have done
23  that because they could have compared forms to check
24  for irregularities.
25  BY MR. SPIRES:

Page 152

1      Q   Let's say, hypothetically speaking, an
2  auditor went out to Lisa and Kim's office and happened
3  to discover that there were irregularities with regard
4  to Trevor Robinson's signature in the claim forms.
5  Then what would have happened next?
6      **A   You would start to think that something's**
7  **wrong.  It's an investigation process.**
8      Q   Right.  So who then investigates that?
9      **A   Depends what the level of the auditor is.  I**
10  **was a senior vice president when I was going out**
11  **auditing things, I didn't really have the time.  I**
12  **would have called in staff people to do that.  I**
13  **happen to like doing things like that.  I would have**
14  **spotted something.**
15         **I might have called in some of my SIU people**
16  **that I had who were very good at this, former police**
17  **people or existing police people who would say, all**
18  **right, what does one leads you to, one leads you to**
19  **two, two leads you to three, or one just shuts the**
20  **door and I'm wrong and the forms were not changed.**
21  **It's an investigation process.**
22     Q   Wait, the forms were not changed?
23     **A   That could have been an answer that my**
24  **investigators looked at.  I could have been wrong.  I**
25  **wasn't wrong in this case, because it's obvious that**

Page 153

1  **they were.  But that's just part of an investigation.**
2      Q   You're saying it's obvious that Trevor
3  Robinson's signature was forged?
4      **A   Right, it is obvious.  But I'm saying in an**
5  **investigation --**
6      Q   Wait, let me finish my question.
7      **A   Go ahead, I'm sorry.**
8      Q   Are you saying in this case it is obvious
9  that Trevor Robinson's signatures were forged?
10     **A   I think so, yes, sir.**
11         MR. McMAHON:  I think he's testified that
12  they were different.
13     **A   They were different.  I didn't say -- they**
14  **were different.  It would have just caused me to look**
15  **deeper, that's all.  Something's not right here, it**
16  **doesn't look the same.  Actually, I look at**
17  **signatures.**
18  BY MR. SPIRES:
19     Q   So when you see irregular signatures, it's
20  right to go look to see why there's different
21  signatures?  Is that what your testimony is?
22     **A   Yes.**
23     Q   All right, we've gone through -- okay, the
24  bottom of the page starting with apparently.
25  "Apparently, Ms. Bryan-Torsiello did not review the

Page 154

1 FBI 302 forms where Agent Aikens stated that no police
2 officer had ever asked her to alter insurance
3 documents."
4        Do you know whether Ms. Bryan-Torsiello had
5 access to the FBI 302 forms?
6    A   She did not ask whether -- no, I don't think
7 she did.
8    Q   You don't think she had access?
9    A   She said that she didn't know, at least in
10 her initial investigation.  She knew later that it was
11 there.  Up to March-April, whenever the hell she did
12 her first report, she didn't know it existed, but then
13 she knew later that it did exist.
14    Q   Do you know whether the FBI just hands those
15 302 statements out?
16    A   I've had good cooperation as an SIU person
17 with law enforcement.  I don't think that they would
18 have said no.
19    Q   You don't know, though?
20    A   I don't know.  I don't know that they
21 wouldn't have said we are investigating.  It's a
22 question she could have asked.
23    Q   Okay.  Next sentence, "This position was
24 consistent with what Lisa Young stated in her
25 deposition."  Can you give me the cite to that as

Page 155

1 well?
2        MR. McMAHON:  Was that the Young deposition?
3        MR. SPIRES:  Yes.
4        MR. McMAHON:  Okay.
5 BY MR. SPIRES:
6    Q   This next sentence, "Since the insurance
7 fraud was premised on alteration of documents," would
8 it be fair to say, because it continues to come up
9 through your opinion, that maybe the most glaring or
10 important failure in Shara's investigation was the
11 failure to interview Lisa and Kim?
12    A   That's one of them.  I wouldn't say glaring,
13 I'd say the whole investigation was bad.
14    Q   Okay.  "Ms. Cooke's request for information
15 on the term 'light duty' was never satisfied by the
16 investigator."  Where did you get information that Ms.
17 Cooke requested information on the term "light duty"?
18        MR. McMAHON:  That was at her deposition.
19    A   Deposition testimony.
20 BY MR. SPIRES:
21    Q   Ms. Cooke's?
22    A   Yes.
23    Q   Okay.  When you say "She," referring to Ms.
24 Cooke, "was simply following AFLAC's interpretation of
25 light duty," are you referring to the interpretation

Page 156

1 in the policy?
2    A   No.
3    Q   Okay.
4    A   What the agents told her.
5    Q   In terms of when you say following
6 AFLAC's interpretation, or what the -- what Lisa and
7 Kim told her, are you saying that she followed that
8 interpretation to fill out the claims forms?
9    A   One of the things that I think was confusing
10 in this.
11    Q   Okay.  Well, I'll represent to you, so we
12 don't have to go back and look at them, that light
13 duty is -- light duty questions are on the physician's
14 claim form and the employer claim form.
15    A   When you go to your agent and ask them a
16 question and they give you an answer, those are the
17 people you believe.
18    Q   Right, but --
19    A   That is AFLAC.
20    Q   Okay, well, isn't it the doctor's
21 interpretation of light duty when he or she is filling
22 out the physician statement?
23    A   Yes, sir.
24    Q   Okay.  So why would Teika Cooke's
25 interpretation, wherever she got it, of light duty

Page 157

1 matter?
2    A   Because AFLAC were the people who were
3 paying her insurance policy.
4    Q   That --
5    A   That's the only thing that she was
6 concentrating on.  She didn't read what the doctors
7 wrote.
8    Q   All right.
9    A   I don't believe -- I believe that these two
10 women were so interested in maintaining their
11 commissions that they told her what they needed to do
12 to keep these agents happy.
13    Q   You're not answering my question.
14        When the doctor fills out the claim form,
15 the physician statement --
16    A   Yes, sir.
17    Q   -- why does Ms. Cooke's interpretation of
18 light duty matter on how the doctor is answering the
19 question on light duty?
20    A   Because AFLAC continued to pay the claims
21 based on her submission of the claims.
22    Q   That does not answer my question.
23    A   I don't understand your question then.
24    Q   All right.
25    A   I mean, if the doctor's definition, he said,

Page 158

1 yeah, she can go back, she has light duty available to
2 her.
3    Q   All right.
4    A   She should be able to do light duty.
5    Q   Well, we can find those claim forms. I'll
6 show you.
7        (Discussion off record.)
8 BY MR. SPIRES:
9    Q   Do you understand on the physician statement
10 that we had earlier as an exhibit that there's a
11 question for the physician as to whether the physician
12 is releasing Ms. Cooke, back to work full
13 time or back to work light time?
14    A   That's fair.
15    Q   You're aware of that?
16    A   I agree with that, yes.
17    Q   All right. How would Ms. Cooke's
18 interpretation of light duty affect the physician's
19 medical opinion as to whether he is releasing her back
20 to work full time or light duty?
21    A   My opinion is that she was released -- the
22 physician that released her back to light duty was
23 something AFLAC did not pick up and did not change the
24 status of her claims payment and she continued to get
25 paid. She continued to process the claims because the

Page 159

1 claims staff told her -- correction, the two agents
2 told her to continue processing the claim. If AFLAC
3 caught that, they could have possibly altered her
4 payment status or stopped paying her. They didn't.
5    Q   All right, let me see if I can make this --
6 because you're not answering my question.
7    A   I'm trying to.
8    Q   Okay. It's a -- and I'll make it a yes or
9 no question.
10      The physician is responsible for filling out
11 the physician statement, correct?
12    A   Yes, sir.
13    Q   The physician is responsible for making
14 determination of whether he or she is going to release
15 Ms. Cooke from his care to work full time or to work
16 part time or to work light duty, correct?
17    A   I agree.
18    Q   Okay. And the doctor's opinion of whether
19 he is releasing Ms. Cooke to work full time or light
20 duty is unaffected by whatever Ms. Cooke has been told
21 by Lisa and Kim, is that fair to say?
22    A   I don't disagree with that at all.
23    Q   Okay.
24    A   That's not what I'm saying, but that
25 statement is true.

Page 160

1    Q   Okay.
2      MR. McMAHON: Harrison, you know in this
3 record there's evidence of the fact that the periods
4 themselves were altered.
5      MR. SPIRES: I'm not saying with regard to
6 alterations. What I'm referencing is --
7      MR. McMAHON: There were periods of
8 disability, but they were altered.
9      THE WITNESS: That's what caused the
10 problem. The doctor's opinion stands.
11 BY MR. SPIRES:
12    Q   You said that Ms. Cooke was simply following
13 AFLAC's interpretation of light duty.
14    A   That's right --
15    Q   Okay.
16    A   -- to say that.
17    Q   Are you talking in that sentence about any
18 sorts of representation of light duty that Lisa and
19 Kim made to Ms. Cooke?
20    A   AFLAC is Lisa and Kim in that context.
21    Q   Is that -- answer my question yes or no.
22    A   Yes.
23    Q   Okay. All right. Why does that have any
24 bearing on how the physician answers that question?
25    A   I'm not saying that it did.

Page 161

1    Q   Okay. How does it have any bearing on how
2 the employer answers that question?
3    A   It didn't.
4    Q   Okay. So back to my original question, what
5 does Ms. Cooke's following AFLAC's interpretation of
6 light duty have anything to do with the claim forms?
7    A   In the altered documents that were
8 submitted --
9    Q   I'm saying outside the altered documents.
10    A   The AFLAC employees told her what light duty
11 was. She did what the two employees told her to do as
12 to their interpretation of what light duty was. I'm
13 not saying it changed the doctor, I'm not saying it
14 changed anything. Just -- I'll let the sentence
15 simply say what it is. It was their opinion that told
16 her what light duty was. If AFLAC chose to deny the
17 claim because the doctor said she could come back to
18 work and they had enough facts, they should have.
19    Q   You say here that, "Ms. Cooke was hoping
20 that explaining how AFLAC would use the term 'light
21 duty' would have exonerated her." That to me tells me
22 you think that Ms. Cooke's interpretation that she was
23 given by Lisa and Kim of light duty is important as to
24 how these claim forms are filled out.
25    A   I do think they were.

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

Page 162

1    Q   I'm trying to figure out how.
2    A   Okay.  The only answer that I can give is
3  that there were altered documents, she continued to
4  submit claims where the documents were altered, and
5  the company continued to pay her.  I don't think she
6  would have continued to pay the claims had she
7  understood what light duty meant in the terms of what
8  the doctors were originally saying and her employer
9  was originally saying.  That's it, that's all I can
10  comment on that.  The fact is the doctor's opinions
11  were good, the employer's opinions were good, but
12  there was other problems surrounding these claims.
13    Q   Okay.  I take that as that Ms. Cooke's
14  interpretation had absolutely no bearing as to how the
15  employer and the physician filled out the claim forms.
16    A   Oh, no, absolutely, I agree with that.  They
17  had -- it had nothing to do with them, just the claims
18  were continuing to be submitted.
19    Q   Okay.  Anything else about Shara?
20    A   No, I couldn't add anything to her.
21    Q   To the opinions that you -- okay.
22        Again, we see, "Most importantly, had Shara
23  interviewed Agents Young and Aikens," that seems to be
24  a recurring theme, that that is one of the most
25  important facts that you're relying on to criticize

Page 163

1  Shara, is that fair to say?
2    A   I think that's important.
3    Q   Okay.  All right, finally, we're on 5, Roman
4  numeral 5.  Okay.  "It is my further opinion that
5  AFLAC has violated insurance industry usual and
6  customary practices by not setting up proper
7  procedures to scrutinize candidate qualifications."
8  What does that mean?
9    A   To scrutinize the candidates that they're
10  hiring.
11    Q   Who are they hiring?
12    A   These two sales agents.
13    Q   You mean entering into the independent
14  contract?
15    A   Entering into the -- entering into their
16  agreements to sell AFLAC policies.
17    Q   What leads you to believe that any sort of
18  additional scrutinizing that AFLAC could have done in
19  this scenario would have turned up anything on Kim and
20  Lisa?
21    A   By hiring people who are truthful and not
22  going to be interested in just the commission that
23  they're generating.
24    Q   Have you seen anything in -- any evidence
25  that shows that there's an indication that Lisa and

Page 164

1  Kim would not be truthful before AFLAC entered into
2  the independent contractor agreements with them?
3    A   I think their lack of training and
4  misunderstanding of insurance was very crucial, and
5  they're going down a path that was bad.  I think a
6  professional would have recognized it, recognized they
7  were going to get caught.  That's the big thing that
8  stops most crooks.
9    Q   Would have recognized what?
10    A   That they could not represent coverages that
11  would not have been -- should not have been payable,
12  that they could -- should not, could not represent --
13  do things in their insurance operation that were just
14  wrong, forging documents, changing them just to
15  maintain the insurance premium structure.
16    Q   Are you telling me that pre-2002 when
17  Ms. Young signed her independent contractor agreement
18  with AFLAC that there's something in Ms. Young's
19  history or something that AFLAC should have discovered
20  that would have given them an indication that Lisa
21  Young was going to lie?
22    A   This was a two-part answer that I gave.
23    Q   Yes or no to my question?
24    A   Yes.
25    Q   Okay, what?

Page 165

1    A   Okay, because if you read the whole answer,
2  it says that they didn't supervise them correctly.
3  That's the first part of the question.
4    Q   Okay, I'm asking about the scrutinizing
5  candidates.
6    A   The second part is I have interviewed
7  literally hundreds of people that we hire, people that
8  pay claims, people that issue policies, and it is an
9  experienced person that should have been used.  I look
10  at their credentials, what they've done, could they
11  understand the problems that they're going to get.  I
12  just would not have hired them.
13    Q   What part of Lisa Young's past would have
14  been discovered by AFLAC had any additional
15  scrutinizing been done that would have prevented them
16  from entering into this independent contractor
17  agreement?
18    A   I just think it's --
19        MR. McMAHON:  I think he testified that she
20  had no supervisory experience.
21        THE WITNESS:  Yeah, but he's going into a
22  second thing, he's saying what could she have -- what
23  could I have been -- what could I have seen if I
24  interviewed her that would have stopped me from
25  hearing her.

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

Page 166

1  BY MR. SPIRES:
2     Q    Right.
3     A    That's your question.
4     Q    Yes.
5     A    And my answer is experience.
6     Q    Are you saying that if a sales associate
7  comes to you and doesn't have experience --
8     A    No, no, my experience.  My experience in
9  interviewing a candidate that's not right for this
10 job.
11    Q    Okay.
12    A    That's what I'm saying.  I would have looked
13 at them and said these are not candidates that are
14 salable people basing their whole life's process on
15 commission, they're not the kind of people I want to
16 be -- whatever they do, they're getting paid for.
17    Q    You have no evidence of a character flaw or
18 anything of that nature or a past criminal history or
19 past history of a job history from Lisa or Kim that
20 gives you an indication that they would behave in the
21 way they did?
22    A    They were simply not experienced enough to
23 do the jobs that they were assigned.
24    Q    Do you know what jobs they were assigned?
25    A    They were basically salespeople.  One

Page 167

1  started off as answering the phones and processing
2  claims forms and the other was out selling.  And
3  neither one of them had any commission-based
4  experience selling practice.  I would -- that's as
5  much as they had when they walked in the door.  They
6  were -- one's a file clerk for years.  There's nothing
7  wrong with file clerks, it's just that these were not
8  people that I would have hired as sales associates for
9  their income to be generated on commission.
10    Q    Why?
11    A    I wouldn't.  They didn't have any
12 experience.  When you generate commission, you've got
13 to sell, you've got to sell.  And what are you
14 selling?  AFLAC's got a good product, I'm not saying
15 it's bad.  I'm just saying that these are people that
16 did not have the experience necessary to walk in the
17 door on day one and start selling disability insurance
18 policies.
19    Q    Well, wouldn't it be fair to say that there
20 sure wouldn't be many sales associates if insurance
21 companies were not entering into contract agreements
22 with them if they refused to hire individuals who
23 hadn't sold policies before?
24    A    There's a lot of experienced people out
25 there.

Page 168

1     Q    Yes or no to my question?
2     A    I would say that that's not a question I can
3  answer, because you make a decision on each person.
4     Q    All right, we'll move on.
5          Just quickly, I think we touched on it, but
6  what corrective action should Shara have taken that
7  would have prevented the indictment of Officer Cooke?
8     A    Do a complete investigation.  Find out --
9  interview the staff of the agency, find out --
10    Q    Staff of -- you're talking about the 97
11 police officers?
12    A    No, no, the two employees.
13    Q    Okay, interview Lisa and Kim?
14    A    Yes.
15    Q    Okay.
16    A    Find out what was going on.  Look at the
17 documents herself, the documents in the claims file.
18 Do an actual audit of the agency.  Look at the agency
19 material, look at the -- talk to underwriting, find
20 out what's the loss ratio of this particular group of
21 agents versus premium.  These are all parts of a
22 reasonable SIU investigation.
23    Q    All of that should have occurred when the
24 file was referred to her for a forged signature?
25    A    Absolutely.

Page 169

1     Q    Okay.
2     A    She said she didn't do it.
3     Q    All right.
4          (Discussion off record.)
5          MR. SPIRES:  Just for the record, we have --
6  Mr. McMahon and I have agreed to adjourn Mr. Amoruso's
7  deposition temporarily, due to Mr. Amoruso's flight
8  schedule, and to re-adjourn at a date in the near
9  future, agreeable date in the near future, to address
10 Mr. Amoruso's qualifications, CV, and history in the
11 insurance agency.
12         MR. McMAHON:  And I have a couple of
13 questions I want to pose to him now.
14         MR. SPIRES:  Okay.  So I guess we're not
15 quite adjourned, but we'll -- my portion is adjourned
16 temporarily.
17         EXAMINATION BY COUNSEL FOR THE PLAINTIFF
18 BY MR. McMAHON:
19    Q    Sir, based upon your experience, is there a
20 department within an insurance company that would
21 determine whether or not a particular policy that
22 representatives are going to sell is appropriate for
23 the target audience of policyholders?
24    A    Yes.
25    Q    What's the name of that department?

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

Page 170

1      A     That would be underwriting.
2      Q     And what do they do to ascertain the
3  propriety of selling a certain policy to a certain
4  group?
5      A     Underwriting examines the group, the
6  individual, and determines the -- they know the
7  policy's conditions and whether or not that person or
8  group is a good candidate.
9      Q     Now, in terms of Shara, what would talking
10  to the 97 police officers who filed similar disability
11  claims, what would that have accomplished?
12      A     It would have given her facts as to how
13  their claims were handled, what was done, what was not
14  done.  It would have been nothing more than another
15  investigative tool to find out if there were other
16  people that claims were being paid.
17      Q     Now, you've criticized AFLAC for not sending
18  people out during the relevant time period, 2005-2010,
19  to the Maryland office.  What would a visit by AFLAC
20  officials have accomplished?
21      A     They would have been able to audit the
22  agency, as we talked about.  They would have been able
23  to find any irregularities that an audit would have
24  happened, and as my understanding AFLAC started doing
25  this in 2011.  So they were just a little late in

Page 171

1  getting to the starting gate.
2      Q     Now, you've testified in response to certain
3  questions that in your opinion the investigation could
4  have gone in a different direction.  Do you remember
5  that?
6      A     Yes, sir.
7      Q     Can you specify what that direction is?
8      A     Well, when they started investigating the
9  forge problem, it started an action that went down a
10  road that Teika Cooke was eventually indicted for.  I
11  think if AFLAC spent more time in the investigation
12  and found out what they were doing, what these two
13  agents were doing -- and I refer to the agents as
14  AFLAC -- we would have gone to a totally different
15  route.
16      Q     And that totally different route would be
17  what?
18      A     Would be that the FBI would have learned
19  different facts earlier.  That the two salespeople
20  would have -- we would have found out what the sales
21  staff was doing, and I don't think Teika Cooke would
22  have been indicted.
23      Q     Okay.  Do you have an opinion as to whether
24  or not AFLAC should have brought in as an investigator
25  somebody with investigative experience with respect to

Page 172

1  the Teika Cooke matter?
2      A     I think a good investigator would have been
3  a necessity in this case.
4           MR. McMAHON:  I have nothing further.
5  Thanks.
6      FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANT
7  BY MR. SPIRES:
8      Q     Okay, just two quick follows up, I believe.
9           Would it be fair to say that the FBI is
10  pretty good at investigating matters?
11      A     Yes, sir.
12      Q     Okay.
13      A     I'd say they started the investigative
14  process, and while they made an original mistake of
15  indicting her early, I think they corrected their
16  ways.
17      Q     Okay.
18      A     So I say they're good in that respect.  They
19  made a mistake originally and they changed their mind.
20      Q     Do you have any criticism as to the FBI's
21  investigation of the Teika Cooke matter?
22      A     I'm not in a position to criticize the FBI.
23      Q     Okay.  They did a fine job?
24      A     Well, they eventually got rid of the
25  indictment and they turned it in, the -- whatever the

Page 173

1  title of the attorney was, district attorney, federal
2  attorney, they dropped the indictment.
3      Q     Okay.  Would it be fair to say that a -- I'm
4  sure there are exceptions, but in general an FBI agent
5  is more qualified and trained to investigate a
6  criminal matter than an employee of an insurance
7  company?
8      A     I don't know, I've hired two FBI people and
9  they were good.
10      Q     They were FBI, right?
11      A     They were both retired FBI.  I used them
12  both in doing some SIU work for us.
13      Q     Okay.
14      A     And they were very good.  But, you know,
15  day-to-day work, I don't know, my street, my police
16  street investigator was still the best I ever had, so
17  I'd take him.
18      Q     Okay.  Do you have any evidence or know of
19  any testimony that indicates AFLAC in any way pushed
20  the FBI, to actually push the FBI to pursue Ms. Cooke
21  and then ultimately the attorney general to indict
22  her?
23      A     I have no information on that.
24           MR. SPIRES:  All right, that's all I have
25  for now.  For now.  Other than the file.  So these are

Page 174

```
1    all the documents that you reviewed to date?
2         THE WITNESS:  I'm hoping -- I had three
3    yesterday, I ended up with two.
4         MR. SPIRES:  Okay.
5         THE WITNESS:  I looked, and it was a --
6    there's another case going on involved in this, some
7    sort of class action involving another law firm, and I
8    grabbed that one.  I don't know if there's any other
9    documents in that.  If there is, I'll send them to
10   Attorney McMahon.
11        MR. McMAHON:  Will you give him a list of
12   everything in there?
13        THE WITNESS:  You've already got a list.
14        MR. SPIRES:  I want a copy of his file.  Is
15   there any writing in here?
16        MR. McMAHON:  No.
17        THE WITNESS:  No, I don't write in files.
18        MR. SPIRES:  I want a copy of his files and
19   I want these, what he's indicated for the -- in the
20   file by sticky tabs.
21        THE WITNESS:  There's not a mark in those
22   files, just my sticky tabs.
23        MR. SPIRES:  I don't want to take his
24   original.  I can take his original and have somebody
25   in my office copy it, but I think it would maybe be
```

Page 175

```
1    both of our preferences if you hold it and give me a
2    copy.
3         MR. McMAHON:  Why don't you take it with you
4    and send me a copy of this.
5         THE WITNESS:  Want me to copy it and have it
6    marked as it is?
7         MR. SPIRES:  And have it marked with those
8    tabs.
9         THE WITNESS:  I can do that.
10        MR. SPIRES:  That would be great.  I guess
11   you're copying the pages, so --
12        THE WITNESS:  And there's my CV, and that's
13   all it is.
14        MR. SPIRES:  And that has any document in
15   this case or transcript?
16        THE WITNESS:  Everything I received from
17   counsel.
18        MR. SPIRES:  Okay.  Includes deposition
19   transcripts?
20        THE WITNESS:  Includes everything I got.
21        MR. SPIRES:  All right, great.  Temporarily
22   closed.
23        (Signature having not been waived, the
24   deposition of PAUL F. AMORUSO was adjourned at
25   1:16 p.m.)
```

Page 176

```
1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2         I, Jacquelyn C. Jarboe, Registered
3    Professional Reporter, the officer before whom the
4    foregoing deposition was taken, do hereby certify that
5    the foregoing transcript is a true and correct record
6    of the testimony given; that said testimony was taken
7    by me stenographically and thereafter reduced to
8    typewriting under my supervision; and that I am
9    neither counsel for, related to, nor employed by any
10   of the parties to this case and have no interest,
11   financial or otherwise, in its outcome.
12        IN WITNESS WHEREOF, I have hereunto set my
13   hand and affixed my notarial seal this 4th day of
14   June, 2014.
15
16   My commission expires:
17   April 30, 2019
18
19
20
21        NOTARY PUBLIC IN AND FOR THE
22        DISTRICT OF COLUMBIA
23
24
25
```

Page 177

```
1    TO: Martin McMahon
2    Re: Signature of Deponent Paul Amoruso, Vol. I
3    Date Errata due back at our offices:  7/6/2014
4
5    Greetings:
6    The deponent has reserved the right to read and sign.
     Please have the deponent review the attached PDF
7    transcript, noting any changes or corrections on the
     attached PDF Errata.  The deponent may fill out the
8    Errata electronically or print and fill out manually.
9
     Once the Errata is signed by the deponent and notarized,
10   please mail it to the offices of Tiffany Alley (below).
11
     When the signed Errata is returned to us, we will seal
12   and forward to the taking attorney to file with the
     original transcript.  We will also send copies of the
13   Errata to all ordering parties.
14
     If the signed Errata is not returned within the time
15   above, the original transcript may be filed with the
     court without the signature of the deponent.
16
17
18   Please send completed Errata to:
19   Tiffany Alley Global Reporting & Video
20   730 Peachtree St. NE, Ste 470
21   Atlanta, GA 30308
22   (770) 343-9696
23
24
25
```

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

Page 178

1    ERRATA

2    I, the undersigned, do hereby certify that I have read the
     transcript of my testimony, and that

3

4    ___ There are no changes noted.

5    ___ The following changes are noted:

6

     Pursuant to Rule 30(7)(e) of the Federal Rules of Civil

7    Procedure and/or OCGA 9-11-30(e), any changes in form or
     substance which you desire to make to your testimony shall

8    be entered upon the deposition with a statement of the
     reasons given for making them.  To assist you in making any

9    such corrections, please use the form below.  If additional
     pages are necessary, please furnish same and attach.

10

11   Page _____ Line _____ Change _____

12   _____

13   Reason for change _____

14   Page _____ Line _____ Change _____

15   _____

16   Reason for change _____

17   Page _____ Line _____ Change _____

18   _____

19   Reason for change _____

20   Page _____ Line _____ Change _____

21   _____

22   Reason for change _____

23   Page _____ Line _____ Change _____

24   _____

25   Reason for change _____

Page 179

1    Page _____ Line _____ Change _____

2    _____

3    Reason for change _____

4    Page _____ Line _____ Change _____

5    _____

6    Reason for change _____

7    Page _____ Line _____ Change _____

8    _____

9    Reason for change _____

10   Page _____ Line _____ Change _____

11   _____

12   Reason for change _____

13   Page _____ Line _____ Change _____

14   _____

15   Reason for change _____

16   Page _____ Line _____ Change _____

17   _____

18   Reason for change _____

19

20   _____
                  DEPONENT'S SIGNATURE

21

     Sworn to and subscribed before me this ___ day of

22   _____, _____.

23

     _____

24   NOTARY PUBLIC

25   My Commission Expires:_____

Cooke vs. American Family Life        Paul Amoruso, Vol. I        05/30/2014

**$**

**$1,000** 96:20

**$107,000** 120:8

**$150,000** 101:12

**$27,000** 53:3
58:4

**$4,000** 97:8

**$60,000** 120:7,11

**1**

**1** 6:10 101:24
102:6 121:17
138:25

**10** 139:1 142:15
144:1

**100** 32:17 68:11,
13 94:17 95:1,4,
11,14 97:19
111:9 120:11
134:12 150:25

**100-percent**
17:13

**101** 87:2

**10:00** 37:19

**11** 136:17

**11-9-06** 9:12

**140** 101:12

**15th** 115:14

**1981** 22:8

**2**

**2** 9:13,14 39:19

**20** 16:24 142:15

**2005** 9:3 90:25

115:14

**2006** 90:25

**2008** 89:22 90:25

**2009** 9:3 61:8

**2010** 61:18 63:4
65:6 101:5
136:9,10,13

**2011** 136:16

**2014** 18:6

**25** 29:25

**26** 7:23

**26(b)** 35:3,18,19
36:22 44:8 51:3
81:24 100:20,23
108:25 109:1,
110:8 145:20

**27,000** 62:9

**3**

**3** 13:24,25
110:19 123:5

**30** 29:25

**30(b)(6)'s** 17:21

**300** 114:1

**302** 41:8,10,12,
21 89:17 104:22
136:11 142:2
154:1,5,15

**378** 115:12

**4**

**4** 102:7,8,9,10,13
121:7,14,17,25
122:1,2 135:16

**40** 32:17

**40-plus** 109:8

**45** 8:12 85:14
137:15

**5**

**5** 109:17 163:3,4

**50** 21:15 32:17
91:15 92:6
137:5

**6**

**6** 101:5 115:8,15
121:21,22

**60** 137:5,12,14

**65,000** 134:5

**67,000** 101:16

**8**

**80** 7:10,17 40:3
96:8 99:2
113:22 119:6,
13,23 120:3,4,9,
10 123:2 129:8,
9,22 132:12
133:21 134:7,9,
23 135:1,9
141:1

**80-percent** 7:4,7
46:14 47:7 69:5
82:6 85:12
96:14 120:24
129:2 132:24
140:20

**80s** 22:10 30:2

**9**

**9** 110:1

**90** 90:3

**96** 45:10 46:19

**97** 46:25 47:1,3
48:14,17 54:5
168:10

**98** 46:22 48:18
54:13

**A**

**A(1)** 138:24

**A-n-t-o-i-n-e**
101:5

**ability** 19:25
96:13

**able** 31:15 32:21
34:16 73:2
101:11 122:25
158:4

**about** 5:17 6:5,
15 11:14 12:2
18:11 20:22
21:13,14 24:22
27:21 29:25
34:12 35:9,10,
37:21 41:19
42:25 43:1 44:9,
18 45:1 46:11
47:20 49:16
50:2 52:23 56:8,
21 59:3 61:4,5
64:18 67:15
68:19 69:1,17
80:3 84:12
85:11 87:5,6
98:4,11,12,13,
22,23 101:11
103:1 104:5,7
105:4,5,7,10
107:13 108:20

110:13,20 111:5 113:25 114:1 116:13 117:17, 20,21 118:18 120:17 124:16 125:11 126:15 127:5,19 129:1 130:8,9,12,13 131:6 132:5 140:13 149:19 150:10,23 160:17 162:19 165:4 168:10

**above** 19:15

**absolutely** 162:14,16 168:25

**acceptable** 142:21 145:6

**accepted** 39:24 91:18 92:11 93:5 122:12

**access** 147:4,5, 13,17,23 148:6, 16 149:1,2 154:5,8

**accident** 12:9

**accordance** 28:6 91:13 144:24

**according** 46:22

**Account** 115:14

**accusation** 24:12

**accusations** 23:1 33:3

**Acknowledgmen t** 115:14

**across** 15:22 23:13 88:17

**act** 22:16

**acting** 88:17

**action** 29:19 142:22 168:6

**actions** 8:1 34:10,13 36:3 38:5 105:4,7,12, 24 124:2 140:3

**activities** 141:5 144:4

**activity** 23:22,23 24:8 29:2 30:20

**acts** 103:16

**actual** 134:5 168:18

**actually** 6:14 9:10,12 11:7 14:6,17,22 16:3 28:20 33:8,10 44:5 46:12 71:8 73:12 74:23 95:5 112:9 114:11 117:5 136:3 137:13,22 144:15 153:16

**add** 139:6 141:10 162:20

**added** 125:24 142:6

**addition** 86:9 141:5

**additional** 163:18 165:14

**address** 40:8 44:6 169:9

**addressed** 112:20 141:8

**adds** 99:21

**adjourn** 169:6

**adjourned** 169:15

**admission** 38:15 39:5

**admissions** 41:7

**admit** 39:7 43:6 51:8 137:7

**admitted** 39:5,9, 13 41:6,22,25 42:12,19 48:4 130:20 131:18 136:12,20,23,24 143:18 150:12

**affect** 158:18

**affirm** 145:5

**AFLAC** 6:2,5 7:11 8:8,22 14:5 15:11 19:3,8 21:2, 22:3 23:4 33:23 35:11,12 38:23 41:3 47:12 49:2,16 51:23 58:10 61:21 62:6 65:3 68:10 70:25 72:24 75:10 78:7 79:25 80:13,23 84:15 88:8 90:20 95:1, 5 97:3,10,14,16 98:1,4,13 101:6, 10 105:20 108:4 110:22 111:7,13 112:2,4,9,17,19, 22,23 113:7,14, 20 114:9,18 117:16,19,21,24 118:7,14 119:11 122:6,12 125:3, 10,23,24 126:8,

16,20,25 127:6, 10,12,25 128:5, 6,19,21 129:14, 15,25 130:14 131:10,16,22 132:8 133:3,4,7, 11,13,22 135:13,17 140:12 141:6 142:20 143:9,13 144:3,23 145:4, 7,8,9,10,11,12, 22,23 146:2,20, 23,25 147:1,3,4, 7,9,10,19,21,22 148:5,8,11,14, 25 149:1,7 156:19 157:2,20 158:23 159:2 160:20 161:10, 16,20 163:5,16, 18 164:1,18,19 165:14

**AFLAC'S** 7:20, 24 13:6,7 18:20 34:19 49:18 75:10 90:13,17 91:20 110:23 111:2 113:3 124:2 125:5 130:1 133:25 138:17,20 142:22 143:10 144:25 148:9, 14,22 149:17 155:24 156:6 160:13 161:5 167:14

**after** 8:12 11:17 20:13 51:3 57:9 61:11,12 63:3

65:2 69:14 127:24 149:9

**again** 18:4 47:23 50:24 79:16 81:4 83:12 84:11 103:20 162:22

**against** 136:6 137:5

**agencies** 7:25 14:21 151:1

**agency** 14:22 15:24,25 20:19 104:1 105:13 106:7 168:9,18 169:11

**agency's** 8:1

**agent** 8:5,10,12 16:8 19:19 30:20 38:22 42:11 59:22 72:16 127:22 139:8,9,23 141:6,19 143:15 144:1,13 154:1 156:15

**agent's** 89:19 135:17 147:4,13 148:16 149:1

**agents** 7:21 11:17 14:24 22:14 35:1 45:8, 9 60:1 62:19 66:9 71:5 72:16 76:14 89:7 120:15 124:6 127:18,25 142:6,7 149:5, 10,18 156:4 157:12 159:1

162:23 163:12 168:21

**ago** 69:12 71:1 112:13

**agree** 5:10 109:5 124:19 129:10 136:17 158:16 159:17 162:16

**agreeable** 169:9

**agreed** 109:9 169:6

**agreement** 5:10 8:3 14:4 17:2 39:24 148:3 165:17

**agreements** 14:9 15:11,12 163:16 164:2 167:21

**ahead** 37:20 50:11 85:6 153:7

**Aiken** 44:18,23 104:8,22 105:16

**Aikens** 11:8 34:1 35:13 36:4 37:23 38:2,11, 18 39:12 40:11, 12 41:6,22 42:19 43:21 44:7 95:22 103:5 104:20,25 105:9,18 106:22 107:8,14,17 126:19 139:4,9, 24 141:11,17 154:1 162:23

**Aikens'** 103:14 105:7 108:18 139:23

**alerted** 49:17

**all** 5:6,10 13:14 15:11 16:10 17:20,21 20:24 23:1,10 24:14 27:24 29:11 31:21 32:3 38:6 42:15 45:21,24, 25 46:18 47:3, 17,18 48:11,12 49:3 51:6 52:3, 4, 53:13,16 54:10,12,16,21, 25 55:18 57:11, 14,22,24 58:3 60:22 61:21 66:23 67:9 70:2 71:10 72:13,18 73:11,23 75:15 76:18 77:14,19 79:5 80:7 83:8 86:25 87:13 89:25 90:22 91:15,19 92:17, 19,24 93:12 94:13 96:12 97:13,25 98:8, 22 100:2,17 101:15 103:18 104:1 107:11,24 108:18,22 109:14,24 110:19 111:7 112:16,20 113:16 120:10 121:4 122:22 123:5 128:15 130:21 131:3 132:16 133:12 136:10, 138:17, 21,24 139:3,7, 22 141:8,

142:11 143:24, 25 148:23,24 150:1,4,9 152:17 153:15, 23 157:8,24 158:3,17 159:5, 22 160:23 162:9 163:3 168:4,21, 23 169:3

**all-encompassing** 31:16 32:12

**allegation** 72:12

**allegations** 59:19 107:13

**alleged** 73:16,17 74:7,19 76:5,17 77:24 79:14

**allow** 92:6 116:22 117:8

**allowed** 58:7 63:15 125:5 147:25

**allows** 142:21

**Allstate** 19:3,6, 12

**almost** 48:4

**along** 15:12 112:2 124:1

**already** 32:22 47:13 85:5 87:25 101:16

**also** 16:25 19:5 24:4 34:2 66:1 69:20 79:8 144:1 146:6 150:5

**alter** 45:15 125:18 154:2

**alteration** 155:7

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

**alterations**
128:21 130:8
136:12 160:6

**altered** 38:16,24
39:16,23 40:12
43:3,9 107:14
128:12 140:11,
13 159:3 160:4,
8 161:7,9 162:3,
4

**altering** 39:6,7,
9,13 40:23 41:6,
22 42:20 43:22
107:18 108:19
125:21 135:18
136:21,23

**alternate** 89:24

**although** 9:11
11:12

**always** 106:14

**am** 17:10 37:13
40:1 54:20 73:1
88:6 100:21
101:6 141:1
145:5,9

**amend** 35:6
37:9,11

**Amoruso** 5:3,6
6:1 8:2 9:18
72:22 98:4
109:6,9 110:4

**Amoruso's**
169:6,7,10

**amount** 16:1,2

**analyze** 7:19

**and/or** 109:14

**anguish** 70:20

**another** 15:21
30:3,22 32:19

38:3 49:25
50:16 70:14
78:1,9,10 90:7
95:13 104:9
110:13 129:4,24

**answer** 5:12
24:1,17 34:16
39:10 43:15
44:4 49:14
55:13 58:1,20,
71:22 79:20
93:14 96:18
98:10 99:3
118:13 120:15
128:3 130:17,25
131:1 134:24
148:21 152:23
156:16 157:22
160:21 162:2
164:22 165:1
166:5 168:3

**answered** 43:12
79:17,19 82:13
88:5 105:25
120:20

**answering** 29:7
92:24 102:25
108:1 134:5
135:14 148:23
157:13,18 159:6
167:1

**answers** 88:24
98:9 133:14
160:24 161:2

**Antoine** 102:18
120:1,2

**any** 5:7 6:16
8:17 21:15
22:16 23:6,13,
15 25:4 34:11,
17,25 35:11

37:24 40:18
42:22,24 44:25
45:22 48:8 63:5
64:18 66:10
77:16 79:9,14
80:16 81:1,11
82:24 83:17,19
90:20 91:14
97:5 98:18,21
103:23 104:3,4
105:3,16,23
106:1 111:12
121:23 122:25
125:4 126:6
127:12,23
128:8,21 131:8
135:12,23
138:18 139:4,
23,24 145:1
160:17,23 161:1
163:17,24
165:14 167:3,11

**anybody** 8:4
22:15 34:4,11
37:21 71:12,23
72:1 77:2 82:18,
22 87:14

**anybody's** 36:2

**anyone** 133:17
137:20

**anything** 8:7
23:13,15 24:5
27:6 43:22 44:7
47:8 52:23
55:21 57:16
59:3 61:17
80:12 81:16
85:11 101:18
127:25 130:12
132:3,10 139:6
141:10 148:22

161:6,14
162:19,20
163:19,24
166:18

**Anything's**
70:17

**anyway** 81:8

**apparently**
153:24,25

**appeared** 117:3

**appears** 64:24
149:17

**application** 6:14
115:5

**applying** 56:11

**appropriate**
37:1 100:19
169:22

**approve** 114:10,
11

**approved** 143:13

**April** 65:8 83:6
101:5 115:14

**area** 19:21 20:2
23:23 28:8
54:11,15 63:17
72:15 74:5
100:23

**areas** 23:11
71:20

**aren't** 148:7

**arm** 30:3

**around** 12:14
19:11 29:24
91:3 95:13

**Arthur** 115:6
116:16,18
117:10

**articulated**
100:20

**as** 5:4,12,13 7:3,
19,22 8:4,8,17
10:2 11:8 13:15
16:19 22:25
23:6,12 24:3
25:18 26:21
27:5,8 28:11
31:4 32:11
34:14 35:6,23,
25 36:24 38:5,
20, 39:23 48:9,
16 49:7 55:23
62:20 67:25
76:7 77:24
79:12 83:13
84:4 86:24 88:1,
14 91:16 93:4
94:12 95:5,12
103:22 104:23
105:19 109:12
110:5 111:2,25
113:14 116:5,
24,25 117:11
119:24 120:3,13
123:1,2,14,16
124:2,4,22
126:5 127:4
130:17 132:8,
11,24 133:3
137:8 138:12,15
139:7,25 140:4
143:19,20
144:10 150:6,
154:16,25
158:10,11,19
161:11,23
162:13,14
167:1,4,5,8

**aside** 131:8

**ask** 46:9 47:16
58:2 59:22 69:2,
3 78:18 113:1,7
114:4 118:20,23
119:1,5 122:14
123:9 131:20,23
135:25 146:19
154:6 156:15

**asked** 7:16 37:17
42:11,23 43:12
57:20 59:19,20
60:6,14 62:19
65:20 67:19
78:18 79:19
82:13 85:7
86:19,25 114:3
134:4 154:2,22

**asking** 25:12,20
37:10,15,18
40:10 49:5,15,
20,21 52:18
80:16 81:25
90:9 110:2
145:20 165:4

**asks** 106:18
119:7

**assertion** 7:23
41:3

**assign** 114:11

**assigned** 71:21
88:25 89:5,6,7
139:24 166:23,
24

**assignment** 86:4,
5,6

**assist** 86:5

**associate** 12:3,23
14:6 15:4,6,18
16:8 44:16
105:19 118:16,

18 142:16,18
166:6

**associate's** 11:22
13:3 14:4,9
93:16 150:18

**associated** 35:11
105:20 127:13
128:22 130:12
138:21 139:3

**associates** 11:8,
14,15 13:9,21
14:10,25 15:16,
21 16:13 46:10
85:8 93:24 94:2
97:6 105:20
136:12 167:8,20

**associates'**
144:10

**assume** 15:11
104:14,16

**assuming** 97:18
106:22 122:9
130:16 136:19
140:2

**assumption** 88:6
144:25

**assumptions**
97:20

**assured** 112:17

**at** 6:5 7:20 10:8
11:18 12:12
19:5 21:3 22:6,
9,13 23:7,8,18
24:6 31:17,23
32:10,18,19
34:9 35:14,16
37:18 39:25
40:1,8 43:1,10
44:25 45:16
46:3,4,6 47:18

48:11,20,21
49:2,10 51:3,6,
10 53:2,15,18
54:15 55:18
56:10 58:21
60:8 61:20 62:8
64:22 65:11
67:7, 69:16
71:13 73:25
74:14 75:16,19
76:22 77:2,18
80:1,23 81:22
82:9,15,22 83:4,
23,25 84:16
85:14 89:22
90:13 91:5,14,
25 92:19 95:24
97:3 106:1,15,
17,19 109:14
110:9 115:24
121:5,8,12
122:8,22,25
123:3 133:15
139:14 143:19
144:16,19 146:3
148:24 150:22
151:3 152:16,24
153:16 154:9
155:18 156:12
159:22 165:10
166:13 168:16,
18,19 169:8

**attached** 6:11
9:15 14:1
102:14 109:18
115:16

**attacked** 75:4

**attempt** 109:5
138:19

**attempted** 44:3
76:21

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

**attention** 48:8
63:10

**attorney** 64:1
70:6 124:9,10
138:7

**attorney's** 33:19

**attorneys** 63:25

**audience** 169:23

**audit** 144:3,9
150:17, 168:18

**audited** 146:17
150:25

**auditing** 149:14
152:11

**auditor** 150:16
152:2,9

**auditors** 150:4,
19 151:15

**audits** 18:7

**auspices** 18:10

**authored** 102:21

**authorities**
24:16 27:1 33:7

**authority** 27:8
28:5 116:8

**authorization**
11:3 114:16
116:21

**authorized**
115:25 116:4

**automatically**
28:2

**automobile**
12:14

**availability**
66:17 111:21

**available** 46:13
47:6 62:17 78:7

117:13 158:1

**avenue** 26:12

**avenues** 76:19
80:2

**avoid** 61:20

**aware** 27:8 79:9
158:15

**away** 46:24 47:1
142:18

———————

**B**

**back** 22:8,10
23:9 29:25 38:1
44:6 52:5 60:4
88:12 96:23
97:13 103:20
123:5 127:3
130:8 136:7
142:20 144:23
156:12 158:1,
12,13,19,22
161:4,17

**background**
18:18 84:9

**backyard** 71:7
90:21 92:23
143:18

**bad** 10:9 40:17
71:22 88:1 90:6,
8 155:13 164:5
167:15

**base** 30:4 95:11
99:21 101:15
120:4,7 123:3,
126:6 129:23
134:5,15

**based** 16:1,2
18:18 24:11
26:6 29:3 66:5

71:3 84:22
127:16 133:4
136:18 140:2,4
157:21 169:19

**basic** 31:6 59:21
60:6

**basically** 15:3
26:22 49:7
51:15 95:18
166:25

**basics** 6:4 56:11

**basing** 49:21
61:10 87:19
166:14

**basis** 26:13
52:21 55:25
82:5 83:11
102:24 103:7
124:4 135:23
139:25 148:4

**Bates** 115:10,11
121:9,10

**bearing** 160:24
161:1 162:14

**became** 30:2

**because** 8:5 23:4
32:21 37:3 47:1
51:23 56:3 58:1
60:2 62:1 63:18,
21 64:25 69:4
71:21 75:6,21
83:19 88:17
94:21 95:9 96:4,
6,19 99:20
104:12 111:9,16
113:12 114:22
119:23 124:6,14
125:5,17 129:23
135:11 136:20
137:1 140:18

143:4,11 146:19
148:13 149:6
151:23 152:25
155:8 157:2,20
158:25 159:6
161:17 165:1
168:3

**become** 26:17
33:16 123:3
147:1

**becomes** 19:22
61:13 76:16

**before** 6:2 9:20
14:7 33:20
44:24 49:14
52:8 71:1 74:14
85:18 111:25
136:21 140:4
164:1 167:23

**beforehand** 6:2

**begin** 94:17

**behalf** 132:20,21

**behave** 166:20

**being** 5:9 7:22
23:21 35:23
50:15 66:3
72:14,19 74:8
75:4 80:2 85:22
99:13 104:14
106:13 140:10,
13 145:5,14
149:11

**believe** 18:6
39:11,12 55:25
64:24 67:8
80:21 84:8 85:3
105:15 112:6,20
121:17 132:14
143:1 156:17
157:9 163:17

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

**believed** 45:18

**benefit** 12:10
14:24 47:12
58:8 106:18
117:6

**benefits** 7:11
12:8,13,17,19
32:20 44:14
46:13 47:6,10
54:1,8,9 59:24
68:1,3 73:11,13
74:8,9 79:13
94:17,22,23,25
95:5,6,9,24
96:8,15 97:5
99:4,7,9,11,15,
17,18,25 100:10
107:1 111:10,
12,16 113:4
114:25 118:10
127:14, 129:16,
18 135:13
140:15,19

**best** 33:12

**better** 17:22
18:23 20:13
34:16 71:6 83:1

**between** 14:5,9
15:3,6,17 16:7
18:8 20:23 26:3
30:16 31:1,6
104:7 120:16
141:6

**big** 34:19 78:12
80:15 89:4
108:3 164:7

**bigger** 79:24

**biggest** 80:6

**Bill** 47:20 50:15
85:18,22 87:13,

20 88:13 101:6

**bit** 22:18

**blank** 119:8

**blessing** 116:14

**blew** 89:3

**blind** 144:20

**board** 15:22
23:13

**bodies** 33:13

**body** 26:15

**boilerplate**
14:19

**bona** 111:18

**bonuses** 123:15

**book** 55:15

**both** 6:21 96:16
106:4 128:15,16

**bottom** 115:24
121:11 144:1
153:24

**bottom-level**
19:14

**bought** 101:10
131:5

**box** 119:13
133:20

**breach** 86:24
87:7 90:9

**break** 38:7,10
77:16 108:23

**brief** 109:3,12

**bring** 13:21
22:25

**broad** 45:25
55:4 145:25

**brochures**
120:23 121:1,3

**broker** 8:13
19:20

**brought** 43:4
61:14 104:9

**Bryan** 35:12
36:3

**Bryan-torsiello**
153:25 154:4

**bucks** 62:10

**building** 114:23

**bulk** 19:25

**bull** 12:18 96:20

**bullet** 83:23 84:3

**burglary** 76:22

**burn** 90:20
92:23 143:18

**burned** 89:12,13
143:21

**burning** 71:7
72:17

**business** 13:19,
20 16:7

**businesspeople**
13:20

**buy** 19:24

---

**C**

**call** 9:11 11:16
14:25 17:5
19:20 23:3
36:18,20 38:22
46:10 51:1
58:18,22 62:18
66:24 67:14,15,
24

**called** 51:20
58:17,18,20
59:16,18 66:25

67:22 152:12,15

**calling** 49:11
120:2

**calls** 106:18

**came** 49:23
50:14 58:9
61:19,23 72:19
83:14 88:17
98:4 135:17
146:14

**can** 7:9 8:8 12:10
15:11 17:2,22
18:12,23 21:6
24:9 25:24
27:20 28:10,11
29:3,19 31:7,10
33:1 36:20,22
38:7,10,23
39:19 40:8
47:12,18 48:11
49:12 50:1 52:8
53:11 58:1 64:9
72:25 77:6,7
80:24 85:14
88:22 90:2,20
91:16 92:10
94:20,21 97:11,
12 98:23 99:3
102:12 105:25
108:23 110:12
112:21 114:12
115:9 119:2,3
120:15 123:11
127:2 130:17,21
132:9 139:11
143:12 154:25
158:1, 159:5
162:2,9 168:2

**can't** 23:16,17
37:15 41:21
72:3 73:5 75:6,

20 92:10,25 94:16 96:15,19, 21 98:10 101:17 124:18 129:17 134:24 143:16

**cancel** 43:6 107:8

**canceled** 126:2

**candidate** 163:7 166:9

**candidates** 163:9 165:5 166:13

**capable** 29:17

**capacity** 116:5

**Capitol** 49:3

**captive** 16:12,14, 16,19,20,25 17:3

**car** 12:15 114:24

**care** 11:19 52:22 56:13,15 60:23 74:7,17 86:24 87:8 90:10 92:18 93:15 94:1 144:10 159:15

**Carlock** 6:3

**carry** 12:13

**case** 6:6 7:22 12:5 13:6 17:10 18:3,20 20:12 35:24 50:7,12 56:20,21,22 60:25 65:23 70:15 71:3 76:25 78:8 83:21 84:1,7 92:22 93:1,25 98:11 102:25

109:10 137:21 152:25 153:8

**cases** 109:8,13 137:5,12 138:13

**cash** 97:9

**casualty** 15:19

**catch** 113:17

**caught** 159:3 164:7

**cause** 138:19

**caused** 124:7 125:2 153:14 160:9

**causing** 136:24

**centered** 53:2

**certain** 8:5 17:1 23:11 91:10 144:18

**certainly** 26:17 27:9 29:11 30:8 55:7 135:11

**chance** 80:25 81:1 88:8

**change** 8:11 37:2 42:12,13 61:4,5 69:15 70:13,16 72:24 75:8 77:24 81:19 88:7,8 96:25 158:23

**changed** 42:24 43:5 61:22 106:23 125:24 130:3 152:20,22 161:13,14

**changes** 23:19

**changing** 70:17 71:6 103:16 105:2 164:14

**character** 166:17

**characterize** 13:14

**charged** 40:13

**charges** 127:24

**check** 27:10,14 31:22 34:25 97:8,9,11 106:19 112:11 144:20 150:5 151:23

**checked** 106:25 119:13 140:16, 24

**checking** 133:20

**chose** 58:20 136:5 161:16

**circumstance** 100:4,5

**circumstances** 10:22 29:17 90:19

**cite** 139:11 141:12 149:22 154:25

**Civil** 5:8

**civilly** 23:22 27:2

**claim** 7:9,15 8:20,21 9:2,11, 12,19,22 10:3, 15 16:3 22:9 23:12 25:11,17, 22 26:5,9,14,16, 19 27:17 28:6, 20 29:9,18,22 30:19 31:14,18, 19 32:5,6,10,14

39:2,3,18,19 40:2,7,11 42:18, 19 43:22 49:9, 12,17,22 50:13 53:7 54:18,19, 23 55:10 57:4 72:17 73:3 74:9, 19,21 76:8 89:20 90:23 91:6 96:21 97:4, 11 101:14 107:3,14,18 108:6,10,12,13, 14 113:18,19 119:5,11 125:9, 11,17,19 126:15,18 127:5,13,19 128:4,9,12,18, 23 129:1 130:10,13 131:9 132:18 133:6,8, 20 134:17 143:1 150:9,19 151:9 152:4 157:14 158:5 159:2 161:6,17,24 162:15

**claimant** 43:4

**claimed** 80:6 83:21

**claims** 23:4 24:15 26:1,3,4, 7,18 27:8,15,16 28:5,7,10,15,19, 25 29:8,14,20, 21 30:8,13,17 31:2,3,4,5,13, 17,25 32:18,21 39:1,17 40:4 44:15 45:11,15

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

46:21 48:18,23
49:3,8,9,10 50:2
51:5 53:7,9
54:6,14 55:5,6,
21 56:8,9 57:3
73:4 106:24
107:2,6 108:1,5,
7,9,11,15 111:8
112:2,4,18
113:13,15,16,17
119:7 125:6,21
126:11,12
133:25 135:18
140:14 150:11
156:8 157:20,21
158:24,25 159:1
162:4,6,12,17
165:8 167:2
168:17

**clarification**
120:6

**clarify**  65:22
79:4 113:24

**class**  55:3

**classes**  55:1

**clear**  30:24 31:3

**clearer**  7:15

**clearly**  7:8,12

**clerk**  83:13
167:6

**clerks**  167:7

**clue**  88:18

**collect**  7:9 32:21
47:10,12 55:22,
24 58:7,10
59:24 68:10
71:9 73:5 75:6
76:15 94:20,21,
22,25 95:1,12,
96:13,15 97:4

99:9,14,16,
101:18 114:5
115:4 132:9

**collectability**
103:1

**collected**  95:24

**collectible**  72:15
73:11,19,20
74:2,4, 75:12,
14,22 76:12
77:4 78:5 95:22,
24 96:5,6
112:18 118:11
133:17

**collecting**  7:16
52:25 54:1,8,9
94:23 95:4,5,9,
10,15 97:5 99:4,
6,11,24 101:17
111:15,16 113:4
126:1 135:6
140:15,18

**collection**  16:1
94:15 111:21
119:3

**column**  38:2,3

**columns**  33:24
38:1

**come**  20:14
40:24 44:6
70:13 71:2
78:17 79:23
110:6 144:3,19
155:8 161:17

**comes**  32:5,6
34:22 89:20
106:16 120:13
166:7

**coming**  50:25
110:6

**comings**  20:19

**comment**  10:8
162:10

**comments**  44:25
81:4

**commission**
163:22 166:15
167:9,12

**commission-
based**  167:3

**commissioners**
92:11

**commissions**
91:18 149:19
157:11

**commit**  72:13

**committing**
80:19

**communication**
103:25

**companies**  16:12
17:19 19:10
24:14 25:6
29:25 30:17
90:1 91:12,16
92:7 167:21

**companies'**
146:3

**company**  12:25
13:4,6,22,23
14:10 15:1,4,6,
7,8,18 16:7,9,
23,24 17:2,16,
25 18:8 19:21,
23 20:18 22:13,
20 23:14 24:6
30:18 34:19,22
89:19 91:9,10
92:8,20 93:16,
23 94:2 108:3

113:14 144:13,
17 145:2 162:5
169:20

**company's**
14:22 93:5

**compare**  19:3
134:17,20

**compared**  150:5
151:23

**comparison**
150:21

**competent**  61:15
81:1

**complete**  168:8

**completed**  65:8

**completely**
27:22 74:6

**computer**
142:17

**conceding**  8:7

**concentrate**  7:24
19:7 46:3 63:16
72:22

**concentrated**
52:1 53:4 71:19

**concentrating**
157:6

**concentration**
46:1

**concept**  8:14

**concern**  80:7
149:17

**concerned**
149:18

**concluded**  65:2,
4

**conclusions**
65:20 74:15

Cooke vs. American Family Life        Paul Amoruso, Vol. I        05/30/2014

**confused** 132:5, 11 133:19

**confusing** 123:16 156:9

**confusion** 119:24 120:13, 14 131:15

**connotations** 29:18

**connotes** 8:5

**consider** 51:6 108:16

**considered** 22:17 28:25 114:13 123:1

**consistent** 11:11 154:24

**conspiracy** 130:4

**constantly** 101:13

**contact** 12:3,4, 24

**contest** 12:18

**context** 82:21 160:20

**continue** 35:7 96:24 123:1 136:6 144:14 159:2

**continued** 64:5 157:20 158:24, 25 162:3,5,6

**continues** 155:8

**continuing** 162:18

**contract** 7:20 13:7 14:5,23 15:2,5 27:4

29:21 144:23 163:14 167:21

**contract's** 28:7

**contractor** 146:1,7 148:3 164:2,17 165:16

**contractors** 13:10

**contracts** 13:22

**contractually** 27:3

**controlled** 146:25

**conversation** 59:4 64:19 69:18 141:22

**conversations** 58:19 70:4

**conveying** 16:9

**convict** 137:16

**Cooke** 9:3 18:14 36:7,11,12 45:13,14,18 50:3 51:15,18 52:15 55:20,24 56:2,23,25 57:7, 14 58:3,17,18, 25 59:17,20,25 60:6,14,18 61:12,20 62:25 64:3 65:16,25 66:22 67:5 69:19 70:3,19, 21 71:10,16,24 72:1,5,11,12 78:21 79:1,9 80:18 81:11 82:18 97:9 98:12,17,18 100:7,8 110:21

111:11 112:3,16 113:12 119:11 120:14 124:5,23 125:9 126:16, 17,20 127:6,17, 20,21,22 128:4, 19 129:3 130:14,19 131:5,10 132:5, 12 133:21 135:8,12 136:8 155:17,24 158:12 159:15, 19,20 160:12, 161:19 168:7

**Cooke's** 9:12 31:24 39:3,7,13 49:8,12,22 51:4 53:7 56:17 60:8, 15,21 65:19,23 69:22 70:9,10 111:8 126:9 132:1, 134:17, 19 136:15 143:2 151:9 155:14,21 156:24 158:17 161:5,22 162:13

**cooperation** 154:16

**coordinating** 141:5

**coordinator** 17:7,8,14,18 20:2,8,9,16,20, 21 21:15,19,22 146:6,14,24

**coordinators** 36:25

**copayment** 115:1

**copies** 101:22

**cops** 33:15,17

**copy** 89:23 90:12 91:6 101:21

**correct** 9:5,7 16:13 21:25 60:24 70:7,24 85:19 91:1 96:5 132:25 141:2 146:22 159:11, 16

**correction** 159:1

**corrective** 168:6

**correctly** 165:2

**costing** 16:3

**could** 12:7,8,17, 18 16:15 17:19 22:16 25:23 26:9,17,19,25 27:2,3,6 30:8 32:11 34:21 35:8 42:21 47:10 49:4 58:12 59:24 61:7,21 62:6 64:4 68:10 70:14,16,25 71:2,5,8,20 73:6 74:24 76:15 78:8 80:1 107:4, 7,19 112:10 118:22 119:23 120:7,14 123:7 130:4 137:2 139:6 142:24 145:25 146:8,10 148:17,20,22 150:5 151:10, 11,22, 152:23, 24 154:22 159:3

161:17 163:18 164:10,12 165:10,22,23

**couldn't** 20:23 24:17 25:1 42:3, 58:9,14 115:4 132:9 141:10 162:20

**counsel** 5:24 8:3 84:18 102:22 169:17

**country** 33:14 92:9

**couple** 21:5 43:13 48:19 60:5 61:25 169:12

**course** 27:6 89:21 106:6 124:12 137:14

**courses** 88:4 105:16 106:5,7

**cover** 6:23 12:15 138:21 139:3

**coverage** 73:21, 22 74:13 75:18 105:3

**coverages** 164:10

**covered** 113:19 140:5,7

**covers** 6:20,21, 25

**create** 91:17

**created** 22:8,13 130:5 144:15

**credentials** 165:10

**crime** 76:20

**criminal** 23:6,22 26:21,22,25 27:2 29:1 30:9 33:13 137:5,12 166:18

**criticism** 43:21, 24 72:4 87:20, 22 89:11 94:13

**criticisms** 6:16 33:23 45:6 108:19

**criticize** 34:21 35:9 46:16 48:9 52:8 71:14 162:25

**criticized** 35:10 36:2 59:13

**criticizing** 33:25 34:2,5,7 59:10, 12,14 73:1 96:2 111:20

**crooks** 164:8

**cross-examination** 5:7

**crucial** 164:4

**culpable** 51:24

**culprits** 136:24

**customary** 26:4 31:5 90:19,23 139:25 142:6 144:12 163:6

**customers** 13:21

**CV** 169:10

---

**D**

---

**D000378** 115:11

**daily** 35:24

**damage** 63:16 130:21

**date** 63:1,11 65:6,10,12 115:10 169:8,9

**dated** 9:12 115:14

**dates** 75:17 151:5

**day** 46:16 81:3 98:8 128:1 167:17

**day-to-day** 27:9 30:8 129:18

**DC** 25:2 54:12 58:8 73:2

**dead** 55:4

**dealing** 30:23 47:15

**decide** 136:25

**decided** 64:1 91:9 137:2

**decision** 66:18 168:3

**deduction** 117:9

**deductions** 114:17 116:22

**deeper** 153:15

**defendant** 5:6,24 104:14 109:11

**defendant's** 6:10 9:14 13:25 102:13 109:17 115:15

**defender's** 138:14

**deficiencies** 7:25

**define** 16:8

**defined** 17:24 32:9

**defines** 15:3

**defining** 32:25

**definite** 52:3

**definition** 12:16 17:12 20:14 30:16 31:3,6 64:4 132:15 133:24 157:25

**definitions** 17:16 18:21 19:11

**denial** 26:6 30:4

**deny** 31:5,19 161:16

**denying** 55:5

**department** 26:1,3,5,8,18 27:16 28:10,11, 15 29:9,14,21 30:13 31:2 49:9, 10 50:2 53:7,9 54:17 108:9,11, 15 118:2 125:7 126:12 169:20, 25

**department's** 28:7

**departments** 28:20 31:4

**depended** 92:19

**depending** 27:7 30:22 90:1

**depends** 28:13 90:3 91:19 152:9

**depo** 144:6

Cooke vs. American Family Life        Paul Amoruso, Vol. I        05/30/2014

**deposition** 5:5,9,
13 6:2,10 7:3
8:7 9:14 13:25
18:4 50:17
59:25 60:8,21
62:13,17 64:21
65:23 66:2
68:20,24 69:9
70:5,9,10 81:5
82:9 83:2 84:23
85:1,2 87:15
98:8 102:10,13
103:8,12,13
104:21 109:7,
14,17 112:12
115:15 126:10,
11 131:24 132:7
139:8,10,15
141:12,17 142:4
146:16,21,22
154:25 155:2,
18,19 169:7

**depositions**
17:21 20:12
21:4 35:23
50:25 102:5
106:4,5 110:6

**depth** 138:18

**derived** 65:24
69:8

**describing** 118:1

**description**
21:17,23

**destroy** 92:10,11
142:7 143:9,11

**destroyed** 89:12,
14 91:22
141:18,20
142:8,14 143:2,
4,7 151:17

**destroying**
142:13,23
143:14

**destruction**
91:12 92:1,
141:21 142:9,20
143:8

**detail** 67:25

**detailed** 66:18
83:15

**detected** 151:11,
14

**determination**
23:7 76:25
159:14

**determine**
25:11,17,21
26:11,25 27:2,6
54:13 56:6,18
58:11 68:9
74:20 75:11,15
76:11 78:4
80:14 88:9
133:7 169:21

**determined** 80:1

**determines** 76:7

**determining**
7:14 79:12

**develop** 23:8
24:9 31:5 33:6
36:23,24 91:12

**developed** 26:7
27:13 37:4
48:22 50:24
51:23 62:7
71:19

**developing** 21:4
23:18 31:11
33:3 35:14
36:25 70:15

**develops** 23:23

**didn't** 27:12
36:14,16,17
41:7,25 42:3
46:9,12,14,19
47:3,5,7 48:6,14
50:18 51:8 53:9
55:13,14,20,21
57:6,14,15,17,
20 58:18 59:14
60:2 61:3 62:13
63:10 64:21
66:9,11 68:8,16,
17 69:2,3,5,15
71:17 72:5,18
76:10 79:1,5
80:3,24 81:10
82:6,7,14,23
83:9,16,18,19
85:8,12 87:20
88:3,9,14,15,16
92:3 103:23
104:4,14,17
105:3,11 106:2,
22 113:10,11
114:19,24
125:8,18 127:24
128:1 137:15,16
152:11 153:13
154:9,12 157:6
159:4 161:3
165:2 167:11
169:2

**difference** 15:16
19:7 20:23 26:2
31:1

**differences** 20:4
26:14

**different** 11:9
14:21 15:18,23,
24 16:4,21

17:16,24 18:21
19:4 31:25
33:24 41:13
49:4 56:20 74:5
150:23 153:12,
13,14,20

**difficult** 48:2

**dig** 61:25

**dime** 51:20
52:21 57:12

**dipping** 95:18

**direction** 49:5
87:3 88:22,24

**directly** 112:4
119:11 125:9
126:16,20
127:6,20 128:5,
19 130:14
131:10 138:11

**director** 15:20

**disability** 6:5,18
8:20 10:2,11,15,
17 12:9 31:19
68:10 94:16
95:2,23 98:13
110:21 114:2,20
115:1,3,7,25
131:6 134:9
140:15,18 160:8
167:17

**disabled** 122:16
123:1,4 133:2
135:9

**disagree** 133:17
159:22

**disbelieve** 56:2

**disclosure** 7:23

**discover** 140:11
152:3

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

**discovered** 80:15
151:13,14
164:19 165:14

**discovers** 27:16

**discovery** 5:7

**discuss** 125:8

**discussed** 59:16,
19 69:18 110:3
148:4

**discussing** 109:4

**discussion**
120:16 145:18
158:7 169:4

**dismissed** 63:9,
20 135:16,20
136:1,2,5,15,20,
22 137:1,6,9

**dispose** 90:11

**disregard** 76:9

**distributing** 13:7

**district** 17:8
20:20,22 21:21
33:19 64:1

**doctor** 157:14,18
161:13,17

**doctor's** 66:24
96:22 156:20
157:25 159:18
162:10

**doctors** 150:7
157:6 162:8

**document** 46:6
75:20 90:8,11,
14 91:12 92:15
93:2,8,10
102:21,23 107:3
115:10,18
117:15 132:3
141:20 142:8

**documentation**
58:23

**documents**
38:16,24,25
39:6,8,9,14,23,
25 40:23 42:24,
25 43:3 44:12
71:6 72:17,18
89:12,13,25
91:21 92:23
103:16 104:13
105:2,12 107:6
108:19 113:15
123:11 125:1,6,
21,24 130:3
131:19 132:14,
16 135:19
136:21,23 140:1
141:18 142:7,
13,23 143:7,12,
14,18,21
150:14,23
151:17 154:3
161:7,9 162:3,4
164:14 168:17

**doing** 18:23 19:8
28:17 30:19
35:1 40:14 44:2
48:8 55:2,17
58:15 64:23
73:4 79:23
82:15 131:19
144:18 146:4
152:13

**done** 17:21
18:22 19:9 21:6
35:17 65:25
72:19 81:3,6
85:13 90:14
91:10 92:8
107:21 144:15

146:1 148:18
150:25 151:6,22
163:18 165:10,
15

**door** 152:20
167:5,17

**double** 95:17

**double-sided**
92:16

**doubt** 85:16

**down** 38:7,10
57:13 61:14,19
110:20 143:25
164:5

**dozen** 30:22

**drafted** 66:5

**drop** 64:1

**dropped** 51:19,
23 52:21 57:12
62:3 64:8,9,10,
13,15 70:21,24,
25 71:1 127:24

**due** 99:14
142:22 169:7

**duly** 5:4

**during** 9:2 31:20
45:11 73:20
74:12 75:16
82:19 134:8,19,
21

**duties** 122:24

**duty** 112:25
117:18 155:15,
17,25 156:13,
21,25 157:18,19
158:1,4,18,20,
22 159:16,20
160:13,18
161:6,10,12,16,

23 162:7

**duty'** 161:21

---

**E**

---

**each** 17:16 18:20
32:10 44:6
56:20 57:25
91:15 109:7,10
168:3

**earlier** 22:2
26:20 27:15
61:16 62:7
110:3 112:21
134:2,25 138:22
139:5 140:7
141:8,22 148:4
158:10

**early** 22:10 30:2
65:6 83:4

**earnings** 123:2,
3,6

**easy** 44:4

**educated** 105:15

**effect** 9:2 61:11
122:8

**effective** 79:14

**eight** 64:16

**either** 51:21 89:2
108:8 129:14

**elaborate** 27:20

**electronic** 94:8

**eligible** 114:5
135:6

**else** 34:4,11
35:10,21 43:22
44:7 47:8 71:12
72:1 80:12
82:22 95:14

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

162:19

**embarrassed**
81:3

**employee** 12:8
16:23,24 66:8
87:2 94:25
95:12 96:19
98:3 99:1
103:20 116:21
117:25 119:3
133:11 145:8,
146:23

**employee's**
119:24 129:18,
19

**employees**
16:14,18,20
51:24 62:1
98:23 111:4
114:12,21
117:12 118:19,
21,24 130:1,2
131:16 147:7
161:10,11
168:12

**employer** 7:10
10:16,18,19,20
23,25 47:13
114:6,10,20
115:24 116:4,7,
12,14 117:8,14,
25 119:8
132:20,21
140:16,19
156:14 161:2
162:8,15

**employer's**
162:11

**employer/
employee** 114:14

**employment**
113:5

**encompass** 33:1

**encouraging**
44:14

**end** 16:3 26:13
51:18 53:2 55:4
58:3 62:8 110:9
139:1

**ended** 83:4

**enforceable** 75:9

**enforcement**
27:1 154:17

**enjoy** 77:20

**enough** 40:17
46:9 72:6,8
118:23 137:16
161:18 166:22

**entail** 24:4 105:1

**entered** 164:1

**entering** 148:2
163:13,15
165:16 167:21

**entire** 96:9
99:19,24 100:9

**entirely** 97:17
99:10,14,23
100:8,13,15

**entitled** 7:11
53:1 55:23
73:13 77:15
95:12 99:24
100:9,11 106:10
111:12,15
135:12 137:4,8

**entrepreneur**
13:19

**entrepreneurs**
13:15

**equals** 55:16

**especially** 59:22

**established**
134:2

**even** 17:14 35:6
48:1 58:6 64:22
78:15 80:3 89:2
91:11 100:22
103:23 104:4,11
107:12 113:23
146:21

**event** 110:11

**events** 92:19

**eventually**
51:16,19

**ever** 45:5 59:1
80:22 86:5,8,16
88:1 105:16
112:3 119:1
131:23 137:19
154:2

**every** 54:18
55:11 58:1,22
89:19 92:8
145:5 150:19

**everybody** 34:24
140:23

**everyone's**
17:11,12 20:13
21:7

**everything** 18:22
21:6 40:24
46:15 56:7
102:5 105:10
106:15 134:23
141:8

**evidence** 5:13

**entrepreneurs**
124:14 160:3
163:24 166:17

**ex-police** 30:6

**exactly** 27:23

**examination**
5:24 90:14
169:17

**examine** 123:11
139:23

**example** 9:11
15:19 18:2 19:3
32:6 39:19
90:12

**examples** 60:5

**except** 5:11 70:4

**excuse** 16:15
96:22 145:17

**exhibit** 6:10
9:13,14 13:24,
25 101:19,23
102:3,13 109:17
115:8,15
121:13,17
158:10

**exhibits** 102:1
121:23

**exist** 154:13

**existed** 154:12

**existing** 152:17

**exonerated**
161:21

**Expand** 22:18

**expedite** 109:6

**experience** 28:13
29:3 30:18 48:7
83:14 88:6
165:20 166:5,7,
8 167:4,12,16
169:19

**experienced**
47:21 56:10
58:12 85:15
165:9 166:22
167:24

**expert** 7:22
33:21 69:14,17
102:20 109:16
138:12,15

**explain** 11:21
12:12 26:2
47:14 83:11
94:14 120:23
149:10

**explained** 17:22

**explaining** 15:6
161:20

**explanation**
17:12 31:1

**extra** 55:22

**extras** 120:12

———————

**F**

**fact** 24:10 26:7
33:1 42:22 65:2
72:24 74:7 75:8
78:6 87:19 88:8
111:14 112:19
120:10 143:4,19
160:3 162:10

**facts** 22:25 23:1,
2,8 25:24 26:6,
16 27:4 31:6,10,
11 33:3,6 49:21,
22 51:16,23,25
52:3 56:5,18
57:23 61:19,23
62:2 63:19,22,
24 64:2 70:13,

15,18 71:2,18
75:1 76:23
78:12 79:23
88:9 109:13
126:6 135:17
137:20,24
161:18 162:25

**factual** 136:19

**failed** 27:22
44:15,22 51:16
103:4 104:10
139:22 140:6

**failure** 139:4
155:10,11

**fair** 13:14 25:9
59:24 95:6
100:12 155:8
158:14 159:21
163:1 167:19

**fairly** 34:24

**fairness** 46:1

**faith** 144:20

**fall** 12:17

**falls** 75:18

**false** 130:5

**falsifying** 72:17

**familiar** 6:6,19
7:2 8:22 9:18
17:9,10 19:1,2,
13 20:25

**far** 13:18 32:11
38:23 46:18
55:23 69:10
72:6,8 88:14

**farther** 35:17
41:7 42:1,3,9

**fashion** 48:4

**fax** 93:22 112:9
125:1 143:17

**faxed** 130:14

**FBI** 39:5,13
40:14,16 41:11,
12 42:4,11,22
51:20,21 61:13,
23 64:24 80:16
85:9 89:15,16
103:14 106:4
130:5 154:1,5,
14

**FBI'S** 43:17
104:22

**fear** 107:7

**February** 65:8
83:5 136:16

**federal** 5:8 32:22
47:15 64:19,22
68:12 123:14
129:16

**felt** 66:18

**few** 86:18 110:2

**fides** 111:19

**field** 18:7

**figure** 135:10
162:1

**figuring** 33:10

**file** 44:15 46:2
50:3 53:7,13
54:2,18 56:2,5,
17 58:11 69:22
73:3 83:13 86:3
88:23 89:15,16
91:21 92:12
96:21 97:4
101:1 116:21
167:6,7 168:17,
24

**filed** 8:21 54:6
81:23 97:11

**files** 54:19

**filing** 74:8

**fill** 10:14,23
27:22 28:1
108:8 119:22
125:14 156:8

**filled** 9:23 10:3,
12,18,20,24
115:5 129:2,3
161:24 162:15

**filling** 132:18
156:21 159:10

**fills** 157:14

**final** 35:14 37:2,
3,5 48:3

**finally** 163:3

**find** 54:15 58:13,
14 68:1,16
76:13 79:25
80:9 89:7
101:14 105:12
114:24 138:19
158:5 168:8,9,
16,19

**fine** 73:24 77:14
94:9 109:24
117:12 146:18

**fingertips**
139:15

**finish** 60:9,11
151:8 153:6

**finite** 93:2

**first** 5:4,20 9:22
22:7 23:10 38:8
42:11 61:8
73:15,18,20,22,
25 74:13,20,24
75:16,25 76:10,
12 77:2 84:1,7

Case 1:13-cv-00060-TFH   Document 37-6   Filed 11/14/14   Page 63 of 92

Cooke vs. American Family Life        Paul Amoruso, Vol. I                05/30/2014

86:14,15 89:11
101:15 115:24
119:22 121:4
131:14 134:22
139:1 154:12
165:3

**fit** 107:3

**five** 47:6 101:13
144:2 145:21

**flags** 72:10

**flaw** 166:17

**flight** 169:7

**flip** 123:5

**focused** 30:3
45:12 47:9
54:11 81:25

**focuses** 29:15

**Focusing** 112:22

**folks** 92:13
94:22 149:15

**follow** 91:10
137:21 138:1
149:14

**follow-ups**
123:10

**followed** 57:3
156:7

**following** 88:21
107:5,13 124:1
155:24 156:5
160:12 161:5

**follows** 127:4

**force** 17:6 18:19
19:1,6,13,23
20:25 46:13
74:11

**forever** 142:25

**forge** 55:14

77:13

**forged** 55:9
73:14,16,17
75:9,20,21 76:3,
5,17 77:24
78:14,16 79:1,6,
7 81:16 153:3,9
168:24

**forgeries** 33:9,11
81:12

**forgery** 24:3
27:21 30:20
31:12 32:8 73:9,
24 74:8,19,20,
23 76:3 77:1,8,
12 78:10,17
79:10,14,22
80:6,8 83:21
84:1,7,8

**forget** 82:21
84:17 136:3

**forging** 164:14

**form** 5:11 7:9,15
9:11,22 10:2,3,
8,9,14 11:2
27:17,22 35:9,
24 39:18 40:2,
11 41:19 42:4,
18,19 43:8 49:9
67:10 89:20
92:14 93:7,17
97:4 106:19
107:2 118:24
119:7 125:15,19
128:13 129:20
132:18 133:6,
20,21 140:14
150:20 157:14

**formed** 34:10,12
35:10,20 36:2

37:21, 135:24

**former** 152:16

**forming** 35:22

**forms** 8:22 9:2,
12,19 23:12
28:21 31:25
39:1,2,3,17,20
40:4,7 41:20
43:4,22 45:15,
16 49:12,18,23
52:16 90:23
91:7 92:21
93:23 97:7
106:24 107:14,
18 112:4 119:5,
11 124:6 125:9,
17 126:15,18
127:5,13,19
128:4,9,18,23
129:1 130:10,13
131:9,18 132:16
134:17 140:10,
13 143:1 150:5,
9,11 151:6,9,23
152:4,20,22
154:1,5 156:8
158:5 161:6,24
162:15 167:2

**formulate** 84:25

**forward** 20:13
23:7 46:17
67:10

**found** 52:1
103:17 106:2,5

**four** 6:15 8:21
31:25 47:5 76:9
110:20 126:22

**fourth** 11:1

**fraud** 22:9
23:12,18,19

24:9,10,15
29:18 30:20
72:12,13 75:3
80:20,21 81:14
124:24,25
125:1,20 135:5
155:7

**fraudulent** 24:15
28:20 29:9 32:6
54:19 80:22
103:16

**fraudulently**
64:3 75:4 76:14

**free** 70:22

**from** 7:10 8:16
14:21 17:10
19:19 22:11
23:4,23 24:8
29:10 30:9 31:6
41:21 46:17
47:13 49:1,8
50:14,19 51:13
53:14 56:7 57:4
65:24 68:5,12,
13 69:8 71:19
78:17 81:3
83:15 94:21,25
95:1,5,14 101:4,
6,10,17 102:22
105:24 107:1,3,
17 108:1,14
111:10,12,16
112:1 114:5,16,
20 116:22 117:8
122:5,12 125:6,
9 127:18,20
128:1,21 131:8
132:10 134:12
135:13 140:15,
19 150:6 159:15
165:16,24

Cooke vs. American Family Life        Paul Amoruso, Vol. I                   05/30/2014

166:19

**front** 55:19
137:23

**full** 81:5 99:20
158:12,20
159:15,19

**full-time** 122:25
123:13

**function** 26:1
27:9 55:6

**functioned** 57:9

**functions** 25:13
31:7

**further** 26:11
58:2 71:18,21
163:4

**future** 37:15,17
169:9

──────────
**G**
──────────

**gatherers** 32:15

**gathering** 33:1

**gave** 25:4 34:14
39:20 60:5,18
83:17 164:22

**geared** 97:14

**general** 9:21
10:10 11:24
12:1,2 14:12,14,
15 16:6 18:16,
17 22:21,24
23:10 106:13
118:17

**generate** 167:12

**generated** 167:9

**generating**
163:23

**gentleman** 120:8

**Georgia** 118:7

**get** 12:10,17
17:22 19:23
20:13 21:6
33:20 40:7 44:5
52:4 68:5,23
82:5 85:1 87:18
89:13 94:3
105:17 107:4,7
108:9 114:20
117:16 118:7,18
120:11 124:4,
18,22 125:2
130:4 133:14
139:20 149:21
155:16 158:24
164:7 165:11

**gets** 19:22 97:8

**getting** 17:4
32:20,22 37:20
47:13 68:3,11,
13 73:5 96:8
97:19 108:16
120:9 125:7
129:5 130:3
166:16

**give** 21:12 24:18
30:25 33:22
37:2 38:4 49:7,
13 56:19 58:22
79:21 82:23
83:19,22 87:3
100:4,7 101:23
108:7 135:23
139:11 149:22
154:25 156:16
162:2

**given** 63:6 81:22
100:5 117:3
161:23 164:20

**gives** 23:3
102:24 166:20

**giving** 42:21
45:22 72:25
73:1 143:22

**glaring** 155:9,12

**go** 13:18 18:6,7
20:12 22:8 23:7
32:11 33:7
36:25 37:20
41:7 42:1,3,9
45:6 50:11 52:5
56:7 67:10,24
71:18,21 72:5
73:10 74:22
85:6 86:16
88:11,22 97:3
101:14 102:12
103:20 107:25
110:19 112:24,
25 117:18 125:6
128:19 142:20
145:4 150:19
153:7,20
156:12,15 158:1

**God** 138:5

**goes** 19:16
106:17 150:16

**going** 8:4,17
9:10 11:9 12:15
16:3 20:12
23:17 29:25
36:18 38:1,3,22
40:7,24 45:21
48:12 52:2,4
53:19 54:15
56:7 57:13
68:16 70:1
76:21 79:25
80:9 84:2 85:10
88:7 91:4 96:25

101:2,15 102:24
105:13 107:8
108:23 109:7
113:14 119:2,12
120:9,11 133:3,
4 134:22 143:15
146:11 152:10
159:14 163:22
164:5,7,21
165:11,21
168:16 169:22

**goings** 20:18

**gone** 35:17 49:4
58:2 71:20
144:16 146:2
153:23

**good** 10:8 40:9
48:20 49:1
54:14,22 56:8
68:5,15 72:20
74:13 80:4,23
97:10 109:2
145:6 154:16
162:11 167:14

**got** 12:6,16 18:9
20:11 23:25
30:1,18 32:2,13,
17 42:22 46:18
49:24 50:19
51:4,21 54:7
55:5 72:12 75:3
80:9 83:21
87:15 92:12
93:3,7 96:25
97:8 101:13
108:14 114:22
117:24 118:2
122:10 128:3
131:17 135:2,10
136:3,7 138:24
156:25 167:12,

Cooke vs. American Family Life          Paul Amoruso, Vol. I          05/30/2014

13,14

**gotten** 43:14

**government** 32:23 47:15 68:12,14 94:16 95:2,10,12,24 96:15,19 97:1 98:3,22 99:4,6, 9,11,14,17,18 101:17 111:10, 17 113:5 116:23,24,25 117:11,14 134:13 135:3, 136:5 137:2,7

**government's** 96:24

**government-sponsored** 117:6

**grand** 63:13 124:16,18,19 137:23

**gross** 123:13 129:23

**group** 12:5 54:10,18,19 55:12 57:8 117:3 118:17 168:20

**group's** 74:21

**groups** 12:4 19:24 20:6

**grown** 22:11

**guess** 9:10 74:2 94:21 116:4 136:6 148:21 169:14

**guideline** 90:20

**guilty** 40:16,19

45:18 51:15

**guy** 8:12 28:25 30:17 67:9 145:6

---

**H**

---

**half** 30:6,22

**half-inch** 41:24

**handle** 17:22 84:2 108:9

**handling** 26:4

**hands** 126:19 154:14

**happen** 70:16 73:20 74:12 75:16 76:22 104:15,17 152:13

**happened** 27:25 31:19,21 51:8,9, 13,21, 53:22 62:2 70:16 76:23 78:11 80:18 81:6 93:25 140:3 152:2,5

**happening** 73:6

**happens** 24:5 29:11 87:4 97:7

**happy** 157:12

**hard** 54:13 73:7

**Harrison** 9:1 15:10 18:12 39:22 52:14 100:18 160:2

**has** 17:16 29:18 49:2,16,24 55:4 70:15 79:14

86:3 91:9,10 99:21 102:20 109:8,9 133:13 142:20 158:1 159:20 163:5

**hashed** 141:21

**hasn't** 62:21

**having** 5:4 27:8 45:16

**He'll** 149:22

**he's** 29:13 30:18, 19 39:25 49:21 68:4 79:17,19 81:22 82:3 85:5 100:20 116:11 128:10,13 129:20,21 133:5,6 137:12 153:11 165:21, 22

**head** 87:4

**headquarters** 112:4 113:21 117:22 118:7 119:12 126:16 127:6 128:5 130:14 131:10 147:22

**heard** 21:24

**hearing** 165:25

**heavens** 76:15

**hell** 143:17 154:11

**help** 84:21 85:3 108:8 109:5

**helped** 61:20

**helpful** 20:14 53:12 81:24 91:23

**here** 6:3 9:22 14:18 16:5 21:9 30:23,25 32:1, 11,17,24 33:22 36:1 37:5,7,14, 18 40:2,4 41:5 56:22 61:11 67:21 68:3,25 69:21 76:19 81:4,7,8 82:3 97:20 98:11,23 100:17 102:20 113:10,25 115:3 119:25 121:24 122:14 128:16 130:5 131:15 142:6 146:21 153:15 161:19

**here's** 46:18 96:22 121:24

**herself** 9:24 80:10 105:5,8 125:12 168:17

**hey** 101:9

**hierarchy** 17:6 18:18 19:1,13

**high** 25:19

**highest** 27:11

**him** 5:19 11:13 48:9 63:23 67:14,24,25 79:18 81:25 102:24 104:9 117:13 120:2 121:15 169:13

**himself** 9:23

**hire** 165:7 167:22

**hired** 70:6 146:1 165:12 167:8

Case 1:13-cv-00060-TFH   Document 37-6   Filed 11/14/14   Page 66 of 92

Cooke vs. American Family Life        Paul Amoruso, Vol. I        05/30/2014

**hiring** 163:10, 11,21

**his** 12:22 18:17, 18 36:17 48:3 49:15,20,21 50:8 67:10 78:23 81:5 87:15 100:20 109:6, 110:8 113:22 116:5,19 117:12 118:6 119:25 120:3,9, 12 131:25 132:7,23 133:1, 11 150:12 159:15

**history** 104:2 106:9 164:19 166:18,19 169:10

**hitting** 45:23

**hold** 116:3

**holding** 18:22 20:10

**holy** 31:24

**home** 22:13

**hope** 81:8

**hoping** 161:19

**house** 94:3

**how** 15:17 16:3 19:1 22:25 24:22 36:19 44:4,9 45:1 47:12,20 49:8, 16,22,24 50:2, 18 51:20 52:19 53:21 57:4 58:10,11 60:7, 13 65:9 68:7 69:3 72:23

73:11 77:7,23 79:12 84:2, 85:14,24 88:5, 16 90:2 93:4 94:20,23 105:25 106:10 112:23 113:11,20 114:18 116:17 118:2,6,14,25 119:22 124:16 125:3,14 126:4, 15,25 127:5,9, 12 128:5,21 132:5 133:22 140:5,17 143:10 145:3 147:4 148:10 149:1 157:18 158:17 160:24 161:1, 20,24 162:1,14

**however** 16:8

**hundred** 48:20 134:6

**hundreds** 165:7

**hungry** 77:19

**hurt** 96:23

**hypothetically** 152:1

──────────

**I**

──────────

**I've** 6:8 9:20 10:9 11:5 12:6 14:15,17,22 17:11 19:5,9 20:10 21:17,23 23:25 32:16 35:3 44:24 45:5 46:18 50:23 83:24 86:18 88:1 90:14

100:5 101:13 136:3 137:13 138:9 139:6 144:15 146:1,2 150:25 154:16

**i.e.** 12:5 19:24 125:1

**idea** 48:20 49:24 51:4 57:18 67:21 69:17,20, 21 92:14

**ideas** 35:2

**identification** 6:11 9:15 14:1 102:14 109:18 115:16

**identified** 102:20

**identify** 8:9 16:15 18:13 101:3 115:9 120:25

**ill** 12:17

**ill-trained** 88:20

**illegal** 94:22

**illicit** 24:7

**immediately** 56:14

**impact** 79:14

**important** 42:7, 16,17,21 49:23 51:6 52:7 54:4 55:11 64:12,14 67:17, 70:18 73:10 78:13 155:10 161:23 162:25 163:2

**importantly** 162:22

**improper** 86:11, 23

**improperly** 138:20

**inadequacies** 138:20

**inadequate** 7:24

**inappropriate** 23:5,15

**incentives** 123:15

**include** 123:14

**included** 11:2

**includes** 123:17

**inclusive** 134:23

**income** 167:9

**incomplete** 83:7

**incorrect** 24:8

**incorrectly** 127:22

**independent** 13:10 144:22 146:7 148:3 163:13 164:2,17 165:16

**indication** 163:25 166:20

**indict** 137:20

**indicted** 51:19 62:3,25 63:14, 24 64:4,5 70:19 71:2 80:19 81:12,16 88:10 124:5,11,23,24 125:20,21,25 127:23 135:3 136:9 137:19

**indicting** 137:23

**indictment**
51:22 61:19
62:2 63:8 64:1,7
70:21,23,25
80:21 135:16,19
136:1,4,15
137:1 168:7

**indictments**
61:14 137:6

**individual** 12:13
19:14 33:8,9
34:4,12,18
35:11 86:6 95:4
100:2 113:21,25
114:21 115:7
118:21,23 119:6
137:19,23

**individual's**
21:16

**individually**
32:10 48:13
109:7

**individuals** 12:5
98:1 99:8,23
167:22

**industries** 15:19

**industry** 15:22
16:19 17:1,18,
24 18:25 56:13,
16 74:18 90:10,
91:24,25 142:12
144:11 145:2
163:5

**information**
23:23 26:18
32:14 36:23
42:10 49:15
50:25 68:5
89:13 112:1
117:16,24

118:3,7,18
124:22 133:7,13
134:1 135:2,11
140:12 142:23
155:14,16,17

**informed** 110:12

**initial** 19:19 24:8
57:9 76:7
154:10

**initially** 61:13
72:20 77:22

**injured** 96:20,
21,23 112:24
113:23 132:13
133:11 134:20,
21

**injuries** 6:20,23
7:1

**injury** 40:4
99:14 111:19
118:1

**innocence**
142:25 143:3

**innocent** 51:17

**input** 27:10

**inquiry** 100:24

**inside** 68:4
114:22

**instead** 45:15,16

**instructions** 84:3

**instrumental**
147:3,11,16,18
148:5,15,25
149:2

**insurance** 7:20
11:22 13:3,5
14:10,22 15:3,
18,22 16:19
18:25 22:20

24:14 25:6
56:13,16 73:18,
25 74:1,14,18
75:24, 76:25
77:2 80:19,21
81:13 89:18
90:10,24 91:18,
24,25 92:20,21
93:16,23 94:2
103:1 105:16
110:21 116:9
122:11 124:24
125:20 128:11
129:17 135:5
141:18 144:4,
145:11 147:19
148:7,8 149:4
154:2 155:6
157:3 163:5
164:4,13,15
167:17,20
169:11,20

**insurance-
related** 127:23

**insureds** 12:4

**intent** 55:22

**intentionally**
113:15

**interest** 139:8

**interested** 12:21
19:9 33:2 68:6,8
69:4 80:8,11
157:10 163:22

**interpret** 117:1

**interpretation**
155:24,25
156:6,8,21,25
157:17 158:18
160:13 161:5,
12,22 162:14

**interpreted**
52:20

**interpreting**
85:25

**interview** 54:5
56:23 59:11,13
60:23 61:12
65:24 66:8,9,10
86:8,14 89:6
155:11 168:9,13

**interviewed** 46:8
47:4 56:25 61:2,
6,7,9,16 65:14
66:20 71:15
72:2,23 86:12
87:14 162:23
165:6,24

**interviewing**
70:3 166:9

**interviews** 61:25
64:18 71:16,19
86:17,19 87:8

**into** 18:7 24:9,10
33:20,24 55:3
67:24 71:20
74:5,22 108:7,
24 142:17 148:3
163:13,15 164:1
165:16, 167:21

**invalid** 76:8

**investigate**
22:14,15,24
23:11 26:10
28:20 29:1,9,22
30:9 32:10 37:1
54:17 55:7 75:3
76:21 78:13

**investigated**
23:2,16

**investigates** 26:5
30:19 152:8

**investigating**
19:10 29:18
32:7 45:19
49:12 51:9 52:8,
15,24 55:6,9
62:8 73:9,14
74:1,10 76:17,
20 84:10 154:21

**investigation**
23:6,24 24:3,5,
9,11 25:19,23
26:9,21 27:7
28:8,11,18 29:4,
16 32:3 33:13
45:5 46:8,15
48:25 49:4
51:14,16,17
52:9,24 53:2,3
54:14,23 55:3,
17,18 56:6
57:10,22 61:5,
13,18,24 62:7,9
64:22,23 65:1,2,
5 66:21 68:7,9
71:3 72:21
76:13 77:24
78:2,8,10 79:15,
23 80:5,11
82:15,19 83:4,
13 85:10 87:6,7,
23 88:1,18
91:23 138:17
152:7,21 153:1,
5 155:10,13
168:8,22

**investigations**
21:25 22:20
25:6,10 26:23
28:16

**investigative**
22:8 26:15

**investigator**
17:15 34:3
35:12 36:18
40:21 46:5
47:22 49:1,16
56:10 61:15
62:19 73:22
74:18 76:3,16
80:15 81:2
85:21 86:9,12
87:1,9 89:2
155:16

**investigator's**
75:25 77:7

**investigators**
33:17 54:25
64:20 80:7 86:2,
17 152:24

**involved** 18:14
19:22 22:12,16
32:2 51:21
57:18 61:13,14
72:17 98:11
109:13 125:3
127:10,12 128:6
131:17 137:14

**involvement**
32:12 63:13
128:22 130:9
148:14

**irregular** 153:19

**irregularities**
49:17 52:16
53:19,23 150:6
151:5,24 152:3

**irresponsibility**
22:10

**isn't** 12:14 26:16
49:18 75:15
91:14 108:11
129:19 132:24
156:20

**issue** 6:5 8:24
49:10,25 76:24
77:23 79:22
80:6,16 110:20
135:7 138:18
165:8

**issued** 75:11
92:20

**issues** 22:10
79:24 109:12
127:23 136:6

**itself** 6:17 8:18
29:9 87:6 96:7
101:20 102:23

---

**J**

**January** 83:5

**job** 17:12,20
18:21 19:5
21:17,23 27:1
44:2 56:11 62:5
64:17 70:20
86:7 88:25 89:5
122:25 123:14
133:12 136:7
147:1 166:10,19

**jobs** 17:17
166:23,24

**Joe** 100:6

**judgment** 56:8

**jump** 74:14
143:25

**June** 63:4 136:9

**June-july** 136:13

**jury** 63:13
124:16,18,20
136:25 137:23

**just** 6:4 8:24 9:1
11:11,17 12:3
18:15 20:10,17,
24 23:10,12,20
27:21,25 30:2,
25 33:22 37:20
39:21 41:18
43:14 45:22
46:7,15,24
47:25 48:5 49:7,
13,24 50:18
52:5 57:20 58:3,
9,23 59:15 60:5,
6,8 62:13 64:9,
21 65:10 67:18
68:8,20 69:19
76:9,21 77:18
78:1,9,11 79:4
81:5 82:23
83:19 84:20
85:13 87:15
92:2 94:12 98:9
101:20 102:19
103:17 104:10,
14 105:10,21
108:13 109:4
111:21 114:25
115:22 125:8,17
126:21 128:16,
25 129:21 134:2
135:8,21 136:20
137:10,24
138:9,13 140:2
142:1 143:19,20
145:1 147:16
149:6 150:22
151:2,5,21

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

152:19 153:1,
161:14 162:17
163:22 164:13,
14 165:12,18
167:7,15 169:5

---

### K

**Kapps** 36:12,13,
17 37:22 38:3
47:20,21 50:15
81:2,10 83:8
87:13,20,22
88:2,6,13 101:6
103:21 104:5,8

**Kapps'** 62:17,21
85:18,22

**keep** 70:1 89:19
94:4 106:16
108:23 130:8
142:13, 143:15,
16 157:12

**keeping** 91:6
93:17 103:16

**kept** 59:6 90:2
93:4

**kick** 28:2

**kicking** 91:3

**kids** 101:13

**Kim** 11:8 34:1
35:13 36:3
37:22 38:2,4,8,
11,18 39:12
40:11,12 41:6,
22 42:19 43:21
44:7 46:11 47:5
60:23 61:6
62:11 95:22
111:5,6,23
112:5 114:19

115:6,25 116:9
119:12 126:19
128:20,21
130:13 136:20
139:4, 147:16
148:4,7,12
149:6, 155:11
156:7 159:21
160:19,20
161:23 163:19
164:1 166:19
168:13

**Kim's** 130:9
147:5,17,23
148:6 152:2

**kind** 31:10 60:13
145:24 166:15

**knew** 27:11
55:23 130:2
131:6 154:10,13

**know** 11:8 17:23
18:6 20:7 21:15
24:21,22,24
25:3,5 30:2
34:22 39:4,16
40:20 41:5 43:8
44:4 48:5,19
50:14,18,20
51:1,2,20 52:7,
14,20,22,23
53:6,12,13,16,
18,21,23 54:1
56:11 57:25
58:21,25 59:3
60:7,13 61:2
62:11,20,25
63:1,8,13,14,18,
20 64:7,11,18,
22 65:4,8,9
66:20 67:1,15,
20 68:16,17,18,

24 69:2,3,5,23
70:2,4,18,23
71:11 72:1,18
74:9,10 78:18,
22 80:3 81:11,
15 82:17 84:9,
14,16 85:9,11
87:13 88:2,4,13,
15,16 91:20,24
96:12,18 97:10
99:8,12 105:18,
22 106:8,9,14
107:22,23,25
109:23 110:4
111:11 112:3
113:6,11
118:14,25 122:4
123:18,21
125:3,11,13
126:4,5 128:2
129:15,17
132:3,7 133:10,
22,24 135:19
136:2 137:5,6
143:10 145:4
146:13,20
154:4,9,12,14,
19,20 160:2
166:24

**knowing** 11:16
57:12 132:15

**knowledge** 50:2
133:9

**known** 61:19
78:12 81:7
112:19,22

**knows** 30:19
52:15

---

### L

**lack** 164:3

**lacked** 103:24
138:18

**lacking** 58:23

**ladder** 19:16,18

**lady** 17:15 31:24
45:4 78:18,
82:20 88:9
101:23 103:22

**language** 7:14
8:18 11:6

**large** 20:6 46:2

**last** 138:14

**later** 8:11 61:7,
17,19,23 63:10
80:15 82:14
123:11 140:3
154:10,13

**law** 8:6 27:1
138:3 154:17

**lawyer** 138:2

**lead** 23:8

**leads** 29:4,6
58:23 152:18,19
163:17

**learn** 26:15 27:7
46:12 47:5
50:24 57:23
113:21

**learned** 57:6
68:12 73:6
77:22 112:23

**least** 48:21 56:10
81:23 106:15,
17,19 154:9

**leave** 40:16,23 63:17 93:4 135:21

**led** 59:21 85:3

**left** 111:14 119:8

**legal** 24:17 47:16

**legitimate** 58:21 79:25 103:19

**legitimately** 71:8

**less** 33:2 42:22 123:2 134:23 135:1,9

**let** 6:9 25:14 35:8 60:4,9,11 63:23 65:21 71:24 79:18 88:11 97:23 101:20 102:22 122:2,14 123:9 128:25 130:7 131:20,23 136:25 151:8 153:6 159:5 161:14

**let's** 44:15 45:6 46:3 48:13 54:7 55:13 70:1 97:20 98:4,11, 22 101:19 108:22 109:16 110:19 123:9,22 143:25 152:1

**letter** 100:25 101:5,9,20 102:24

**letting** 32:24

**level** 20:17,20 22:6,14 27:11 90:1 152:9

**levels** 28:13

**Liberty** 16:25 22:7

**license** 105:17 138:3

**licensing** 106:6

**lie** 42:11,23 164:21

**lied** 42:13 130:5

**lieu** 109:9

**life** 61:21 62:4 83:25

**life's** 166:14

**light** 110:6 112:25 117:18 155:15,17,25 156:12,13,21,25 157:18,19 158:1,4,13,18, 20,22 159:16,19 160:13,18 161:6,10,12,16, 20,23 162:7

**like** 19:16 27:12 39:21 45:25 57:5 58:12 79:20 87:16 108:4 121:2 137:7 142:24 143:23 152:13

**limited** 80:10

**line** 15:12 56:6 58:4 80:10

**lines** 110:20

**Lisa** 11:7 14:6 33:25 35:12 36:3 37:22 38:2, 4 44:9 46:11 47:5 60:23 61:6

62:12 89:11,13 95:21 96:2 97:6 103:4,13 108:21 111:5,6,23 112:5 114:19 115:6,25 116:9 119:12 126:19 128:20,21 130:9,13 136:20 139:4 145:11 146:14 147:5, 16,17,23 148:4, 6,7,12 149:2,6, 11 152:2 154:24 155:11 156:6 159:21 160:18, 20 161:23 163:20,25 164:20 165:13 166:19 168:13

**list** 33:23 38:4 44:5 149:1

**listed** 82:3 109:8

**listen** 37:12

**listened** 27:12

**literally** 165:7

**little** 22:18 61:24

**live** 146:11

**living** 145:5

**local** 20:1,5 29:2

**log** 106:16

**logs** 104:1

**long** 62:4 71:1 84:14 94:12 150:2

**look** 7:20 11:18 22:9 23:8, 31:17,23 32:10, 16 33:7 46:3

48:20,21 49:2 51:10 54:14 55:18 75:16 76:22 83:23 85:14 90:2,13 98:8 106:1 121:5,8 130:7 133:15 144:19 150:20 151:1 153:14,16,20 156:12 165:9 168:16,18,19

**looked** 19:5 34:9 60:10 114:18 144:16 146:3 152:24 166:12

**looking** 10:7 21:3 32:17,19 43:1 45:16 46:4, 59:6 60:8 65:11 75:19 77:18 84:4 121:12 143:19 150:22 151:2

**looks** 73:25 74:14 77:2

**loss** 16:2 39:25 168:20

**lost** 41:2 62:5 70:20 79:12 142:25

**lot** 14:21 26:14 32:18 48:7 67:24 81:21 91:2 93:21 101:12 120:16 167:24

**lots** 72:21 151:6

**lying** 42:17 62:1 133:23

## M

**mackerel** 31:24

**made** 52:1 66:24
67:14 76:24
107:6 129:12
131:9,11 160:19

**maintain** 12:20
90:12 107:9
164:15

**maintaining**
157:10

**major** 92:8
108:3

**make** 12:3,4,24
23:7 25:18 27:4
29:22 66:18
78:12 97:20
101:11,19,22
102:3 105:11,
12,14 107:1,2,3
109:6 119:2,3
120:5 135:4
144:13,25
145:13 146:3
159:5,8 168:3

**makes** 7:23 26:6
133:3 134:5

**making** 73:12
80:10 88:6
96:20 99:2
112:24 113:22
114:16 119:6,13
120:7, 129:8,9,
22 132:5,12
133:21 134:6,9,
22 135:1,8
141:1 146:10
159:13

**malfeasance**
30:21 31:12

**manner** 139:25

**manual** 87:2

**many** 11:17
17:23 25:8 31:9
72:23 91:16
167:20

**March** 65:8 83:5

**March-april**
154:11

**mark** 101:23
109:16

**marked** 6:10
9:14 13:25
102:13 109:17
115:15 121:20

**market** 20:6

**marketing** 17:19
19:21

**Martin** 41:14
52:17 63:23
110:4

**Maryland** 24:22,
23

**Massachusetts**
106:7,8

**match** 150:20

**material** 41:24,
25 88:23 104:3
108:8 117:2
122:24 143:12,
14,15 168:19

**matter** 18:14
75:13 157:1,18

**mattered** 132:24

**matters** 73:13

**may** 12:8 20:2

23:19,20,21
28:12 32:16
33:15 35:24
36:23 37:2
50:24 51:19
68:23 70:13
84:25 85:15
88:7 100:25

**maybe** 18:12
28:10 30:1,24
45:17 53:8 56:1
65:11 75:17
95:3 112:21
128:2 137:5
155:9

**Mcmahon** 5:15,
19,22 8:2 9:1,6,
8 11:10,24
12:22 14:12
15:10,14 16:15
18:12,16 22:21
25:12 29:13
36:10,13 38:7,
14 39:21 43:12
45:13 46:22
49:14 50:1,8
52:14 62:16
63:4,21 66:12
67:7 70:8 73:16
76:5 77:15 79:4,
8,17 81:20,22
85:5,22 95:16
100:18,22
101:2,8,22
102:2,4,9,11,16,
18 104:17
108:25 109:2,
20,23 110:8,12,
15 111:18
112:8,11 113:24
115:9,12,19

116:3,7,11
117:19,23
118:6,10,14
119:15 120:1,
20,25 121:3,14,
19,22,25 122:4,
9,19 123:7
124:12,18
125:16 126:9,23
127:9 128:6,10,
25 129:7,11
130:16 131:4
132:20 137:11
138:5 139:11,
14,20 141:15,24
142:2 144:5
145:17 151:11,
19,22 153:11
155:2,4,18
160:2,7 165:19
169:6,12,18

**me** 6:9 11:16,21
16:15 21:12
24:18 25:14
26:2 27:11,23
28:19 29:8
30:25 31:10
33:22 34:14
35:8 37:15 38:4
41:21 42:11,23
48:16 49:7,13
53:11,12 54:16
55:8 56:12,19
58:12 59:15
60:4,9,11 63:6
64:12 65:21
67:19 69:8,25
71:4,18,24 73:8,
13,19 74:17
75:23 76:2
83:11 84:18
88:11 93:21

94:8,14 96:1
97:21,23 98:3,7
100:4,7 101:15
104:12 107:16
110:5 117:3
122:2,14 123:7,
9 128:25 130:7
131:20,23
134:16 135:4,23
138:12 139:18
141:12 145:17
149:10 150:22
151:3,8 153:6,
14 154:25 159:5
161:21 164:16
165:24

**mean** 5:20 7:12
21:4 30:21 35:2
36:23 47:11
64:15 66:17
72:9,10 84:17
100:15 102:2
106:14 108:5
111:24 119:14
125:18 128:13
134:18 149:11
157:25 163:8,13

**means** 120:24

**meant** 162:7

**measure** 8:6

**medical** 11:3
12:9 31:20
115:2 158:19

**meet** 64:3 93:15

**mental** 70:20

**mentioned** 40:18
50:16 103:24

**met** 6:1

**mid** 30:1

**middle** 61:18

**might** 12:21
17:14 19:25
20:1 26:11,
27:13 28:9
31:23 35:6
47:19 61:16,20
76:8,13 77:23
78:1 86:10
93:18,19,20
100:11,19 110:7
125:12 152:15

**mind** 48:1 69:15
70:18 119:24
120:3

**mindset** 64:2

**minute** 32:16
36:10 45:17
50:8 55:24 80:8,
24

**miscommunicate
d** 23:21

**mislead** 8:4

**mismatching**
150:6

**misrepresentatio
n** 27:4

**misrepresentatio
ns** 131:9,11

**missed** 80:14
89:4 128:2

**missing** 53:8
109:20 128:15
133:12 150:15
151:6

**misunderstandin
g** 164:4

**mixing** 95:3

**modified** 97:7

**moment** 37:18
44:25 47:18
48:11 67:16
71:13

**money** 23:4
52:25 55:22,24
137:21 149:15

**monitor** 139:5
144:13

**monitoring** 7:25

**months** 64:16
134:17,20,
136:21

**more** 7:16 28:24
29:17 30:1
36:23 42:22
47:19 50:24,25
58:24 66:17,18
68:23 72:20
76:12 79:18,21
80:16, 84:25
85:3,16 96:8
108:13 110:5
114:25 126:21
137:14 150:25

**most** 13:11
14:18 16:6
24:13 45:4 91:2
155:9 162:22,24
164:8

**motive** 43:5

**move** 19:11
108:22,24
123:22 135:15
147:2 168:4

**much** 16:3,10
29:3 49:4 54:11
61:16 62:7
73:11 132:5
142:12 149:15

**moment** 167:5

**multiple** 19:9

**Mutual** 16:25
22:7

---

**N**

---

**name** 21:12 28:1
36:19 47:23,25
48:1 50:16
64:23 67:2
82:21 100:4,6
119:25 141:19
142:8 169:25

**names** 19:5

**nature** 166:18

**near** 169:8,9

**necessary** 29:20
37:9 45:7 78:4
105:17 167:16

**necessity** 61:1

**need** 12:20 30:16
59:21 60:2 66:9,
11 71:18 84:5,
20 93:10 106:8
107:7 138:4

**needed** 28:8 55:7
62:14 85:3
157:11

**neither** 167:3

**never** 28:25 58:9
68:12 79:8
83:14,17 94:10
124:19 126:18
131:5 132:6
138:2,3,7 144:2
155:15

**new** 110:7

**next** 17:4 20:17,

20 55:2 60:1
106:21 112:16
115:23 124:1
138:24 139:7,22
150:1 152:5
154:23 155:6

**nobody** 106:2

**none** 104:3
105:21,24
106:11

**nonexistent** 75:7

**nonpayable** 26:1

**norm** 89:1

**normal** 24:7
27:9 90:18
104:1 120:12

**normally** 132:8

**notes** 84:17
87:16

**nothing** 55:5
70:15 76:12
111:18 143:12
162:17 167:6

**Nothing's** 96:24

**notice** 5:10 26:5
27:17

**noticeably** 83:22

**noticed** 116:20

**notices** 92:12

**notorious** 23:18

**November-
december** 65:7

**now** 18:15 32:12
36:2 37:18 46:4
61:23 62:21
65:13 66:7 69:8
70:22 72:3,24
82:2 98:23
100:24 105:4

115:23 116:3
122:4 145:3
169:13

**number** 74:11
79:19 101:24
102:6,7 110:5,
19 121:9,10,22
139:19 141:13,
14 144:5

**numeral** 163:4

---

## O

**o'clock** 37:19

**objections** 5:11

**obvious** 66:7
71:18 140:10,
12,17,23
149:10,11
150:22 152:25
153:2,4,8

**occasion** 112:8

**occasions** 110:5

**occurred** 51:22
73:24 168:23

**occurs** 149:9
150:18

**off** 5:16 6:4
12:18 13:22
82:2 102:12
106:19,25 109:4
145:18 158:7
167:1 169:4

**off-the-job** 6:20
7:1

**offer** 8:17 12:6

**offers** 13:23

**office** 18:7 20:17
22:6,14 33:19

36:25 66:6,24
89:19 93:16
104:24 106:16,
17 108:7 125:6
138:8,14 146:15
150:18 152:2

**office's** 144:2,4
145:21

**officer** 15:20
47:10 54:8
68:15 100:2
110:22 142:24
154:2 168:7

**officers** 30:6,7
45:10 46:20
47:1,4,6 48:14,
17 54:5,9,12
58:8 66:13,14
68:2,10 73:12
95:21 98:19
99:9,13 112:23
114:1 115:7
117:17 147:4,6,
24 148:6,16
149:1,3 168:11

**offices** 30:1
144:10

**official** 144:3
145:7,22,23,24
146:2,20 147:1

**Oh** 5:19 44:18
60:12 102:9
109:2,22 121:12
123:25 138:4
162:16

**okay** 5:14,21,23
6:9,19,25 7:2,6,
12,18 8:16,25
9:8,21 10:1,6,
16,22 11:1,7,21

13:2,12,17
14:16,20 15:9,
14 16:22 17:4
18:1,11,25
19:12 20:3,7,24
21:9,18,24 22:2,
5,18 23:9,25
24:13,20 25:5,9,
20 26:2 27:15,
25 28:4,19,23
29:5,12 30:15,
24 31:8 33:5,20
34:8,11,20 35:5,
19 36:1,6,8
37:14 38:1,15,
20,25 39:2,4,10,
12,16,18 40:20
41:8,17,21 42:2,
6,15 43:2,8,14,
19,24 44:1,9
45:6 46:4,6
48:24 50:15,22
51:7,12 52:11
53:4,10,20,25
54:4,24 55:9
56:12,19,21,24
57:2 58:16 59:3,
10 60:4 62:15,
23 63:2,8,12,20
64:11,13 65:4,
17,21 66:5,16
67:6,13 69:11,
16,20,24 70:12
71:14 72:4,8
75:23 76:2 77:5,
12 78:3,22,25
79:16 81:19
82:12,17,25
83:11 84:9,19,
24 85:21 86:5,8,
11,16,21,23
87:5,11,17,24

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

88:16,19 89:11,
18 90:5 93:12,
15,21 94:1,6,11,
19,23 95:3,8
96:1,21 97:23,
24 98:20 99:5,8,
22 100:12
104:25 105:22
106:12,21
107:16,20
111:2,11 112:7
113:2,6 114:8
116:2 117:23
118:5,23 119:5,
10,18 122:9,15,
18 123:20,22,25
124:1,4,16
126:6 127:8
128:2 130:11,
15,24 131:20
132:3,10,17
134:14,16,25
136:18 137:3,25
138:15,24
139:2,13,22
140:7,23 141:4
142:22 143:25
145:15 146:9,
13,19 147:14,15
148:2 149:9,17,
23 150:3,13
151:4 154:23
155:4,14,23
156:3,5,11,20,
24 159:8,18,23
160:1,15,23
161:1,4 162:2,
13,19,21 163:3,
4 164:25 165:1,
4 166:11
168:13,15
169:1,14

**on-the-job** 6:20,
23 40:4

**once** 32:2 56:17
144:2 145:21

**one** 9:11, 15:20
19:8,25 25:13,
16,18,21 26:12
30:22 31:21
38:2 40:1,18,22
42:5,14 43:1
44:6 46:16,19
47:3 54:7,11,18
55:10,16 62:18
64:24 72:7
74:11 76:15
79:18,21,22
80:20 81:3
83:25 86:2
88:21,22 89:11
97:8 101:21
104:11,22
105:17 107:15
112:8 121:19,24
123:5 125:11,12
126:17,21 127:3
128:1,12 129:23
138:4,13 143:19
145:17 151:1
152:18,19
155:12 156:9
162:24 166:25
167:3,17

**one's** 167:6

**one-sided** 93:7

**ones** 39:4 40:13,
15 92:7 111:15
126:19 128:11
129:7

**only** 6:25 7:17
17:1 19:8,9 22:2
23:17 29:14,24

58:1 88:22
97:14,25 99:1,3
101:15,21
105:25 116:20
117:7 123:8
125:11 130:21
131:12 138:15
148:14 149:19
157:5 162:2

**open** 32:3

**open-minded**
55:4,17

**operation**
164:13

**operations** 144:3
145:22

**opinion** 34:10,12
35:9,10,20,23,
24 36:2 37:21
45:12,14 49:15,
20 61:4,5 68:23
70:14,16 71:17
81:19,20,25
83:1 84:20,25
85:16 103:7
111:14 125:13
126:5 135:22,24
137:1,4 143:22
155:9 158:19,21
159:18 160:10
161:15 163:4

**opinions** 8:17
33:20 35:15
36:24 37:4,24
38:5 49:22
81:23 100:19
102:25 110:3,7,
14,15,19 138:21
139:3 141:9
162:10,11,21

**opportunity**
110:13

**orchestrated**
14:17

**order** 45:22
67:10 74:3 75:2
106:9

**organization**
23:16 57:7

**organizations**
144:15

**original** 88:12
89:20,23,25
90:7,11 91:6,21
92:15,21 93:4,8,
10 94:3,9,12
122:11 141:18
142:16,18 143:1
150:14 161:4

**originally** 162:8,
9

**originals** 89:12,
14 90:6 91:3,11,
22,23 92:1
93:17

**other** 5:7 14:21
15:11 17:3
34:11,17 35:11
37:24 44:8,24
45:8,9,10 46:16,
19 47:3 48:14,
17,21 50:13
54:5,8 57:21
59:22 66:10
68:2 71:20,23
73:12 74:14
76:18,19 78:12
80:2,20 82:18
93:1,9 97:5
98:21 103:15,23

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

105:16 107:1
110:6 114:17
115:2 119:9
123:15 162:12
167:2

**others** 63:17
102:2,4

**our** 22:14,15
34:22,23

**out** 9:23 10:3,12,
15,18,20,23,24
12:10 18:6
20:14 22:9
27:22 28:1
33:10 34:22
40:25 48:19
52:1 54:15 58:9
61:23 68:1,16
72:19 73:10
76:13 79:25
80:9 89:1, 90:7
92:17 96:25
97:1,17 99:10,
13,19,23 100:8
101:1,14 105:13
106:2,17 108:8
114:24 115:6
117:4 119:23
125:14 129:2,3
132:18 135:10,
17 137:16
144:3,19 145:10
150:16,19 151:3
152:2,10 154:15
156:8,22 157:14
159:10 161:24
162:1,15 167:2,
24 168:8,9,16,
20

**outright** 56:1

**outside** 14:10
26:9 31:13,14
32:13 35:11
36:3 37:22
71:10,25 75:18
89:10 114:14
146:1 161:9

**over** 20:17,20
33:13,18 56:10
89:20 97:23
113:22 137:20
141:1

**overlapping**
31:7

**overtime** 101:12
123:15,17

**owes** 53:3 58:4
62:9

**own** 8:1 14:22
38:15 43:5 81:2
91:17 138:20
149:10,12

**owning** 22:12

—————————

**P**

—————————

**page** 9:22 10:1,
16 109:21 110:1
115:24 121:7,
14,17,25 122:1,
2 123:5 139:1,
11,18,19
141:13,14
144:1,5 149:22
153:24

**pages** 6:15 41:25

**paid** 28:6 32:22
44:13 48:8
107:4,7 116:17
124:7,8 125:23

127:14,15,16,25
130:4 158:25
166:16

**paper** 20:14
37:6,7 90:11
91:6 136:4
142:18

**paragraph**
122:19

**park** 114:23

**parking** 114:23

**part** 19:22 25:23
29:16 41:1
42:15 55:2 57:8,
19 68:7,9 78:1
83:5 85:2 102:4
108:10,16 109:6
111:25 112:22
123:19 129:21
131:13 132:8
133:25 153:1
159:16 165:3,6,
13

**part-time** 30:7

**participants**
66:10

**particular** 18:3
49:9 50:7,12
102:20 138:22
168:20 169:21

**particularly**
151:10

**parties** 51:24

**parts** 168:21

**party** 132:15
133:5,6

**pass** 140:12

**past** 61:17
165:13 166:18,

19

**path** 87:3 164:5

**patient** 158:12

**pattern** 68:3

**Paul** 5:3,6 98:4
128:16

**pay** 16:2 26:19
29:20,23 31:4,5,
18 63:10 68:12,
13 73:5 77:6
89:8,9 95:1 96:7
97:17 99:7
101:15 111:7
118:19 120:10,
12 123:3,6,14
133:4 135:9
157:20 162:5,6
165:8

**payable** 25:11,
17,22,25 27:5
74:9,21,22,24
75:1 76:9
113:14,16
126:12 133:8,10
164:11

**payers** 26:18

**paying** 26:13,16
33:2 55:5 94:17
95:10 157:3
159:4

**payment** 26:6
27:8 28:5 30:4
110:24 115:2
116:22 158:24
159:4

**payments** 68:11
125:2,7

**Payroll** 115:13

**pays** 12:19 99:1

Cooke vs. American Family Life         Paul Amoruso, Vol. I                    05/30/2014

**paystubs** 134:19,
  20,21 135:11

**Penn** 115:6
  116:4,16,18
  117:10

**Pentagon** 95:21
  110:22,23 111:3
  112:17 116:25
  147:5,23

**people** 12:24,25
  13:8,21 19:11,
  19 21:5 23:19
  26:10 28:13,17
  29:2 30:6,14,23
  31:4,17 32:1,18
  33:14,15,18
  34:23 35:3
  36:24 40:25
  44:15 46:8,13
  47:4 48:18,21
  54:13 55:1
  65:15 71:8,15
  72:14,23,25
  73:3 86:8 90:16
  106:10,14
  107:1,7,9 108:7
  117:4 119:9
  120:17 130:2
  131:21,22 137:6
  143:13 144:22
  145:9 146:1
  147:8,20 148:1,
  10 152:12,15,
  156:17 157:2
  163:21 165:7,8
  166:14,15
  167:8,15,24

**people's** 19:4
  78:7

**per** 33:14

**percent** 7:10,17
  40:3 68:11,13
  90:3 94:17 95:1,
  4,11,14 96:8
  97:19 99:2
  111:9 113:22
  119:6,13,23
  120:3,4,9,11
  123:2 129:8,9,
  22 132:12
  133:21 134:7,9,
  12,23 135:1,9
  141:1

**perfect** 80:13

**perfectly** 58:20
  97:10 142:21

**perform** 122:24

**perhaps** 79:20

**period** 9:3 31:20
  45:11 62:4
  63:15 64:16
  75:18 91:5

**periods** 73:21
  74:12 134:9
  160:3,7

**permission**
  114:20

**permit** 115:6
  116:9

**permitted** 5:8

**perpetrated**
  131:16

**person** 17:20
  18:5,8,9,20
  27:10 29:1
  32:20 49:11
  53:21 68:4,5
  73:25 74:14
  76:20 80:23
  85:15,24 107:3

116:8 154:16
  165:9 168:3

**person's** 67:1

**personally** 17:23

**personnel**
  114:16

**persons'** 17:17

**perspective**
  98:24

**PFPA** 141:6
  142:23 147:4,17
  148:16 149:1

**phone** 23:3
  58:19 66:24
  67:14,15

**phones** 167:1

**physician** 10:4,
  13,14 156:22
  157:15 158:9,
  11,22 159:10,
  11,13 160:24
  162:15

**physician's** 10:1,
  10 156:13
  158:18

**pick** 31:15
  158:23

**picture** 79:24
  108:3

**piece** 41:24
  77:11 142:18

**pile** 136:4

**pitch** 55:3

**place** 7:17
  131:14

**plain** 145:1

**plaintiff** 109:12
  142:24 169:17

**plan** 66:11

**plane** 109:6

**played** 137:22

**plea** 39:24

**plead** 40:18

**pleaded** 40:16

**please** 110:11
  144:7

**plenty** 130:19

**plus** 53:3 55:15,
  16

**point** 33:12
  35:14,16 37:3
  46:17 51:3,10,
  13,14 61:20
  80:1 83:7,23
  84:3 97:1

**points** 25:19

**police** 19:24 29:2
  30:7 33:14,15
  45:10 46:13,19
  47:1,4,6,10
  48:14,17 49:3
  54:5,7,9,12 58:8
  66:12,14 68:2,
  10 76:19 95:21
  98:18 99:9,13
  100:2 110:22
  114:1 115:7
  116:25 117:17
  118:2 147:5,23
  148:6 149:3
  152:16,17 154:1
  168:11

**policemen** 12:5
  32:17 57:8,21
  73:2

**policies** 11:23
  12:14 15:23,25

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

19:15,16 43:6,7
44:13 71:8
76:14 80:2
94:13,15 95:20,
23 96:2,6 105:3,
14 107:10
112:17 114:11,
21 115:1,2,7
116:10 125:23
126:2 130:1,22
144:24 145:10
147:8,19,20,25
148:8,9,11,12,
14,17,22 149:4,
18 163:16 165:8
167:18,23

**policies'** 44:14

**policy** 6:5,6,15,
16,18,20,22 7:8,
11,13,15,19,22,
24 8:18 12:9,10,
15,19,21 13:6
15:21 48:19
58:10 72:14,15,
25 73:3,18 74:1,
2,4,11,21 75:2,
3,9,10,12,22
76:1,8,12,25
77:2,13,23 78:5
79:13 80:9 89:8
91:17 94:16,20,
21 95:2 96:7,10,
11,24 97:14,16
98:1,7,14,21,25
99:7,25 100:10,
12 101:10 103:2
107:9 110:21
114:2,4 115:1,2,
3 117:4 118:16,
17 119:1,4
120:10,23

121:5,12,18
122:3,5,7,10,11
123:19 129:16,
17,21 131:6,12,
13 132:8 133:4,
11,15,25 142:21
143:9,10
145:11,13
148:21 149:7
156:1 157:3
169:21

**policy's** 75:17
77:3

**policyholder**
8:21 9:23 16:4
29:10 54:18
55:11 106:18
108:15

**policyholder's**
10:3 55:10 94:3

**policyholders**
24:4,15 93:22
169:23

**poor** 87:7

**poorly** 46:8 47:4
54:2 58:11
65:14,25 71:15
81:3,6 134:4

**portion** 39:18
40:11 41:6,23
42:6,8,18,19
50:3 139:9
169:15

**portions** 125:18

**portrait** 26:17

**pose** 169:13

**position** 20:10
93:5 154:23

**positions** 21:11

**possibilities** 32:4
55:19

**possible** 70:17
73:9

**possibly** 75:14
159:3

**post** 58:22

**posted** 54:3 56:2
58:12

**potential** 22:9
32:8 49:17
86:25 94:15

**potentially** 26:25
32:6 68:1

**practice** 150:17
167:4

**practices**
144:12,14 163:6

**pre-2002** 164:16

**prefer** 11:13
34:6,9

**preference** 11:10

**premise** 74:4

**premised** 155:7

**premium** 15:25
16:2 164:15
168:21

**present** 33:7
56:5 62:19 75:1

**presented**
124:14

**preservation**
104:2

**president** 34:21
116:5,6 152:10

**pretty** 14:18
16:10 29:3 41:2
54:11 66:7

142:12 149:14
150:2

**prevented**
107:12,17
165:15 168:7

**private** 13:8
114:13,17

**probably** 11:16
45:4 46:16 48:7
66:5 67:18
72:20 83:1 92:8
137:14 150:25

**problem** 13:13
32:19,24 41:1
51:18 61:21
80:14 136:25
138:19 160:10

**problems** 76:19
80:3 162:12
165:11

**procedural**
23:19 92:9

**procedure** 5:9
90:13,15,17

**procedures**
146:3 163:7

**process** 35:22
57:3 91:8
113:15,17,19
134:1 150:11
152:7,21 158:25
166:14

**processed** 108:6
111:23 113:13
137:4

**processing** 73:4
108:1,2,5,12,13,
16 112:1 135:18
159:2 167:1

Case 1:13-cv-00060-TFH   Document 37-6   Filed 11/14/14   Page 78 of 92

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

**produce** 101:25

**produced** 60:19
87:25 88:23
104:3,13

**product** 12:6,7
13:5 16:9 19:23,
25 139:23 141:7
167:14

**production**
90:14 106:7

**products** 17:2,3

**professional**
143:22 164:6

**proffer** 39:23
43:17

**proffered** 7:22

**progression**
19:19

**promise** 34:23

**promote** 19:23

**pronounce** 48:2

**pronouncing**
36:19 101:7

**proof** 130:16,19
145:1

**proper** 49:5
104:25 106:22,
23 107:11,16
146:5 163:6

**properly** 36:14,
16,17,21 43:23
45:19 47:22
83:9 105:15
108:19

**property** 15:19

**prosecute** 33:18

**provable** 26:12
33:4,5,6 72:20

**prove** 137:15
142:24

**proved** 51:17
143:2

**provide** 109:10
139:18,19
141:12

**provided** 131:12

**provides** 133:6

**province** 49:18

**provisions** 28:7

**public** 138:13

**pull** 39:19

**pulled** 101:1

**purpose** 5:8
22:19 25:10
38:23 101:10
123:8 141:20
142:9 143:8

**purposes** 8:6

**pushing** 105:2

**pushy** 86:22

**put** 12:24 28:1
37:6,7 38:2,3
98:24

---

## Q

**qualifications**
163:7 169:10

**question** 5:11
7:16 12:22
21:18,21 24:1,
18 29:8 34:14,
17 35:8 36:1
37:12 39:10
45:25 47:16
50:5,6,9 52:17
60:1,9,11 67:19

71:25 74:24
78:18 82:13,14
88:12 89:3
92:24 93:2
96:17 97:13
98:10 99:3
100:1 102:22
106:19,21
110:13 113:1,4
114:3,4,9
115:19,22,23
116:13 118:6,13
119:16,19,20
120:21 121:15
126:23,25
127:2,9 128:3,
15,18 130:17
134:4,24
135:14,25
140:14,20,21,24
143:5 145:15
148:23 153:6
154:22 156:16
157:13,19,22,23
158:11 159:6,9
160:21,24
161:2,4 164:23
166:3 168:1,2

**question's** 25:24

**questionable**
27:5

**questioned**
126:13

**questioning** 52:6

**questions** 46:9
58:24 59:21,22
60:6,10,13
62:20 66:8
72:11 80:17
82:1 85:7 86:19,
25 88:5 98:9

103:1 105:25
106:3 110:2
113:8 120:16
122:14 123:10
169:13

**quick** 108:23

**quickly** 121:7
142:1 168:5

**quite** 149:9
169:15

**quote** 27:18

---

## R

**raised** 72:10

**randomly** 45:23

**rather** 87:9
112:4 138:25

**ratio** 168:20

**re-adjourn**
169:8

**reach** 33:12

**reached** 37:3
110:20

**read** 5:20 41:8,9,
10 42:4 45:5
59:8,11,13
60:14,15, 62:21
65:11,17,19,23
66:2 68:21,23
69:9,12 70:8,10
72:12 81:5
82:10,11 83:2
84:23 87:16
89:2 103:8,12,
13 110:5 112:14
117:2 124:10,19
126:9,11 127:3,
4 131:23 132:10
138:25 143:13

Cooke vs. American Family Life        Paul Amoruso, Vol. I                05/30/2014

147:10 150:1
151:21 157:6
165:1

**reading** 5:18
81:4 83:12
84:11 110:18
132:7 138:25

**ready** 28:6 37:2,
11

**real** 17:17 26:12
48:1

**realistically** 73:2
133:15

**really** 11:19
25:4,25 26:16
30:17 33:2
42:25 44:13
48:8 68:6 128:3
133:16 135:19
152:11

**reason** 58:22
63:25 74:10
76:18 95:17
97:1 131:15
143:8,23 146:19

**reasonable** 55:8
80:25 168:22

**reasoning** 56:9

**reasons** 40:22
58:15 72:16
128:24 151:7

**recall** 131:4

**receive** 100:11
106:1,22 117:17
135:12

**received** 56:17
105:19,23
111:12 149:13,
14

**receives** 26:5
74:19 76:3

**receiving** 40:3
100:9 106:25
107:1 134:12

**recess** 109:3

**recipients** 44:14

**recognized**
164:6,9

**record** 5:16
39:22 62:16,20
65:21 79:5
95:16 101:3
102:12,19 106:9
109:5 113:24
125:17 127:4
130:17 142:7,
14,19 145:18
158:7 160:3
169:4,5

**recorded** 59:5

**recording**
141:19

**records** 11:3
31:20 48:21,22
104:2

**recurring**
162:24

**refer** 7:3 8:4,8
11:7 26:10 28:9,
15 145:21

**reference** 58:19
141:15

**referenced**
100:23 117:5

**references** 142:3

**referencing**
26:21 146:20
160:6

**referral** 50:19

**referred** 16:18
26:20 29:1
38:20 49:10
50:13,20 53:6,9,
14,17 64:25
69:22 104:8
168:24

**referring** 6:7
8:23 27:17 45:9
48:16 64:21
65:15 66:12
71:15,17 111:2
140:21 145:8,9,
155:23,25

**reflect** 102:19

**reflected** 139:7

**refused** 167:22

**regard** 11:22
19:12 21:2,18,
21 23:12 24:2,4,
6 32:7 72:5
90:23 91:6 92:1,
20 128:4 152:3
160:5

**regarding** 7:21
92:22 135:17
140:14

**regardless** 96:13

**regional** 17:7
20:8,21 21:19
146:6,14,24

**regular** 30:17

**regulations**
148:10

**rehash** 110:2

**rehired** 70:21

**relate** 22:25

**related** 75:21
81:16

**relating** 88:5

**relation** 8:24
10:15 46:2

**relationship**
15:3,17 16:7
18:8 114:14
116:20

**relationships**
16:5,6

**relatively** 43:7

**release** 159:14

**released** 158:21,
22

**releasing**
158:12, 159:19

**relevant** 79:24
84:1

**relies** 133:7

**relying** 140:2
162:25

**remember** 42:5,
13 43:10,16
65:10,12,13
67:16,19 71:13
72:3,23 82:21,
22 84:18 125:22
132:6

**remembered**
72:23

**remembers**
109:13

**rendering**
102:25

**rep** 17:19 19:20

**rephrase** 25:14

**replace** 90:7

**replica** 92:14

**report** 24:14
35:4,18,20
36:22 37:8
43:17 44:8,25
48:4 52:1 61:8
62:9 64:24
69:14,17 96:22
106:17 154:12

**reporter** 102:8,
10 127:4

**reporting** 24:8,
23

**reports** 20:18

**reprehensible**
103:17

**represent** 6:2
119:10 126:17,
21 127:7 136:8
156:11 164:10,
12

**representation**
129:11 143:16
160:18

**representations**
12:24 127:17

**representative**
8:13 11:12
38:24 116:18

**representatives**
8:5,8 9:6 11:14,
57:18 117:20
128:12 169:22

**reproduction**
89:25 93:8

**reps** 8:9

**request** 155:14

**requested**
155:17

**require** 15:25
24:14,23 25:5
56:13,16 91:5,
11 105:8
144:11,12

**required** 60:23
142:11 144:9

**requirements**
15:24 145:12

**requires** 24:23
46:1 54:17
74:18

**research** 24:18

**reserve** 5:10

**respect** 129:2

**response** 102:21

**responsibilities**
15:7,8 20:5
25:16,21 139:24

**responsibility**
18:21 21:7
24:19 85:9
103:21 117:8
129:15 133:14
135:18 141:7
145:13

**responsible**
33:9,10,11
57:15 93:1
108:11 129:8
132:18 159:10,
13

**responsive** 5:12

**rest** 7:3 133:14

**result** 124:2

**resulted** 78:10

**resulting** 110:24

**results** 59:6
87:23 146:17

**retaining** 149:19

**retention** 104:2

**return** 98:1

**returns** 99:1

**reverting** 130:8

**review** 140:4
153:25

**reviewed** 116:21

**reviewer** 58:12

**revised** 110:7,15

**riding** 12:18
96:20

**right** 13:14
18:15 20:24
23:20 27:19
30:10 31:21
34:15 36:2 37:7,
9,18 38:6 41:19
42:15 43:21
44:3,19,20,
45:21,24 46:4,6,
18,25 47:3,17
48:12,15 52:4,
53:13, 54:16,21
56:22 57:1,11,
14,24 58:3
60:22 62:21
65:13 66:7 67:9
69:2,8 70:2
71:10 72:13,24
75:15 77:14
78:24 79:7 82:2
83:8,10 87:13
90:22 92:24
93:12 94:13
96:12 97:13,25
98:22 100:2,17
103:18 105:6
107:11,24
108:18,22

109:15,24
110:19 111:7
112:16,20
118:11 121:4,11
122:14,22 123:5
126:15 127:12
131:3,19
136:10,17,18
137:13 138:16,
17,24 139:7,22
141:11 142:10
143:25 146:21
147:12 148:23
150:1,4,9 152:8,
18 153:4,15,20,
23 156:18
157:8,24 158:3,
17 159:5
160:14,23 163:3
166:2,9 168:4
169:3

**rights** 49:2

**Robinson** 67:8,9,
22 68:15,18
69:1 70:3 71:11,
16,23,25 72:5
78:22 81:17
82:18 129:3
132:4,11,18
133:9,19,23,24
150:12

**Robinson's**
131:24 151:10
152:4 153:3,9

**Roland** 119:24

**role** 7:20,21
11:22 15:17
20:15 21:16
22:24 24:7
25:25 28:8
29:20 31:16

Cooke vs. American Family Life        Paul Amoruso, Vol. I        05/30/2014

32:7,9 34:1,3
62:8 74:25
75:19,25 85:18,
22 104:10
108:3,15 116:19
118:2 131:25
137:22
**roles** 20:25 21:8,
10
**Roman** 163:3
**rule** 7:4,7,23
31:5 46:14 47:7
57:5 69:6 73:15,
18,20 74:11
82:6 85:12
96:14 120:24
129:2 132:24
140:20
**rules** 5:8 144:17,
18 145:10,12
148:9
**run** 48:12
119:21
**rundown** 49:13
**running** 13:20
15:5 22:12

— S —

**safe** 35:20
**said** 11:1 19:12
22:2 23:10
27:15 42:12
43:16,21 44:24
48:13 50:17
51:15 52:5 53:3,
19 55:20 57:6,
13,14,19 59:16,
23 60:5 61:3
62:13 63:21

65:14,20 68:5,7,
8,17 69:4,19
70:2,14 72:13
76:10 78:19,22
80:11 81:2 82:7
83:8 87:16 88:4
92:2,5,6 94:10,
12 97:7 103:4,
12 104:4 105:10
107:8 111:25
113:12 116:13
119:9 135:5
139:6 140:4
142:2 146:16,
21,22 147:16
154:9,18,21
157:25 160:12
161:17 166:13
169:2
**salable** 166:14
**salary** 7:10
12:20 40:3 95:5,
11,14,15 96:23
97:2,19 99:2,20,
21,24 100:9
101:11,16
113:23 114:16
116:22 117:9
119:14 120:4,7,
9 123:13 129:9,
23,24 132:12
133:22 134:6,
10,15
**sales** 11:8,14,15,
18,22 12:3,23
13:3,9,21 14:4,
5,10,25 15:4,16,
18,21 16:8,12,
25 17:6,7,13,18
18:2,19 19:1,6,
13,19,21,22

20:1,8,16,21,25
21:5,14,19,22
46:10 57:17
85:8 89:19
93:16,22,23
94:2 97:6
105:19,20 111:4
113:3 114:4,12
118:16,18
120:15 136:11
142:16,18
144:4,10 146:5,
6,13,14,24
150:18 163:12
166:6 167:8,20
**salespeople**
59:18 106:8
147:7 166:25
**salesperson**
20:1,5 38:12,21
**same** 15:12,22
16:11 17:19,20
21:18,21 28:11,
12 54:10,11
95:25 97:3
103:17 106:15
153:16
**satisfied** 41:3
133:2 155:15
**saw** 7:15,17
14:18 51:1,14
83:15 104:3
105:21,24
106:11 146:16
**say** 9:1 10:7 12:6
13:19 23:17
25:9 26:13
30:12 31:20,24
32:16 33:5 34:9
35:2,20 36:10,
22 42:23 58:3

64:9 72:8 76:10,
20 79:1,5 80:23
81:10 82:23
85:14 90:3,18
93:1 97:21 99:3
100:12 111:23
116:3,7 117:19
120:7 121:25
123:18 130:21
143:16 145:4,5,
7,22 146:11,17
152:1,17 153:13
155:8,12,13,23
156:5 159:21
160:16 161:15,
19 163:1 167:19
168:2
**saying** 26:22,24
29:13 30:12,25
38:18 44:22
45:16 52:22
55:25 65:22
71:14 78:6,9,11
81:15 91:4
93:13 99:12
104:10 107:11
114:19 124:11
125:7 129:8,21
134:11 143:24
147:15 148:2,5,
20 151:4,8
153:2,4,8 156:7
159:24 160:5,25
161:9,13 162:8,
9 165:22 166:6,
12 167:14,15
**says** 13:7 23:3
34:22 57:14
58:18 59:25
97:5,8,10 101:9
109:20 122:1

123:8 165:2

**scan** 90:3 92:16, 17

**scanned** 89:23 90:12 92:16 93:17

**scanning** 90:1,6

**scans** 93:6,7,9 142:17

**scenario** 34:1,3, 13 77:22 105:9 106:23 136:18, 163:19

**schedule** 169:8

**school** 98:5

**schooled** 127:21, 22 131:16

**scope** 89:10

**screw** 11:12

**scrutinize** 163:7, 9

**scrutinizing** 163:18 165:4,15

**se** 33:15

**second** 10:1 52:12 94:13 122:22 145:17 165:6,22

**see** 18:5 24:19 31:24 33:7 34:25 40:1,5 44:15 48:22 53:9 54:7 55:13 59:7 60:2 61:17 66:9,11 70:17 87:4 95:3 103:23 104:1,13 110:24 116:23 122:2,16 150:20

153:19,20 159:5 162:22

**seeing** 20:13

**seemed** 47:21 61:10 103:21

**seems** 18:20 55:7 142:1 162:23

**seen** 9:20 10:9 11:5 14:7,9,15 17:11 18:4 21:17,23 40:24 88:1 102:16 115:5,18 124:17 137:15 163:24 165:23

**sell** 13:22 17:1,3 94:16 98:7 114:12,20,23 115:6,25 116:9 118:16 129:17 147:25 148:10 149:18 163:16 167:13 169:22

**selling** 11:22 12:2,3 13:5 15:20 19:15 71:7 76:14 96:2 105:14 133:15, 16 144:23,24 145:9 148:11,12 149:6 167:2,4, 14,17

**sells** 8:12 118:17

**seminar** 145:4

**send** 149:15,16

**sending** 9:4

**sends** 50:3 74:5 125:17

**senior** 152:10

**sense** 85:13 135:4

**sent** 8:22 11:3 78:8 84:18 101:5 112:2,3 119:11 126:16, 20 127:6,17,20 128:4,19 131:10

**sentence** 110:25 112:16 122:23 124:1 138:22 139:1,7,22 141:8 147:10 150:4,10 151:9, 21 154:23 155:6 160:17 161:14

**sentences** 150:2

**separate** 33:24

**September** 61:18

**sergeant** 67:7 71:11,16 82:18 129:3,20

**set** 14:22 15:25 19:4 23:1 25:6 26:15 28:12,24 29:22 30:5 134:22 145:10 147:5

**setting** 147:3,13, 17,18,23 148:5, 15,25 149:2 163:6

**several** 90:15

**shame** 48:4

**Shara** 35:12 36:3,20,21 37:22 38:3 45:1, 2 47:24,25 48:13 49:9,11,

23,25 50:4,20 51:4,9 52:7 53:6 54:5 56:14,16 58:25 59:10,15 60:6,13,18,23 61:2,7 62:11 64:19 65:14 66:3,20 67:22 68:18 69:1,22 70:2 71:11,14 72:2,4 73:8 77:22 78:13 82:5,17 83:9 84:14 85:3 87:20 88:3,14 162:19,22 163:1 168:6

**Shara's** 50:12,15 52:23 61:5 65:24 66:1,4 69:9,18 84:6,9 87:21 155:10

**she'd** 84:11 108:8

**she's** 23:4 49:1 55:25 57:15 70:22 73:14 74:8 75:10 98:5 105:14 129:21, 22 134:6

**short** 83:7

**shorten** 112:21

**shot** 79:21

**should** 8:9 10:24 23:16 31:15,18, 19 32:3,20,25 35:1 36:22 44:13 46:22 56:11,24 57:3,6 58:2 59:15,18

73:2 80:22 84:2
94:14 96:3 97:9
110:23 111:7
112:19,22 113:3
120:25 124:7
128:1 130:2,22
140:24 141:19
142:7 158:4
161:18 164:11,
12,19 165:9
168:6,23

**shouldn't** 52:25
54:2 58:7 96:4
104:8 125:2
127:14 131:13

**show** 6:9 8:25
9:10 134:22
143:13 158:6

**showing** 133:21

**shows** 163:25

**shuts** 152:19

**sick** 12:16,17

**sickness** 9:22
10:15

**side** 30:9,10

**sign** 5:19 27:13
116:24 132:19

**signature** 5:22
31:24 45:17
55:10,14 67:11
73:9,14,16,17
74:20 76:3,5,17
77:9,25 78:14,
23 81:17 150:21
151:2 152:4
153:3 168:24

**signature's** 75:8

**signatures** 31:25
76:9 79:5 150:6,
12,20,24 151:4,

5, 153:9,17,19,
21

**signed** 10:19
15:10 109:23
114:1 117:14,25
122:5 144:14
164:17

**signing** 5:18
109:21 133:20

**signs** 27:10
129:20

**simple** 51:25
82:13

**simply** 27:21
34:17 148:2,13
155:24 160:12
161:15 166:22

**since** 29:24
155:6

**single** 58:1 89:19

**single-page**
92:16

**sir** 9:25 10:5
14:7 85:20
116:1 140:22
151:14 153:10
156:23 157:16
159:12 169:19

**sit** 150:19

**sitting** 21:9
33:22 36:1 37:4,
14,18 41:5
67:21 68:25
69:21

**situation** 113:18

**SIU** 17:14,15
22:6,7 23:18
24:2 25:13,16,
21 26:3,10,14,

20,22,24 27:8,
13 28:2,9,11,24,
25 29:24 30:14,
18,21 31:1,4,11,
15,23 32:2,5,6,
16 33:1,6,10,12
34:2 36:18 45:4,
5 54:14,17 55:1
61:12 62:9
74:18 78:2
83:17,20 84:1,7,
15 85:24 88:18
103:22 152:15
154:16 168:22

**SIU'S** 27:6 32:7
55:9

**SIU-1** 84:16

**six** 28:24 30:21
64:16 136:21

**slipshod** 46:7
51:14

**slot** 28:1

**Smith** 100:6

**snowball** 61:11

**sold** 43:7 44:13
72:14 73:19
80:2 94:13,14
95:21 96:3,4
110:21 114:3,25
115:1 117:4,7
128:11 129:16
130:1,22,23
145:14 147:8,20
148:9,21,22
149:5 167:23

**sole** 149:17

**solely** 69:8 87:21

**somebody** 21:13
27:22,25 86:12
89:3

**someone** 16:9
19:15 21:12
23:2 31:12,13
35:9 51:19
52:21 53:19
85:13 95:14
107:4 116:16
145:24 146:10,
25 149:16

**someplace** 136:4

**something's**
32:1 152:6
153:15

**sometimes** 11:13
19:22 93:9
142:14

**somewhat**
143:17

**sorry** 6:24 25:12
45:14 60:12
100:15 101:4
102:11 110:18
115:20 119:14
151:18 153:7

**sort** 18:22 19:16
24:7,11 34:25
49:18 61:11
68:3 83:22 84:3
89:24 92:9
105:18 112:20
116:14 163:17

**sorts** 92:17
160:18

**sounded** 80:22

**source** 68:16

**space** 114:22

**speak** 16:10 60:3
101:20

**speaking** 139:10
152:1

**speaks** 102:23

**special** 21:25
22:19 25:6,10
28:16

**specific** 21:14
22:3,25 23:11
25:22 39:23
40:7 41:19
42:25 43:17
46:1 54:15 65:6
83:17, 90:20
102:22 147:1

**specifically**
40:18 42:10
49:16 114:11
121:1 124:9

**specify** 128:25

**specimen** 122:6

**speculate** 137:8

**speculating**
143:20

**speculation**
137:3,11

**spell** 48:2

**Spires** 5:5,17,21,
23,25 6:1,13
8:15 9:5,7,9,17
11:15,20,25
13:1,24 14:3,
15:13,15 16:17
18:15,17,24
22:22 25:14,15
30:11 36:15
38:9,17 40:6
41:13,16 43:14,
18 45:20 47:2
49:20 50:5,10
52:17 53:5
60:17 62:23,24
63:7,23 64:6

66:15 67:12
70:11 74:16
76:6 77:17,21
79:11 81:9,21
82:2,4 85:17
86:1 95:19
97:22 100:21
101:19 102:3,7,
17 103:3 104:19
108:22 109:1,4,
22,24,25
110:10,16
111:22 112:15
114:7 115:11,
13,21 116:8,15
117:21 118:4,9,
12,15 119:17
120:18,22
121:4,6,16
122:2,7,13,20,
21 123:9,12
124:13,21
126:3,14,24
127:2,8,11
128:7,14 129:5,
10,13 130:18
131:7 132:22
137:18 138:6
139:13,17,21
141:16,25
142:3,5 144:7,8
145:19 151:12,
20,25 153:18
155:3,5,20
158:8 160:5,11
166:1 169:5,14

**spoke** 59:1,2

**spot** 114:23

**spotted** 150:24
152:14

**squarely** 34:24

**staff** 16:25 19:6
20:18 21:5
22:15 32:14
110:24 111:3
112:17 113:3
114:4 125:5,14,
24 133:16
138:20 142:22
152:12 159:1
168:9,10

**stamp** 115:10,11

**stand** 36:22

**standard** 11:5
17:18 54:17
56:13,15 60:22
74:17 86:24
87:8 89:18
90:10,23 91:5,8,
14,15,19 92:1,
10,18,20,25
93:2,13,15 94:1
105:8 142:12
144:10 145:2

**standards** 91:13
144:25

**stands** 160:10

**star** 115:3

**start** 6:4 23:5,7
38:10,12 48:13
49:6 51:10
56:24 74:3
97:23 110:1
122:22 152:6
167:17

**started** 22:6 51:9
52:24 65:7
74:10 76:18,24
80:5 83:13,16
129:25 130:22

167:1

**starting** 38:4
46:16 72:11
124:2 153:24

**starts** 73:22
76:20

**state** 17:6,7,18
18:2,9,13 20:1,
8,16 21:14
24:18 29:2
33:15,17 39:21
62:16 91:14,15
93:6 95:16
110:20 125:16
126:5 131:15
144:16 146:5,
13,24

**stated** 7:8,12
35:3 110:8
154:1,24

**statement** 10:2,
11,17 24:11
33:21 41:11,12
51:4 59:5,7,8,20
60:18 61:3
65:18 81:23,24
100:20,23
108:24,25
109:9,10,12,16
110:9 123:24
145:20 156:22
157:15 158:9
159:11,25

**statements** 23:1
41:8,10,22
103:14 104:22
136:11 154:15

**states** 21:15
24:14 25:5
91:11,15 92:6

Cooke vs. American Family Life        Paul Amoruso, Vol. I        05/30/2014

93:8 111:10 116:23,24,25 117:11,14 132:4 134:12

**statewide** 22:13

**status** 158:24 159:4

**stay** 11:12

**stealing** 23:3

**step** 56:19 76:7, 13

**stepping** 67:25

**sticks** 151:3

**still** 7:10 20:11 21:3 23:25 29:7 35:14 36:25 69:21 79:12 90:11 91:3 93:12 133:19

**stone** 67:25

**stop** 35:8 80:24 130:7

**stopped** 128:1 159:4 165:24

**stops** 164:8

**story** 49:8 103:17

**straight** 56:6 80:10

**street** 13:8,22 16:10

**strictly** 45:12 111:21

**strike** 56:14 71:24 88:11 97:15 119:14 134:18

**strong** 41:2

**structure** 118:19 164:15

**submission** 157:21

**submit** 55:21 57:16 101:14 137:24 162:4

**submitted** 45:11 46:21 48:18 54:14 57:4 58:5 61:8 106:24 113:18 124:6 125:12 137:13 146:17 161:8 162:18

**submitting** 23:4 31:14 32:18 48:23 49:3 57:7 128:9

**subordinate** 84:4 87:9 105:15

**substance** 70:4

**substandard** 138:18

**substantial** 122:24

**substitute** 101:11

**such** 5:12 23:11 123:14 150:6

**summaries** 84:12

**summary** 66:1,5 68:20 69:9,11 70:5 82:11 83:12 84:23 85:2 87:16,21

**sun** 24:5

**supervise** 36:14, 16,17 44:23 47:22 48:3 83:18 103:5 104:20 139:16 165:2

**supervised** 36:21 71:5 85:23,24 140:5

**supervising** 86:3,9,13 139:9 141:7

**supervisor** 18:13 36:9 38:13 44:16 48:9 50:12,15,18 59:23 66:25 67:1,4 81:2 82:20 83:22,24, 86:25 87:2,8 103:19 117:25 118:1 129:4 132:1,17 139:25 140:11

**supervisors** 97:6 150:7

**supervisory** 104:9 165:20

**supplier** 134:1

**supply** 133:13

**support** 101:13

**supposed** 10:12 57:20,22 88:21 89:8,9 96:7 117:16 118:18 133:22 144:19, 20 146:4

**supposedly** 68:4 84:12

**sure** 8:3 17:13, 14 36:5 40:24 41:18 57:8 64:25 67:24 77:17 78:15 84:13 97:11 100:22 105:11, 12,14 113:9 119:21 132:15 144:13 145:2,13 146:3,10 167:20

**surrounded** 77:1

**surrounding** 33:3 162:12

**Susie** 23:3

**sworn** 5:4

**system** 14:23 30:5 31:13,14 34:25 108:6,10, 17 112:1 117:13

**systems** 16:1

---

**T**

---

**table** 127:3

**tailored** 107:6

**take** 8:16 20:24 29:19 63:5 69:11 77:15 83:23 90:7 93:9 98:8 106:2 108:23 134:16, 19 145:3 162:13

**taken** 5:6,9 35:24 91:16 109:3 168:6

**takes** 142:16

**taking** 20:12 21:4 46:24,25 144:20

**talk** 11:14 32:1
45:7 46:9,19
47:3,5 48:14
55:11 57:17,21
58:2 85:8 98:4,
11,22 106:10
168:19

**talked** 56:8
61:16 62:11
65:1 68:19 69:1
71:11 82:17,20
125:11

**talking** 10:10
12:2 18:15
20:22 21:13,14
27:20,21 40:10
41:19 42:25
43:1 44:18
46:11 48:25
56:21 87:5,6
98:11,13,23
104:5,7 105:4,5,
7 107:13 108:20
111:5 113:25
114:1 117:20,21
127:19 129:1
130:7,9,12,13
150:9,23 160:17
168:10

**target** 169:23

**taught** 127:21

**teach** 55:1 106:6,
7

**teacher** 98:5

**teams** 22:8

**Teika** 9:3,12
18:14 31:23
39:3,13 45:12,
13,14,18 47:1
49:8 50:3 51:15,

18 52:15 55:20,
24 56:2,23,25
57:7,14 58:3,17,
18,25 59:17,20,
25 60:6,8,14,15,
18,21 61:12,20
62:25 64:3
65:16,19,23,25
66:22 67:5
69:19,22 70:3,9,
10,19,20 71:16
72:11,12 78:21
79:1,9 80:18
97:9 98:12,17,
18 100:7,8
113:12 124:5
126:9 129:3,12
131:4 156:24

**Teika's** 45:14

**telephone**
103:25 106:16

**tell** 25:1 31:10
41:21 42:4
48:16 53:11
54:3 56:12 60:1
69:25 73:8,13
81:10 86:14
87:2 90:15
92:25 93:21
102:24 105:10
110:11 123:7
124:9

**telling** 27:23
28:14,19 29:8
54:16,20,22
69:8 71:4 74:17
75:23,24 76:2
94:8 96:1
104:12 164:16

**tells** 161:21

**temporarily**
169:7,16

**ten** 84:12

**term** 14:24
16:16 21:25
50:17 145:24
155:15,17
161:20

**terminated**
40:21,22,25
95:17

**termination** 41:1

**terms** 17:9,11
19:4 49:11 87:5
88:3 93:13
144:9 147:22
148:15 156:5
162:7

**testified** 5:4
60:22 79:8 85:5
109:14 126:18
128:10,13 131:5
134:25 135:8
139:15 141:11,
17 144:1 150:17
153:11 165:19

**testify** 50:1
62:18 128:17

**testifying** 65:22
137:12

**testimony** 8:16
59:17 83:3
92:18,22 96:3
99:22 104:21
112:12 128:16
131:8 132:4
139:8 140:1
141:4 147:16
148:13 153:21
155:19

**than** 7:16 28:24
29:17 30:1 33:3
35:18 37:25
41:7 42:1,3,9,22
44:8,24 46:16
50:13 58:2
71:23 72:20
76:12 80:16,25
82:18 87:9 93:1
96:8 98:2
103:15 105:16
108:13 112:5
114:17,25 123:2
126:21 135:1,9
137:14 150:25

**Thank** 138:5

**their** 7:21,25
15:17 18:9,21
19:2,5,6,13
20:4,25 21:8
22:24 24:2,7
25:16,18,19,21,
23 26:9,17 28:1
29:16,20 31:15,
16 32:3 34:1,10,
12 38:5 41:1,2
43:6 47:13
48:21,22 62:7
64:2 68:11,13
71:3,5 78:7
80:15 90:1
91:17 93:22
95:1,2,4 97:19
99:2,20,24
104:21 106:4
107:7,9 113:16,
17 114:4,24
116:22 117:14
118:2 125:6
127:24 133:4,16
143:8,14 145:3,

12,13 149:10,
12,19 157:10
161:12, 163:15
164:3,13 165:10
166:14 167:9

**them**  8:4,8 11:17
12:6 13:11,
14:15,17,25
19:15,20 23:2
27:12 28:9
29:25 30:1,7
32:2 33:16,17
35:3,25 37:7
40:21,25 43:5,7
45:22 46:10
48:25 58:2,7
60:3 61:2,7,9,
16,17,24 65:1
72:7,21 83:16
86:14,15 87:3
89:20 91:2,9
106:11 107:15
108:8,9 118:20
119:1 125:25
126:13 127:17
130:3 137:16,17
138:9,10,11
139:5 143:9
144:19 147:25
148:9,10
156:12,15
162:17 164:2,
14,20 165:2,12,
15 166:13
167:3,22

**theme**  162:24

**themselves**
91:17 160:4

**there's**  17:17
19:7,14,15 20:4
26:8,14 32:19,

50:24 55:15,16,
25 58:19 76:18,
19 92:17 130:16
143:12 153:20
158:10 160:3
163:25 164:18
167:6,24

**therefore**  56:3
75:19 88:20,21
128:20

**thereof**  50:3

**they'd**  89:24
118:25 119:1

**they'll**  93:9

**they're**  13:5,6,19
15:20 16:10,18
18:23 20:17
21:4 26:15
29:17 31:10,11
32:22 33:2,14
47:13 54:11,
73:12 90:6
97:18 99:6,19
128:11 143:14,
15 146:3,4
163:9,23 164:5
165:11 166:15,
16

**they've**  22:11
138:12 165:10

**thick**  41:24

**thing**  19:8,9
29:14 59:25
65:11 73:7,25
75:16 76:11
77:2 78:12 80:4,
20 86:14 120:3
129:23 138:25
157:5 164:7
165:22

**things**  16:21
32:2 34:15,23
35:1,6 36:24
37:1 57:5,17
59:14 62:6 64:3
68:6 72:19
74:13 89:9 90:4
103:22,23 104:1
110:6 125:22
142:15 144:18
151:1 152:11,13
156:9 164:13

**think**  8:9 12:10,
23 13:18 15:10
16:18 20:11
21:8 23:25 29:7,
13,19 36:9,21
37:1 39:22,24
40:17 42:15,17
45:7 47:9,18,19
48:7,11 49:15,
23 50:1 52:2
58:6 59:2 61:9,
15 62:14 63:4
65:7 66:25
79:17,18,19
81:13,18,22,24
85:5 102:23
103:19 104:10
108:18,20 112:8
117:10,11,13
118:6 120:20,25
121:10 132:6
133:3,17 134:2
141:21 143:5
152:6 153:10,11
154:6,8,17
156:9 161:22,25
162:5 163:2
164:3,5 165:18,
19 168:5

**thinks**  26:8

**third**  10:16
122:23 150:4

**though**  123:19
138:15 154:19

**thought**  25:4
43:16 59:5
82:24 85:11
103:24 116:13
131:19

**thousand**  134:6

**three**  6:15 31:21,
25 47:5 81:23
126:22 150:2
152:19

**through**  33:18
45:6,21 48:12
62:3 63:14
64:16 65:11
70:20 78:7
108:6 109:7
112:5 114:15
117:2,4,7
119:12,21
126:18 128:20
153:23 155:9

**throughout**
66:20 105:19

**throws**  74:5
142:17

**time**  5:12 9:3
29:11 40:8
45:11 53:15,18
61:8 63:15
64:17,23 67:7
69:16 71:1
77:16,19 79:25
80:13, 82:15,22
83:25 84:16
89:4,22 91:5,25

92:19 95:25
97:3 105:19
113:16 122:8
123:3 152:11
158:13,20
159:15,16,19
**times** 43:13
58:21 79:20
93:9
**tired** 77:19
**title** 17:15
**titled** 115:13
**titles** 17:24 19:5
**today** 21:9 33:22
37:5,14 41:5,20
56:8 67:21 69:1,
21 81:7 90:3
91:11 114:9
128:17 133:18
**together** 12:25
**told** 11:11 57:16
59:15,23 103:14
104:23 110:5
119:22 125:13,
14 131:17
156:4,7 157:11
159:1,2,20
161:10,11,15
**Tom** 6:3 11:11
**too** 11:17 13:18
49:2 54:9
**took** 44:2 47:1
61:24 62:8
84:20 88:5
105:16 112:1
**Torisello** 47:22,
25
**Torsiello** 36:19
**totally** 19:4,7

122:16 123:1,3
**touched** 126:19
168:5
**towards** 97:15
**track** 100:19
**trail** 130:6
**train** 44:15,22,
23 48:6 83:9
87:20 103:4,22
104:20 139:5
**trained** 43:23
44:3 48:6 86:18
107:25 108:20
138:21
**trainer** 17:7
**training** 83:17,
20 87:6 88:3,14
104:25 105:5,9,
18 106:1,5,22,
23 107:12,17
123:8 149:13
164:3
**transaction**
116:14
**transcribed** 59:6
**transcript** 6:12
9:16 14:2 60:14,
16 62:17,21,22
65:17,19,23
81:4 82:10
102:15 109:19
115:17
**transcripts**
124:19,20
**transfer** 81:14
**transmit** 125:1
**transmittal**
124:25

**Trevor** 67:22
68:18 69:1,17
70:3 71:23
78:22 81:17
131:24 132:4,
11,17 151:10
152:4 153:2,9
**trial** 109:14
**tried** 65:12 98:7
**trouble** 7:14
62:4
**true** 56:4 58:10
88:13 106:20
135:17 159:25
**truthful** 163:21
164:1
**try** 8:13 13:19
**trying** 55:22
65:10 77:13
103:15 110:2
135:10 159:7
162:1
**tunnel** 23:17
**tunneled** 31:17
**turn** 6:15 33:17
51:16 95:13
110:1 121:7
137:20
**turned** 33:13
62:1 163:19
**twice** 47:10
94:22,24 95:6,9,
15 138:13
**two** 8:9 16:20
20:23 30:16
31:7,21 33:24
38:1 46:24 47:4
55:16 57:17
59:18 72:16,24

85:8 97:6
108:19 111:4
125:21 126:20
128:24 147:7,20
152:19 157:9
159:1 161:11
168:12
**two-part** 164:22
**two-sided** 93:6
143:5
**type** 12:21 15:20
**typed** 69:14,16

---

**U**

---

**U.S.** 124:9,10
138:7
**ulterior** 43:5
**ultimately**
132:23
**unable** 122:23
**unaffected**
159:20
**under** 5:8 18:9
24:5 29:21
48:19 58:7 73:3
75:10 90:18
96:24 99:25
100:10 113:4
125:13 145:10
**understand** 8:20
9:21 10:2,7,11,
17 13:9 15:2
17:5 18:23
19:14 21:24
33:25 34:2
46:14 47:7
49:24 82:6 90:9
97:16 100:1
105:13 106:3,14

114:13 119:15,
16,19 144:22
157:23 158:9
165:11

**understanding**
7:6 10:12 11:21
13:2 18:1,18
20:11,15 21:7,
10 22:19 24:13
40:12 49:7,13
68:25 69:7 83:4
84:6 95:20 96:9,
11 97:14, 98:25
108:2 116:19
132:23 133:1

**understands**
116:16

**understood** 57:5
58:6 82:14,16
83:14 162:7

**underwriters**
32:13,14

**underwriting**
32:12 113:17
168:19

**uniformly** 151:6

**uninvolved** 68:4

**union** 12:6
114:15 116:5,6,
11,18 117:4,5,7,
12

**unions** 19:24

**unit** 21:25 22:7,
26:20,22,23,24
28:2,9,12,16

**unit's** 25:10

**United** 111:10
116:23,24,25
117:10,13
134:12

**units** 22:6 23:18
25:7 29:24

**unknowledgeabl
e** 85:15

**unpayable**
100:13

**unsuspecting**
43:4

**until** 5:12 17:20
18:22 21:6 57:9
136:16 139:1

**untruths** 125:25

**up** 7:9 11:12
14:22 15:25
16:3 19:16
22:25 23:9 25:6
26:13,15 28:2,
24 29:22 30:5
31:15 39:19
49:11 50:3
51:16 60:4 61:8
62:1 69:14,16
70:13 71:2
79:23 90:2
108:18 114:1
144:14 146:11,
12 147:3,5,13,
17,18,23 148:5,
15,25 149:2,14
154:11 155:8
158:23 163:6,19

**upon** 91:17
114:18 169:19

**us** 53:3 58:4 62:9
149:15,16

**use** 8:10,13 12:8
13:16 26:19
34:6 67:25 71:9
142:24 161:20

**used** 5:13 33:15
50:17 119:2
165:9

**using** 14:24
17:11 124:25

**usual** 14:18 26:4
29:17 31:4
90:18,22 139:24
144:12 150:17
163:5

**usually** 10:21
20:5 101:25
119:7

---

**V**

---

**vague** 143:17

**valid** 73:19 74:1
75:2,17 76:11
77:3 78:5 80:9

**value** 42:22

**varies** 93:10

**various** 21:10

**venture** 114:14,
18

**Vermont** 144:16

**version** 94:8

**versus** 15:19,21
87:1 168:21

**very** 31:3 41:19
42:17 46:2,7
49:23 78:12
80:4 86:22
106:13 149:18
152:16 164:4

**vice** 152:10

**violated** 163:5

**violation** 90:19

**Virginia** 24:25

**vision** 31:18

---

**W**

---

**wages** 123:13

**wait** 21:5 32:16
36:10,16 45:17
50:8 55:24 80:8,
24 152:22 153:6

**waiting** 17:20
18:5 87:15

**waiving** 5:22

**walk** 108:7
167:16

**walked** 167:5

**want** 5:17,19 6:4
11:11,13 14:25
16:8 19:2,20
28:9 30:4,7
33:16,17,21,22,
34:23 41:18
52:5,20 67:23
71:21 92:15
98:9 102:3,19
103:20 110:1
118:25 122:4
123:10 139:16
144:5 149:15,25
166:15 169:13

**wanted** 107:9
117:12 137:17

**wants** 15:7

**Washington**
25:2 54:12 58:8

**wasn't** 43:1,23
48:6 53:1 54:13
55:23 57:19,21
63:15 64:2 68:6,
7,8,9 69:4

Cooke vs. American Family Life          Paul Amoruso, Vol. I                    05/30/2014

72:15,16 74:2
78:23 82:16
83:15 85:8 89:6,
7 94:10 100:15
107:21,25
111:15 129:9,11
132:17 133:16
135:11 152:25

**water** 37:20

**way** 35:1 36:23
46:24 69:14
78:9 86:18
106:15 113:7
114:9 117:1
122:10 166:21

**Wayne** 101:4,8
102:18,19,21
120:1,2

**Wayne's** 101:9

**we'll** 11:18
38:10,12 44:6
102:22 121:4
122:22 124:19
135:14 147:2
168:4 169:15

**we're** 5:22 8:4,7
11:8 32:17
41:18,19 44:18
46:6 56:7 89:22
90:25 95:3
98:23 113:25
123:24 130:7
150:23 163:3
169:14

**we've** 92:12
104:13 138:24
153:23

**week** 55:2 69:11
96:21

**Weiman** 101:6

**well** 10:7 11:10
16:20 17:10
21:13 25:14,
27:20 34:19
35:22 37:4,7
45:21,24 46:3,
24 47:12 50:1
52:14 53:18
54:7 55:13 56:1,
12,20,21 57:9
58:10 63:21,23
66:19 67:23
73:8 81:10,22
82:2 83:12
88:11 93:21
96:1 97:5,15
101:22 102:11
108:13 115:22
116:8 118:9
119:5,10 120:19
121:4,19 126:9
129:7 133:19
134:2 137:11
142:3 147:10
155:1 156:11,20
158:5 167:19

**went** 49:8 57:13
62:3 63:14
64:16 70:19
76:23 85:14
125:9 126:18
152:2

**were** 9:2 27:17
30:5,6 33:4
40:22 42:24,25
43:1,7 46:13
48:5,18,23 49:3
51:23,24,25
53:19,23 61:14,
19,25 62:1,6

63:19,22,25
64:2 66:7 68:1,
2,11,13 71:6,7
72:10,19 73:1,4
75:1 76:14 79:5,
7 80:2 89:9
95:21,22,23
96:4,6 99:10,13,
23,24 102:4
105:12 107:8
109:4 111:25
112:18,24
114:5,25 115:2
118:1,10 119:11
121:3 125:22,23
126:21,22
127:19 129:2,7,
16 130:2,22
131:21 133:15
136:12,24 137:7
138:20 140:10,
21 143:1,4,7,11,
21 146:11
147:7,8,16,18,
20 148:12,14
149:6,10,11,18
150:12,14
152:3,16,20,22
153:1,9,12,13,
14 157:2,10
160:4,7,8 161:7,
25 162:3,4,8,11,
18 164:7,13
166:22,23,24,25
167:6,7,21

**weren't** 112:19
148:11

**what's** 7:6 44:8
47:23 68:16
70:5 80:9 88:7,
23 103:7 119:25

121:9 168:20
169:25

**whatever** 11:10,
13 14:25 19:20
29:19 59:16
63:25 159:20
166:16

**whenever**
154:11

**Whereupon** 5:2

**wherever** 156:25

**whether** 6:19
24:22 25:5,11,
13,17,22 27:5
33:8 40:2,3 47:9
58:25 61:2
62:11 68:9
72:22 73:12
74:20,21,22,25
75:9 77:3,6
79:12,13 81:11
96:12 99:8,12
105:22 109:11,
14 111:11 112:3
113:6 119:2,6
123:17 132:11
133:8 146:13,23
154:4,6,14
158:11,19
159:14,18
169:21

**which** 11:2 39:4,
19,23 40:10,15
41:5,22 42:4,5,
6,8,14,18 43:1,8
49:21 51:14,16
55:22 57:5,22
72:25 81:20,25
88:7 101:16
110:22 112:9
113:13 121:19

122:23 128:16
133:5,6,7,16
135:23 136:11
138:19 141:15

**while** 7:8 61:24
70:13 110:22
112:13 147:3
148:25

**who** 18:13 19:10
31:13 33:10,18
34:12,22 36:6,
16 41:9 43:3,4
44:17 45:9,10
47:22 49:10
51:1 53:21 54:5
57:12,13 65:15
66:20 67:9 70:6
73:2 98:1 99:23
103:11,21
104:22 111:2
114:1 116:16
117:14 138:20
152:8,16,17
157:2 163:11,21
167:22

**who's** 6:3 54:8
85:13 95:4
103:10

**whole** 20:2 34:1
76:24 85:1
135:7 138:25
155:13 165:1
166:14

**whose** 39:2
42:18

**why** 30:25 31:11
39:25 41:18
49:6 50:18,20
51:1,4 53:6,16
54:4 55:10
57:17,20 63:18,

20 64:7,11
67:20,21,22
69:20,21 70:23
73:9,13 75:5,13
78:15 85:7
95:17 108:22
111:7 120:14
124:4,23 131:15
135:19 137:8
143:7,17,
153:20 156:24
157:17 160:23
167:10

**wife's** 98:5

**will** 5:5 8:13
13:7 20:14 29:9
33:12,18 37:12
55:2 66:17
96:23 97:16
98:8 102:5
123:1 136:25
139:18 141:12

**willing** 37:6

**win** 137:2

**wire** 80:20 81:14
124:25 125:1

**with** 6:4,6,19 7:2
8:3,23 9:18
11:12 12:4,14,
25 13:3,13 14:5
15:11 17:9,10,
15 19:1,2,12,13
20:25 21:2,18,
21 23:12,15
24:2,3,6 26:8
27:16 28:6,14
30:23 32:7
35:11 38:4,10,
12 40:13 44:7
47:15,20 48:13
49:5,6 55:5,21

56:10,24 59:17
61:12 62:18
64:19 65:3
70:14 71:2,16
72:4,11,20
73:22 74:3 77:1,
23 80:10 84:14
86:6,16 90:7,23
91:6,9,13 92:1,
20 94:18 104:5
105:20 106:11
111:18 116:11
117:24 124:2
127:13 128:4,22
129:1 130:13
131:18 133:2,17
136:6,17 138:22
139:4,18,19
144:25 145:11
148:4,9 150:19
152:3 153:24
154:17,24
158:16 159:22
160:5 161:6
162:16,17
164:2,18 167:7,
22

**withdrawn**
63:18 125:22

**within** 55:11
169:20

**without** 45:19
57:12 60:7
90:19 98:10
108:1 120:6
138:18 141:19
145:1 148:17,21

**witness** 8:10
11:16 36:12
41:15 66:14
77:18 79:7 87:1,

9 100:25 101:4,
9,21,25 111:20
112:10,13 116:6
121:2,21,23
122:1 138:12,15
160:9 165:21

**woman** 43:3
50:19 52:25

**woman's** 50:16

**women** 157:10

**wondering** 135:1
142:4

**word** 8:10 13:16
34:6 117:5
145:4

**words** 95:3

**work** 12:7 30:8
63:15 96:22,25
97:17 99:1,10,
13,19,23 100:8
122:25 139:23
141:7 158:12,
13,20 159:15,
16,19 161:18

**worked** 16:24
84:11 138:7,9,
10,11

**working** 23:20
44:16 75:10
83:16 101:14
105:20 108:3
109:11

**works** 19:1
116:12

**world** 32:13
145:25

**worse** 104:11

**worst** 45:5

**worthless** 43:7

100:16

**wouldn't** 13:16
24:24 30:7 43:6
81:7,8 120:12
126:1 131:11
154:21 155:12
167:11,19,20

**wrapped** 108:18

**write** 14:23
31:21

**writing** 14:23
51:3 109:10

**written** 14:15
33:21 70:5 92:9
103:25

**wrong** 23:22
26:8 27:3,16,18
32:1 34:15 35:2,
3 41:4 52:22
55:21 57:13,16,
22 63:19,22
64:2 72:19
120:2 127:25
137:7 145:1
151:21 152:7,
20,24,25 164:14
167:7

**wrongdoing**
22:16,17 127:13
128:8,22

**wrongdoings**
22:9

**wrote** 157:7

---

**Y**

---

**yeah** 13:11 42:23
63:5 66:7 69:10,
13 72:21 77:17
78:16,17 83:6

89:24 97:10
118:22 132:19
136:14 138:9,
142:12 151:16,
22 158:1 165:21

**year** 101:12,16
120:7,8,11
138:14 145:5

**years** 8:12 11:17
16:24 27:12
29:25 84:12
85:14 89:21
142:15 144:2
145:21 167:6

**yesterday** 65:12

**yet** 18:5 37:3,11
50:24 51:2
62:17 66:2
70:17 140:11

**you'd** 12:12
67:24 107:1,2
112:11 121:7

**you'll** 110:1
138:25 150:1

**you're** 7:16 8:17
12:16,18 16:1
17:3 19:13
20:11,22,24
28:13 29:7
30:23,24 33:1
36:19 37:15
38:18 40:10
44:22 48:16
49:15 55:6,17
59:10 65:22
66:12 69:7
71:15 75:23
76:2 77:13,15
79:23 81:15,25
84:4 86:2,9,12

87:19 92:24
93:13 94:8
95:12,14 96:1,7,
19,20,25 97:18
98:3 101:2,15
105:4 106:10
108:2 122:9
129:1 135:14
136:19 137:8
138:2 140:1
142:13 143:20
144:18,19,20,21
147:15 148:23
151:4,8 153:2
157:13 158:15
159:6 162:25
168:10

**you've** 21:24
32:2,13 34:12
54:7 59:16
72:12 75:3 80:8
83:21 85:18
93:3,7 102:16
108:14 120:20
132:10 138:7,11
167:12,13

**Young** 11:7
33:25 35:12
36:3 37:22 38:2
44:9,10,19 61:6
89:11,13 95:22
96:2 103:4
104:6,7 105:5,7,
8 108:21 119:8
139:4,8 140:11
141:6 144:1
145:11 154:24
155:2 162:23
164:17,21

**Young's** 14:6
45:12 103:13

139:10 146:15
164:18 165:13

**yourself** 107:2